IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DENNIS TROYER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| THOMAS HENEGHAN, OLIVIER ) | Case No. |
| LIVOLSI, PORTFOLIO ) | |
| MANAGERS, INC., and ) | |
| NATIONAL FUTURES ) | |
| ASSOCIATION ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

COMES NOW Plaintiff, Dennis Troyer, by and through his undersigned attorney, and for his complaint against Defendants, Thomas Heneghan; Olivier Livolsi; Portfolio Managers, Inc.; and National Futures Association now states as follows:

## JURISDICTION AND VENUE

1. This court has jurisdiction pursuant to 28 U.S.C. §§1331, 1332 and 7 U.S.C. §§13a-2(2), 25(c).

2. Venue is proper in this judicial district under 28 U.S.C. §1391(b)(ii) and 7 U.S.C §13a-2(4) because a substantial part of the events giving rise to Plaintiff's claims occurred within this district.

## PARTIES

3. Dennis Troyer ("Troyer") is a resident of LaGrange County, Indiana, which is within this judicial district.

1

4. National Futures Association ("NFA") is the only registered futures association established pursuant to 7 U.S.C. §21.

5. Portfolio Managers, Inc. ("PMI") is a for-profit corporation incorporated in the State of Illinois. PMI was an introducing broker registered with the NFA until permanently barred from membership on or about February 26, 2016.

6. Thomas Heneghan ("Heneghan") was last known as a resident of Los Angeles County, California, who has worked as an NFA associate member and as an associated person for various introducing brokers registered with NFA since the mid-1980s, until being permanently barred from NFA membership on or about March 14, 2016.

7. Olivier Livolsi ("Livolsi") is believed to be a resident of Los Angeles County, California who worked as an NFA associate member for less than one year.

## FACTS RELEVANT TO ALL CLAIMS

8. On or about January 8, 2007, while registered as an NFA associate member, Heneghan became registered as an associated person ("AP") of Statewide FX Inc. ("Statewide FX"), an introducing broker registered with NFA.

9. Statewide FX acted as an introducing broker for Vision Financial Markets LLC ("Vision"), a futures commission merchant and commodity pool operator registered with the NFA. At Heneghan's request, Troyer opened a commodities trading account with Vision.

10. On or about December 24, 2009, at Heneghan's request, Troyer issued a check in the amount of four thousand dollars ($4,000.00) to Vision to purchase five (5) futures contracts on the Japanese yen.

11. On March 18, 2010, Heneghan's registration with Statewide FX was terminated.

11. However, at Heneghan's request, Troyer continued to purchase commodities futures contracts through Statewide FX in his account at Vision. Heneghan instructed Troyer to work with Livolsi, who was registered as an associated person of Statewide FX from November 4, 2009 to September 1, 2010.

12. On or about March 22, 2010, Troyer issued a check in the amount of ten thousand dollars ($10,000.00) to Vision by mailing it to Livolsi at Statewide FX for the purpose of purchasing commodities futures contracts.

13. On or about March 29, 2010, Troyer issued a check in the amount of four thousand, five hundred dollars ($4,500.00) to Vision by mailing it to Livolsi at Statewide FX for the purpose of purchasing commodities futures contracts.

14. On or about April 6, 2010, Troyer issued a check in the amount of twenty thousand dollars ($20,000.00) to Vision by mailing it to Livolsi at Statewide FX for the purpose of purchasing commodities futures contracts.

15. On or about April 19, 2010, Troyer issued a check in the amount of eighteen thousand dollars ($18,000.00) to Vision by mailing it to Livolsi at Statewide FX for the purpose of purchasing commodities futures contracts.

16. On or about May 17, 2010, Troyer issued a check in the amount of five thousand dollars ($5,000.00) to Vision by mailing it to Livolsi at Statewide FX for the purpose of purchasing commodities futures contracts.

17. On or about July 6, 2010, Troyer issued a check in the amount of fifteen thousand dollars ($15,000.00) to Vision by mailing it to Livolsi at Statewide FX for the purpose of purchasing commodities futures contracts.

18. On or about August 4, 2010, Troyer issued a check in the amount of nine thousand, one hundred twenty-five dollars ($9,125.00) to Vision by mailing it to Livolsi at Statewide FX for the purpose of purchasing commodities futures contracts.

19. Throughout this time, Troyer received monthly statements from Vision which showed he held numbers futures contracts in currencies and commodities. In addition, Heneghan repeatedly assured Troyer the value of his account was increasing.

20. On or about December 9, 2010, unbeknownst to Troyer, NFA issued a Complaint charging Statewide FX and several of its principals with making deceptive and misleading sales solicitations.

21. On or about July 28, 2011, unbeknownst to Troyer, NFA terminated Statewide FX's registration and ordered it to never reapply for NFA membership or act as a principal of an NFA Member.

22. On or about September 11, 2013, unbeknownst to Troyer, NFA filed a complaint against Vision alleging it had facilitated a commodity trading adviser in misappropriating customer funds related to trade allocations.

23. On or about June 20, 2014, unbeknownst to Troyer, Vision was ordered to pay a $1.5 million fine and $2.053 million in restitution to its customers. Vision was also ordered to withdraw from NFA membership.

21. On March 18, 2010, while registered as an NFA associate member, Heneghan applied for registration with Atlantis Trading Corp. ("Atlantis"), an introducing broker registered with the NFA. NFA approved Heneghan's registration with Atlantis as an AP and principal.

22. On or about March 29, 2010, at Heneghan's request, Troyer opened an account with Peregrine Financial Group Inc., d/b/a "PFG Best" ("PFG"), an introducing broker registered with the NFA.

23. Although Heneghan had been registered with PFG from January 22, 1999 to July 27, 2001, he was not registered with PFG as an AP at that time.

24. On or about March 29, 2010, Troyer issued a check in the amount of four thousand, eight hundred dollars ($4,800.00) to PFG for the purpose of purchasing seven hundred and eighty (780) contracts on coffee futures on Heneghan's recommendation. Troyer mailed the check to Heneghan's attention at PFG's address in Chicago, Illinois.

25. On or about April 12, 2010, Troyer issued a check in the amount of nine thousand dollars, five hundred dollars ($9,500.00) to PFG by mailing it to Heneghan's attention at PFG's address for the purpose of purchasing commodities futures contracts.

26. On or about June 10, 2010, Troyer issued a check in the amount of eight thousand dollars ($8,000.00) to PFG by mailing it to Heneghan's attention at PFG's address for the purpose of purchasing commodities futures contracts.

27. On or about June 30, 2010, Troyer issued a check in the amount of seven thousand, three hundred dollars ($7,300.00) to PFG and overnighted to Heneghan's attention for the purpose of purchasing commodities futures contracts.

28. On or about August 24, 2010, Troyer issued a check in the amount of three thousand, nine hundred dollars ($3,900.00) to PFG and overnighted to Heneghan's attention for the purpose of purchasing commodities futures contracts.

29. On or about October 13, 2010, Troyer issued a check in the amount of five thousand dollars ($5,000.00) to PFG and overnighted to Heneghan's attention for the purpose of purchasing commodities futures contracts.

30. Throughout this time, Troyer received monthly statements from PFG which showed he held numbers futures contracts in currencies and commodities. In addition, Heneghan assured Troyer the value of his account was increasing.

31. On or about May 5, 2012, Heneghan's registrations with Atlantis were terminated.

32. On or about July 10, 2012, unbeknownst to Troyer, the Commodities Futures Trading Commission ("CFTC") filed a complaint against PFG and its owner, Russell Wasendorf, Jr. ("Wasendorf") alleging fraud, misappropriation of customer funds, violation of customer fund segregation laws, and making false statements.

33. On or about August 13, 2012, unbeknownst to Troyer, Wasendorf was indicted on 31 counts of lying to regulators. It was alleged he stole as much as $215 million from PFG's clients over a 20-year period.

34. On or about February 13, 2013, unbeknownst to Troyer, the CFTC issued an order permanently barring PFG and Wasendorf from the industry.

35. On or about October 16, 2012, while registered as an NFA associate member, Heneghan applied for registration as an AP with PMI and NFA approved the registration.

36. Prior to applying with PMI, Heneghan had been registered with thirteen (13) different NFA member firms over a twenty-seven (27) year period.

37. According to NFA's own records, with the exception of PFG, which was facing charges of fraud, misappropriation of customer funds, violation of customer fund segregation laws, and making false statements, none of the firms with whom Heneghan had previously been

registered were still in business at the time he applied with PMI. Furthermore, in addition to PFG and Statewide FX, many of those firms had been accused of serious violations.

38. At some point in 2013, while registered as an AP of PMI, Heneghan encouraged Troyer to participate in a new commodities trading program. Heneghan told Troyer the program was set up under his (Heneghan's) trading account in order to avoid account maintenance fees and additional commissions. As a result, Heneghan instructed Troyer to issue checks directly to him so he could deposit them into the program. However, Heneghan assured Troyer his funds would be segregated into separate sub-account.

39. On or about April 1, 2013, Troyer issued a check in the amount of four thousand, two hundred dollars ($4,200.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

40. On or about April 16, 2013, Troyer issued a check in the amount of three thousand, seven hundred dollars ($3,700.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

41. On or about June 21, 2013, Troyer issued a check in the amount of nine thousand, eight hundred dollars ($9,800.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

42. On or about February 12, 2014, Troyer issued a check in the amount of eight thousand dollars ($8,000.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

43. On or about March 20, 2014, Troyer issued a check in the amount of two thousand, four hundred dollars ($2,400.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

44. On or about June 24, 2014, Troyer issued a check in the amount of twelve thousand, three hundred dollars ($12,300.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

45. On or about August 22, 2014, Troyer issued a check in the amount of eight thousand dollars ($8,000.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

46. On or about October 10, 2014, Troyer issued a check in the amount of eleven thousand dollars ($11,000.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

47. On or about December 10, 2014, Troyer issued a check in the amount of one thousand, seven hundred dollars ($1,700.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

48. On or about February 20, 2015, Troyer issued a check in the amount of three thousand, nine hundred dollars ($3,900.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

49. On or about April 8, 2015, Troyer issued a check in the amount of seventeen thousand dollars ($17,000.00) payable to Heneghan for the purpose of purchasing commodities futures contracts through the program.

50. Throughout this time, Heneghan repeated assured Troyer his futures contracts were performing well and that the value of his account was growing. In fact, in 2015, Heneghan informed Troyer the value of his account exceeded five hundred thousand dollars ($500,000.00).

51. At some point in 2015, Troyer instructed Heneghan to close out his account and wire the funds to him.

52. However, Heneghan repeatedly made excuses as to why he could not transfer the funds to Troyer.

53. Eventually, Troyer realized Heneghan had no intentions of returning any of his funds. As a result, Troyer filed a complaint against Heneghan with the CFTC.

52. In addition, Troyer, through his counsel, contacted Amanda Murphy ("Murphy"), President and CEO of PMI, to notify the firm that its AP, Heneghan, was refusing to return the funds contained in his trading account.

53. At Murphy's request, Troyer instructed his counsel to provide PMI with copies of the canceled checks issued to Heneghan while he was registered with PMI.

54. However, PMI refused to acknowledge Troyer's claims and, instead, alleged his payments to Heneghan were intended for wagers on sporting events.

55. On or about December 21, 2015, NFA filed a complaint against PMI, Heneghan, Murphy, and two additional APs of NFA who worked with Heneghan in PMI's Los Angeles ("LA") branch office.

55. According to the complaint, NFA had begun an exam of PMI in November of 2014, and:

> 8. Heneghan, who, as previously alleged, was an AP at the LA branch, had also worked at several firms which were the subject of prior disciplinary actions brought by this Committee for sales practice fraud. Like [another AP defendant], Heneghan had also worked at Statewide. Prior to that, Heneghan had worked at a number of different firms, including Siegel Trading Co., another firm which was permanently barred from NFA for sales practice fraud. Additionally, Heneghan worked at Jack Carl Associates, Inc. and Trading Centers of America, Inc., two other firms which were the subject of disciplinary Complaints by this Committee.
>
> 9. In the course of its exam of PMI, NFA reviewed customer activity statements and tax forms for the various branch offices. NFA's review revealed that between October 2012 and August 2015 all but two of the LA branch office's 68 customers lost money, totaling about $1.2 million, and paid over $660,000 in commissions. Additionally, many of these accounts had commission to equity ratios equal to or

exceeding 20% and traded both outright long options and option spreads, which may be indicative of abusive trading practices.

56. Specifically, with regard to Heneghan, the NFA's complaint alleged:

> 22. NFA's review of the customer trading activity showed that 97% of PMI's LA branch customers had net losses and that 98% of all Heneghan's customers had net losses and, on average, lost 94% of their investment. NFA's review also found that Heneghan routinely made misleading and deceptive sales solicitations that downplayed the impact of commissions on profitability; exaggerated profit potential and minimized risk of loss; and failed to disclose that 97% of PMI's LA branch customers lost money trading with PM.

57. With regard to Murphy, the NFA's complaint alleged she failed to adequately supervise the LA branch office to ensure it complied with NFA's sales practice rules. NFA also faulted Murphy for failing to apply heightened supervision to Heneghan, given that he had previously worked for NFA firms that had been disciplined.

## COUNT 1

### Violation of the Commodity Exchange Act

58. This count is pled against Heneghan.

59. Pursuant to 17 CFR §4.30(a), it is unlawful for a commodities trading advisor to solicit, accept or receive from an existing or prospective client funds, securities or other property in the trading advisor's name (or extend credit in lieu thereof) to purchase, margin, guarantee or secure any commodity interest of the client.

60. Between April 1, 2013 and April 8, 2015, Heneghan solicited and accepted eighty-two thousand dollars ($82,000.00) from Troyer in Heneghan's own name for the purpose of purchasing commodities futures contracts for Troyer.

61. As a result of Heneghan's violation of 17 CFR §4.30(a), Troyer suffered financial and emotional damages.

62. 7 U.S.C. § 25(a) provides that any person who violates the Commodities Trade Act shall be liable for actual damages caused by the violation.

WHEREFORE, Troyer prays this Court enter judgment in his favor and against Heneghan, including an award of the following damages:

    A.    compensatory damages for the financial and emotional injuries caused by these violations;

    B.    prejudgment interest from the date he made issued each payment to Heneghan;

    C.    reasonable attorneys' fees, costs, and litigation expenses; and

    D.    any other relief this Court deems just and appropriate.

## COUNT 2

### Violation of the Commodity Exchange Act

63. This count is pled against Heneghan and Livolsi.

64. Pursuant to 7 U.S.C. § 6b(a), it is unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery for or on behalf of any other person to cheat or defraud or attempt to cheat or defraud the other person or willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract.

65. Pursuant to 7 U.S.C. § 6b(e), it is unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any registered entity, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery (or option on such a contract):

    (1) to employ any device, scheme, or artifice to defraud;

    (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

11

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

66. Heneghan repeatedly provided Troyer with false and misleading information to induce Troyer into alleging entering into commodities futures trade.

67. Specifically, Heneghan falsely led Troyer to believe he was still registered as an associated person of Statewide FX in order to induce Troyer to continue purchasing commodities futures contracts through that firm after Heneghan's registration had been terminated.

68. Livolsi knowingly and willfully aided and abetted Heneghan in inducing Troyer to continue purchasing commodities futures contracts through Statewide FX by accepting checks issued by Troyer at Heneghan's direction.

69. Heneghan also falsely led Troyer to believe he was registered as an AP of PFG in order to induce Troyer to purchase commodities futures contracts through that firm even though he was not registered with PFG at that time.

70. Heneghan further falsely led Troyer to believe he had established a trading account through which he would make commodities futures trades for Troyer and that he would maintain a segregated sub-account for Troyer to induce Troyer to issue checks payable directly to him.

71. Furthermore, Heneghan repeatedly and falsely assured Troyer his commodities futures contracts were successful and that the value of his account had grown to over five hundred thousand dollars ($500,000.00).

72. As a result of these fraudulent acts, Heneghan induced Troyer to invest at least two hundred six thousand, one hundred twenty-five dollars ($206,125.00) in commodities futures contracts.

73. Of that amount, eighty-one thousand, six hundred twenty-five ($81,625.00) resulted from Livolsi's aiding and abetting of Heneghan's fraudulent scheme to encourage Troyer to continue trading through Statewide FX after Heneghan was no longer registered with the firm.

74. 7 U.S.C. § 25(a) provides that any person who violates the Commodities Trade Act shall be liable for actual damages caused by the violation.

WHEREFORE, Troyer prays this Court enter judgment in his favor and against Heneghan, including an award of the following damages:

A. compensatory damages for the financial and emotional injuries caused by these violations;

B. prejudgment interest from the date he made issued each payment to Heneghan and Livolsi;

C. reasonable attorneys' fees, costs, and litigation expenses; and

D. any other relief this Court deems just and appropriate.

## COUNT 3

**Vicarious Liability under the Commodity Exchange Act**

75. This count is pled against PMI and NFA.

76. Pursuant to 17 CFR § 1.2, the act, omission, or failure of an agent or person acting for any association or corporation within the scope of his employment or office shall be deemed the act, omission, or failure of such association or corporation.

77. At all times relevant to this complaint, Heneghan was registered as an "NFA Associate Member" and was acting within the scope of that office when he perpetrated the illegal and fraudulent acts on Troyer.

78. Heneghan was an associated person for PMI from October 16, 2012 to April 15, 2015 and was acting within the scope of that employment when he perpetrated the illegal and fraudulent acts on Troyer.

WHEREFORE, Troyer prays this Court enter judgment in his favor and against the NFA and PMI, including an award of the following damages for their vicarious liability for Heneghan's actions:

- A. compensatory damages for the financial and emotional injuries caused by Heneghan's violations of the Commodities Act;
- B. prejudgment interest from the date he made issued each payment to Heneghan;
- C. reasonable attorneys' fees, costs, and litigation expenses; and
- D. any other relief this Court deems just and appropriate.

## COUNT 4

### Failure to Enforce the Commodity Exchange Act

79. This count is pled against NFA.

80. Pursuant to 7 U.S.C. §25(b) (2), a registered futures association that fails to enforce any bylaw or rule that is required under 7 U.S.C. §21 shall be liable for actual damages sustained by a person that engaged in any transaction specified in 7 U.S.C. §25(a) to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaw or rule.

81. Pursuant to 7 U.S.C. §21(b)(3)(D), the rule of a registered futures association must provide that, except with the approval or at the direction of the CFTC, no person shall be admitted to or continued in membership in such association, if such person has associated with any person who is known, or in the exercise of reasonable care should be known, to be a person

who would be ineligible for admission to or continuance in membership as a result of being previously expelled from a registered futures association.

82. Pursuant to 7 U.S.C. §21(b)(7) the rules of a registered futures association must be designed to prevent fraudulent and manipulative acts and practices.

83. On its website, NFA makes the following representation to the investing public regarding its efforts to protect them from fraudulent and manipulative acts and practices:

> ***Rigorous registration screening***. NFA thoroughly screens all firms and individuals wishing to register with the CFTC and become Members of NFA. Applicants must meet stringent fitness requirements and must provide fingerprint cards for FBI background checks. In addition, individual registrants must pass comprehensive proficiency testing requirements. NFA has the authority to deny, revoke, suspend, restrict or condition any firm's or individual's registration.

84. However, NFA's rules and "rigorous registration screening" did nothing to stop Heneghan from registering with numerous NFA Member Firms after his previous firms were barred from the industry or from continuing to market commodity futures to the public as an NFA Associate Member even though its own records clearly showed he had a history of working for firms that had been suspended or expelled by the NFA.

85. In fact, in its complaint against Murphy, NFA charged her with failing to take appropriate action based upon the knowledge, "[Heneghan] worked at several firms which were the subject of prior disciplinary actions brought by this Committee for sales practice fraud."

86. Needless to say, the same allegation can be made against NFA in its failure to abide by the assurances it had made that *it* would engage in "rigorous registration screening" to protect the investing public from individuals such as Heneghan.

87. Had NFA complied with the requirements of 7 U.S.C. §21(b)(3)(D) and investigated Heneghan's activities years ago, it would have saved Troyer and other investors from losing millions of dollars.

WHEREFORE, Troyer prays this Court enter judgment in his favor and against NFA, including an award of the following damages:

A. compensatory damages for the financial and emotional injuries caused by these violations;

B. prejudgment interest from the date he made issued each payment to Heneghan;

C. reasonable attorneys' fees, costs, and litigation expenses; and

D. any other relief this Court deems just and appropriate.

Respectfully submitted,

Phillip J. Troyer, Indiana License #18456-53
6800 W. 138th Terrace, #914
Overland Park, Kansas 66223
260-452-5987 (phone)
philtroyer@comcast.net
Counsel for Plaintiff