# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| DENNIS TROYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-00146-SLC |
| | ) | |
| NATIONAL FUTURES ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court is a motion to dismiss and a supporting memorandum filed by

Defendant National Futures Association ("the NFA") seeking to dismiss Plaintiff Dennis

Troyer's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 34; DE

37). Troyer has filed a response in opposition (DE 38), and the NFA has filed a reply brief (DE

40). This motion is now ripe for ruling.[1]

For the reasons set forth below, the NFA's motion to dismiss will be GRANTED.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, or any

portion of a complaint, for failure to state a claim upon which relief can be granted. "To survive

a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)); *see also Ray v. City of*

*Chicago*, 629 F.3d 660, 662-63 (7th Cir. 2011) ("While the federal pleading standard is quite

---

[1] Federal question jurisdiction exists under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (DE 41).

forgiving, . . . the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (citation and internal quotation marks omitted)). A plaintiff is required to include allegations in the complaint that "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads [himself] out of court." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic Corp.*, 550 U.S. at 554). Thus, "a plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, *might* suggest that something has happened to [him] that *might* be redressed by the law." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010) (citation omitted).

## II. FACTUAL AND PROCEDURAL BACKGROUND

In this suit, Troyer seeks to hold the NFA, a self-regulatory organization ("SRO") for the futures industry, liable for an allegedly fraudulent scheme perpetuated by Thomas Heneghan, a broker and an associate member of the NFA. Troyer alleges that from December 2009 to April 2015, all while Heneghan was an associate member of the NFA, Heneghan solicited and accepted funds from Troyer for the purpose of purchasing commodities futures. (DE 30 ¶¶ 10-17, 26-31, 40-51). Troyer alleges that he has never received any of the more than $500,000 in assets purportedly held in his account with Heneghan; nor has he been able to recover any of the $206,126 that he invested through Heneghan. (DE 30 ¶¶ 10-17, 26-31, 40-51, 63). More particularly, Troyer alleges the following facts in his amended complaint:

In 2009, Heneghan was registered as an associated person ("AP") of Statewide FX Inc. ("Statewide"), an introducing broker registered with the NFA that functioned as an introducing broker for Vision Financial Markets LLC ("Vision"). (DE 30 ¶¶ 6, 7). At Heneghan's request,

Troyer opened a commodities trading account with Vision, and in December 2009, Troyer purchased futures contracts by issuing a check to Vision. (DE 30 ¶¶ 7, 8). In March 2010, Heneghan's registration with Statewide was terminated. (DE 30 ¶ 9). Heneghan, however, instructed Troyer to work with another AP of Statewide, Oliver Livolsi, and to continue purchasing commodities futures contracts through Statewide in his account at Vision. (DE 30 ¶ 10). Troyer did so, issuing seven more checks to Vision for the purpose of purchasing commodities futures contracts. (DE 30 ¶¶ 11-17). Throughout this time, Troyer received monthly statements from Vision showing that he held futures contracts in currencies and commodities; additionally, Heneghan repeatedly assured Troyer that the value of his account was increasing. (DE 30 ¶ 18).

In March 2010, Heneghan applied for registration with Atlantis Trading Corp. ("Atlantis"), an introducing broker registered with the NFA. (DE 30 ¶ 23). The NFA approved Heneghan's registration as an AP and principal. (DE 30 ¶ 23).

Later that same month, Troyer, at Heneghan's request, opened an account with Peregrine Financial Group Inc., d/b/a PFG Best ("PFG"), an introducing broker registered with the NFA. (DE 30 ¶ 24). Although Heneghan had been registered with PFG from January 1999 to July 2001, he was not registered with PFG during the time period relevant to this suit. (DE 30 ¶ 25). From March to October 2010, Troyer issued six checks to PFG for the purpose of purchasing futures contracts, mailing the checks to Heneghan's attention at PFG's address. (DE 30 ¶¶ 26-31). Throughout this time, Troyer received monthly statements from PFG showing that he held futures contracts in currencies and commodities; additionally, Heneghan assured Troyer that the value of his account was increasing. (DE 30 ¶ 32).

3

In December 2010, unbeknownst to Troyer, the NFA issued a complaint charging Statewide and several of its principals with making deceptive and misleading sales solicitations, alleging that the NFA's audit found that approximately 95% of Statewide's customers lost money trading with Statewide. (DE 30 ¶ 19). In July 2011, unbeknownst to Troyer, the NFA terminated Statewide's registration and ordered it to never reapply for NFA membership or to act as a principal of an NFA member. (DE 30 ¶ 20).

In May 2012, Heneghan's registrations with Atlantis were terminated. (DE 30 ¶ 33).

In July 2012, unbeknownst to Troyer, the Commodities Futures Trading Commission ("the CFTC") filed a complaint against PFG and its owner, Russell Wasendorf, alleging fraud, misappropriation of customer funds, violation of customer fund segregation laws, and making false statements. (DE 30 ¶ 34). The following month, unbeknownst to Troyer, Wasendorf was indicted on 31 counts of lying to regulators. (DE 30 ¶ 35).

In October 2012, Heneghan applied for registration as an AP with Portfolio Managers, Inc. ("PMI"), an introducing broker registered with the NFA. (DE 30 ¶¶ 5, 37). NFA approved Heneghan's registration. (DE 30 ¶ 37). By this time, Heneghan had been registered with 13 different NFA-member firms over a 27-year period. (DE 30 ¶ 38). With the exception of PFG, none of the firms with which Heneghan had previously been registered were still in business, and many of those firms had been accused of serious violations. (DE 30 ¶ 39).

In February 2013, unbeknownst to Troyer, the CFTC issued an order permanently barring PFG and Wasendorf from the industry. (DE 30 ¶ 36).

At some point in early 2013, Heneghan encouraged Troyer to participate in a new commodities trading program. (DE 30 ¶ 40). Heneghan told Troyer that the program was set up

under Heneghan's trading account in order to avoid account maintenance fees and additional commissions. (DE 30 ¶ 40). Heneghan then instructed Troyer to issue checks directly to Heneghan so that he could deposit them into the program. (DE 30 ¶ 40). Heneghan assured Troyer that his funds would be segregated into a separate sub-account. (DE 30 ¶ 4). From April 2013 to April 2015, Troyer issued 11 checks payable to Heneghan for the purpose of purchasing commodities futures contracts through this program. (DE 30 ¶¶ 41-51). Throughout this time, Heneghan repeatedly assured Troyer that his futures contracts were performing well and that the value of his account was increasing. (DE 30 ¶ 52).

In September 2013, unbeknownst to Troyer, the NFA filed a complaint against Vision alleging that it had facilitated a commodity trading advisor in misappropriating customer funds to trade allocations. (DE 30 ¶ 21). In June 2014, unbeknownst to Troyer, Vision was ordered to withdraw from NFA membership and to pay a $1.5 million fine and $2.053 million in restitution to its customers. (DE 30 ¶ 22).

At some point in 2015, Heneghan informed Troyer that the value of his account exceeded $500,000. (DE 30 ¶ 52). Troyer instructed Heneghan to close his account and wire the funds to him. (DE 30 ¶ 53). Heneghan, however, repeatedly made excuses as to why he could not transfer the funds to Troyer. (DE 30 ¶ 54). Eventually, Troyer filed a complaint against Heneghan with the CFTC. (DE 30 ¶ 55). Troyer's counsel also contacted Amanda Murphy, president and chief executive officer of PMI, to notify PMI that its AP, Heneghan, was refusing to return funds contained in Troyer's trading account. (DE 30 ¶ 56). At PMI's request, Troyer's counsel provided PMI with copies of the cancelled checks issued to Heneghan while he was registered with PMI. (DE 30 ¶ 57). PMI, however, refused to acknowledge Troyer's claims and

instead alleged that his payments to Heneghan were intended for wagers on sporting events.  (DE 30 ¶ 58).

In December 2015, the NFA filed a complaint against PMI, Heneghan, Murphy, and two additional APs who worked with Heneghan at PMI's Los Angeles branch.  (DE 30 ¶ 59).  In the complaint, the NFA noted, among other things:  (1) that its review of the branch's customer trading activity revealed facts indicative of abusive trading practices and that 97% of the branch's customers had net losses; (2) that 98% of Heneghan's customers had net losses and, on average, lost 94% of their investment; (3) that Heneghan routinely made misleading and deceptive sales solicitations, exaggerated profit potential, minimized risk of loss, and failed to disclose that 97% of the branch's customers lost money trading with PMI; (4) that Murphy failed to adequately supervise the branch to ensure that it complied with the NFA's sales practice rules; and (5) that Murphy failed to apply heightened supervision to Heneghan, given that he had previously worked at several firms, including Statewide, that were the subject of prior disciplinary actions for sales practice fraud.  (DE 30 ¶ 62).

As stated earlier, Troyer has never received any of the more than $500,000 in assets allegedly held in his account with Heneghan, nor has he been able to recover any of the $206,125 that he invested through Heneghan.  (DE 30 ¶ 63).  On May 8, 2016, Troyer filed the instant case against Heneghan, Livolsi, PMI, and the NFA, alleging various violations under the Commodities Exchange Act ("the CEA"), 7 U.S.C. §§ 1 *et seq.*  (DE 1).  On January 30, 2017, Troyer filed an amended complaint, dismissing Heneghan and Livolsi and advancing four claims against PMI and the NFA.  (DE 30).  In Counts 1 and 2 of his amended complaint, Troyer alleges that PMI and the NFA are vicariously liable for Heneghan's purported violations of §§

6b(a) and 6b(e) of the CEA and its related regulations. (DE 30 ¶¶ 64-89). In Count 3, Troyer advances a claim against the NFA pursuant to § 25(b)(2) of the CEA, alleging that NFA failed to enforce a rule or bylaw that it was statutorily required to enforce. (DE 30 ¶¶ 91-101). In Count 4, Troyer advances a state law fraud claim against the NFA under Indiana Code § 35-43-5-3(a)(2), Indiana's criminal deception statute, and § 34-24-3-1, Indiana's Crime Victims' Compensation Act. (DE 30 ¶¶ 102-108). On May 7, 2017, Troyer voluntarily dismissed PMI from this suit (DE 44), leaving the NFA as the sole Defendant.

## III. DISCUSSION

*A. An Overview of Commodities Futures Contracts, the CEA, the NFA, and the CFTC*

It is helpful to begin with a brief overview of commodities futures contracts, the CEA, the NFA, and the CFTC:

"A commodity futures contract is a contract to buy (or sell) a standard quantity of a particular commodity at a specified price and time in the future." *Commodity Futures Trading Comm'n v. Risk Capital Trading Grp., Inc.*, 452 F. Supp. 2d 1229, 1235 (N.D. Ga. 2006). "The owner of a futures contract is exposed to risk beyond the purchase price of the futures contract." *Id*. "If he still owns the contract at maturity, he would be forced to purchase (or sell) the specific commodity at the price set in the contract or to meet his obligation through alternative means." *Id*. "Two types of investors purchase commodity futures contracts: hedgers and speculators. Hedgers buy futures contracts to minimize (or transfer) risk and to lock in a price certain for the underlying commodity; speculators buy futures contracts to take on risk in the hopes of realizing capital gains on their investments." *Id*. at 1235 n.6. "[S]peculators (especially retail investors . . . ) typically do not hold commodity futures contracts to maturity; speculators purchase futures

contracts to make a profit, not to take actual delivery of a large quantity of commodities." *Id*.

"The CEA governs the trading of commodity futures contracts, and grants to the [CFTC] the authority, in large measure, to implement the regulatory regime established therein." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1150 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (1995). "The CEA has been described as a 'comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" *Vitanza v. Bd. of Trade of N.Y.*, No. 00 CV 7393(RCC), 2002 WL 424699, at *3 (S.D.N.Y. Mar. 28, 2002) (quoting *Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*, 735 F.2d 653, 661 (2d Cir. 1984)). "Section 22 of the CEA expressly provides for a private right of action, explicitly enumerating the exclusive circumstances under which a private litigant may assert a right of action for violations of the CEA or CFTC regulations." *Id*. (citing 7 U.S.C. § 25(b)(5)); *see Klein & Co. Futures, Inc. v. Bd. of Trade of New York*, 464 F.3d 255, 259 (2d Cir. 2006) ("CEA § 22 enumerates the only circumstances under which a private litigant may assert a private right of action for violations of the CEA."). "Section 22(a) relates to claims against persons other than registered entities and registered futures associations." *Klein & Co. Futures, Inc.*, 464 F.3d at 259 (citing 7 U.S.C. § 25(a)). "Section 22(b) deals with claims against [registered] entities and their officers[,] directors, governors, committee members and employees." *Id.*; *see* 7 U.S.C. § 25(b).

"[The] NFA is a Registered Futures Association which, pursuant to the [CEA] § 17, 7 U.S.C. § 21, functions as the futures industry's self-regulatory organization[,]" that is, an SRO. *Nicholas v. Saul Stone & Co., LLC*, 224 F.3d 179, 181 n.6 (3d Cir. 2000); *see also Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1326 n.3 (11th Cir. 2002)

("[The NFA] is a congressionally authorized futures industry [SRO].").  The NFA operates under the oversight of the CFTC, the federal government's regulator for the futures industry.  *See U.S. Commodity Futures Trading Comm'n v. Altamount Glob. Partners, LLC*, No. 6:12-cv-1095-Orl-31TBS, 2014 WL 644693, at *3 (M.D. Fla. Feb. 19, 2014).  "The purpose of the NFA is to assure high standards of business conduct by its [m]embers and to protect the public interest." *R.J. Fitzgerald & Co.*, 310 F.3d at 1326 n.3.  "[The NFA] performs screening to determine fitness to become and remain a member of the NFA, establishes and enforces certain rules and standards, audits and investigates members, and conducts arbitration in futures disputes." *Nicholas*, 224 F.3d at 181 n.6.  "Membership in the NFA is mandatory for all entities conducting business on U.S. futures exchanges." *Commodity Futures Trading Comm'n v. Levy*, 541 F.3d 1102, 1104 n.4 (11th Cir. 2008); *see also Nicholas*, 224 F.3d at 182.

To further its goal of creating and implementing a comprehensive program for self-regulation of the commodity futures industry, "[the] NFA is required to adopt rules governing the conduct of its membership." *MBH Commodity Advisors, Inc. v. Commodity Futures Trading Comm'n*, 250 F.3d 1052, 1056 (7th Cir. 2001).  "Pursuant to its statutory mandate, the NFA has adopted numerous rules governing member conduct." *Id.* (citation omitted).  "These rules are subject to [the CFTC's] approval and must provide standards governing the sales practices of NFA members." *Id.* (citing 7 U.S.C. § 21(p)(3); 17 C.F.R. § 170.5).  "In addition, these rules must be 'designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, in general, to protect the public interest, and to remove impediments to and perfect the mechanism of free and open futures trading.'" *Id.* (quoting 7 U.S.C. § 21(b)(7)).

*B. Counts 1 and 2 Alleging That the NFA Is Vicariously Liable for Heneghan's*
*Actions Fail to State a Plausible Claim Under § 2(a)(1)(B) of the CEA*

In Counts 1 and 2 of his amended complaint, Troyer seeks to hold the NFA vicariously

liable for the purportedly fraudulent actions committed by Heneghan, a broker and an associate

member of the NFA.  In its motion to dismiss, the NFA argues that Counts 1 and 2 must be

dismissed because:  (1) Heneghan's status as an associate member of the NFA, without more,

does not make him an agent of the NFA; and (2) none of the provisions of the CEA that Troyer

cites in his amended complaint create a private right of action against the NFA.

Section 2(a)(1)(B), the CEA's vicarious liability provision, states:

> The act, omission, or failure of any official, agent, or other person
> acting for any individual, association, partnership, corporation, or
> trust within the scope of his employment or office shall be deemed
> the act, omission, or failure of such individual, association,
> partnership, corporation, or trust, as well as of such official, agent,
> or other person.

7 U.S.C. § 2(a)(1)(B).  Section 2(a)(1)(B) "enacts a variant of the common law principle of

respondeat superior."  *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963,

965 (7th Cir. 1986).  "The common law principle makes an employer strictly liable—that is to

say, regardless of the presence or absence of fault on the employer's part—for torts committed

by his employees in the furtherance of his business[.]"  *Id.* (citation omitted); *see also Bosco v.*

*Serhant*, 836 F.2d 271, 280 (7th Cir. 1987) ("Section 2(a)(1) of the [CEA] . . . imputes liability

for an agent's violations of the Act to the agent's principal . . . , consistently with usual notions

of respondeat superior." (citation omitted)); *U.S. Commodity Futures Trading Comm'n v.*

*Byrnes*, 58 F. Supp. 3d 319, 324 (S.D.N.Y. 2014) (collecting cases).  This provision "varies from

the common law only to the extent that it may be interpreted as a quasi-criminal statute and that

it applies to torts committed by agents that are not necessarily employees of the princip[al]." *Shroff v. Rosenthal Collins Grp., LLC*, No. 08 C 929, 2009 WL 2704582, at *4 (N.D. Ill. Aug. 25, 2009) (citations omitted); *see, e.g.*, *Commodity Futures Trading Comm'n v. Commodities Fluctuations Sys., Inc.*, 583 F. Supp. 1382, 1383-85 (S.D.N.Y. 1984) (imputing violations of the CEA salespersons not only to their employer, but also to the clearing firm with whom the salespersons were registered as associated persons).

"The language of § 2(a) is broad, and extends vicarious liability to 'any individual, association, partnership, corporation, or trust.'" *U.S. Commodity Futures Trading Comm'n v. Yumin Li*, No. 15 C 5839, 2016 WL 8256392, at *8 (N.D. Ill. Dec. 9, 2016) (quoting 7 U.S.C. § 2(a)(1)(B)). "Principals are strictly liable for their agents' acts—even if the agents are not employees—if the principals authorize or ratify the acts or even just create an appearance that the acts are authorized.[2] *Rosenthal & Co.*, 802 F.2d at 966; *see Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp.,* 575 F.3d 1180, 1182 (11th Cir. 2009) (Under § 2(a)(1)(B), "the test for vicarious liability is common law agency."). "This is so even though in a case of ratification or apparent authority the principal does not himself direct the act and may indeed know nothing about it when it occurs . . . ." *Rosenthal & Co.*, 802 F.2d at 966. A court

---

[2] To elaborate, "[a]n agent's authority may be actual or apparent; if it is actual, it may be express or implied." *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 865-66 (7th Cir. 1998) (citing Restatement (Second) of Agency §§ 7-8 & § 7 cmt. c). "Implied authority is that authority which is inherent in an agent's position and is, simply, actual authority proved through circumstantial evidence." *Id.* "Actual authority 'to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'" *Id.* (quoting Restatement (Second) of Agency § 26). "In contrast, 'apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purported to act for him.'" *Id.* (quoting Restatement (Second) of Agency § 26). Here, Troyer alleges that Heneghan's authority was apparent, not actual. (DE 30 ¶¶ 74, 89).

makes an "overall assessment of the totality of the circumstances" to determine whether an agency relationship exists. *Shroff*, 2009 WL 2704582, at *4 (quoting *Stotler & Co. v. Commodity Futures Trading Comm'n*, 855 F.2d 1288, 1292 (7th Cir. 1988)); *see also Gibraltar Monetary Corp., Inc.*, 575 F.3d at 1187 (discussing the legal standards for vicarious liability under the CEA); *Yumin Li*, 2016 WL 8256392, at *7 (same).

Troyer argues that he has adequately pled an agency relationship between Heneghan and the NFA under § 2(a)(1)(B). In support, Troyer points to the following allegations in his amended complaint:

> 72. Pursuant to 7 U.S.C. § 2(a)(1)(B), the act, omission, or failure of an agent or person acting for any association or corporation within the scope of his employment or office shall be deemed the act, omission, or failure of such association or corporation.
>
> 73. Pursuant to 17 CFR § 3.2(a), the CFTC assigned the registration of commodities futures traders to NFA. As a result, membership in NFA is required for anyone acting as a commodities trader under the Commodities Futures Act ("CEA"), which meant Heneghan could only legally solicit commodities futures trades from Troyer if he was an NFA Associate Member.
>
> 74. At all times relevant to this complaint, Heneghan was registered as an "NFA Associate Member" and was, therefore, acting within the scope of that office and as NFA's apparent agent when he perpetrated these illegal and fraudulent acts on Troyer. Therefore, NFA is liable for Heneghan's actions as his principal.

(DE 30 ¶¶ 72-74; *see also* DE 30 ¶¶ 86-89).

Additionally, in his response brief, Troyer points to the following language posted on the NFA's website:

> Investor confidence is crucial to the success of the derivatives

> markets, and the best way to gain investor confidence is to demand the highest levels of integrity of all market participants and intermediaries.
>
> Membership in NFA is mandatory, assuring that everyone conducting business with the public on U.S. futures exchanges and in the retail forex marketplace must adhere to the same high standards of professional conduct.

(DE 38 at 16 (quoting https://www.nfa.futures.org/NFA-about-nfa/index.HTML)).  Troyer argues that by posting this language on its website, the NFA "encouraged the public to rely upon its diligence in selecting and regulating its Members to have confidence when investing in commodities futures."  (DE 30 at 16).

Here, even if Troyer could sue the NFA under a vicarious liability theory,[3] Troyer fails to plead a plausible agency relationship between Heneghan and the NFA because Troyer's allegations rest solely on Heneghan's status as an associate member of the NFA.  Heneghan's status as an associate member of the NFA, without more, does not make him an agent of the NFA for purposes of vicarious liability under the CEA.  Troyer is conflating Heneghan's registration as an NFA associate member (apparently, the NFA has 55,000 associate members (DE 40 at 7)), with permission to act on the NFA's behalf.  As the NFA persuasively asserts, merely issuing a license or registration to an individual does not constitute an approval by the registering agency for the licensee to act on the registering entity's behalf.  Expanding agency law in this manner would reach an absurd result where any licensing agency, for example, the Indiana Professional Licensing Agency, would become vicariously liable for the acts of all of its

---

[3] Because Troyer fails to plausibly plead that Heneghan has an agency relationship with the NFA, Troyer's claims based on vicarious liability in Counts 1 and 2 fail to state a claim and will be dismissed. Consequently, the Court need not reach the NFA's second argument—that no private right of action exists under the CEA for a vicarious liability claim against a registered futures association.

licensees, merely by the fact that it issued a license to the professionals.

There are no allegations in the amended complaint that the NFA ever employed Heneghan, directed his activities, or authorized him to act on the NFA's behalf. *See Gibraltar Monetary Corp.*, 575 F.3d at 1187-89 (discussing the legal test for vicarious liability under the CEA); *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1334 (7th Cir. 1995) ("[T]he Indiana courts have held that the mere existence of a formal licensing or dealership agreement will not create an agency relationship in the absence of evidence that the principal is exercising control over the details of the purported agent's work." (citation omitted)); *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 675 (Ind. 2001) ("[A]pparent authority refers to a third party's reasonable belief that the principal has authorized the acts of its agent; it arises from the principal's indirect or direct manifestations to a third party and not from the representations or acts of the agent." (citations omitted)). Nor is Troyer's assertion that the language on the NFA's website offering assurances of high standards of professional conduct by the NFA's members sufficient to create a reasonable belief that Heneghan was authorized to act on the NFA's behalf. Notably, Troyer has not cited *any* case in which a broker and associate member has been viewed as an agent of the NFA. *See Asa-Brandt, Inc. v. ADM Inv'r Servs., Inc.*, 344 F.3d 738, 749 (8th Cir. 2003) (acknowledging that a party's "mere status" as an introducing broker, without more, was insufficient to plausibly plead an apparent agency relationship with a futures commissions merchant); *Lacovara v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 551 F. Supp. 601 (E.D. Pa. 1982) (dismissing plaintiff's claim that sought to recover losses in transactions involving commodity futures on the grounds that a commodity contract market licensed by the CFTC pursuant to the CEA failed to properly supervise its members); *see generally* Jerry W. Markham,

*Commodities Regulation: Fraud, Manipulation & Other Claims*, 13 Commodities Reg. § 4:1

(2017); Jerry W. Markham, *Judicial Decisions on Respondeat Superior Under the Commodity*

*Exchange Act*, 13 Commodities Reg. § 4:14 (2017); Deborah Sprenger, J.D., *Who Is "Agent," so*

*as to Subject Principal to Liability, Under § 2(a)(1)(a) of Commodity Exchange Act (7 U.S.C.A §*

*4)*, 98 A.L.R. Fed 588 (1990).

In short, no reasonable person could interpret Heneghan's status as an associate member

of the NFA—without more—as the NFA's consent to have Heneghan act on the NFA's behalf in

soliciting futures commodities.  *See Stotler & Co.*, 855 F.2d at 1292 ("The real question is

whether Allen was acting as Stotler's agent for soliciting customers to trade commodity futures

accounts.").  As such, Troyer fails to state a plausible claim of vicarious liability against the

NFA under § 2(a)(1)(B) of the CEA, and therefore, Counts 1 and 2 of his amended complaint

will be dismissed.

### C. Count 3 Alleging that the NFA Failed to Enforce a Bylaw or Rule Does Not State a Plausible Claim Under § 25(b)(2) of the CEA

In Count 3, Troyer advances a claim against the NFA under 7 U.S.C. § 25(b)(2), alleging

that it violated the CEA by failing to enforce a bylaw or rule required by 7 U.S.C. § 21.  The

NFA seeks to dismiss Count 3, asserting that Troyer fails to identify a bylaw or regulation that it

allegedly violated, and even if he did, Troyer does not plausibly allege that the NFA acted in

"bad faith" as required by § 25(b)(2).  (DE 37 at 7).

Section 25(b)(2) states:

> A registered futures association that fails to enforce any bylaw or
> rule that is required under section 21 of this title or in enforcing
> any such bylaw or rule violates this chapter or any Commission
> rule, regulation, or order shall be liable for actual damages
> sustained by a person that engaged in any transaction specified in

subsection (a) of this section to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaw or rule.

7 U.S.C. 25(b)(2).  Additionally, § 25(b)(4) requires:  "A person seeking to enforce liability under this section must establish that the . . . registered futures association . . . acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss."  7 U.S.C. § 25(b)(4).

Troyer cites two sections of § 21 in support of his allegations against the NFA.  First, he cites § 21(b)(3)(D), which provides that the association's rules must provide that, except with the approval of the CFTC, "no person shall be admitted to or continued in membership . . . if such person . . . has associated with him any person who is known, or in the exercise of reasonable care should have known, to him to be a person who would be ineligible for admission to or continuance in membership . . . ."  7 U.S.C. § 21(b)(3)(D).  Troyer also cites § 21(b)(7), which more generally states that "the rules of the association are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, in general, to protect the public interest, and to remove impediments to and perfect the mechanism of free trade and open futures trading."  7 U.S.C. § 21(b)(7).

In the context of these provisions, Troyer makes the following allegations:

93. NFA had actual knowledge Heneghan had been associated with several individuals and firms that had been barred from its membership for committing fraudulent acts.

94. Despite that knowledge, as well of knowledge 7 U.S.C. § 21(b)(3)(D) prohibited it from maintaining Heneghan's registration under those circumstances without the CFTC's approval, NFA permitted Heneghan to continue to solicit commodities futures trades from the public as an NFA Associate Member.

95.     NFA had actual knowledge Heneghan had participated in the manipulative trading scheme Statewide FX had perpetrated on its clients.

96.     Despite that knowledge and knowledge of Heneghan's past association with other NFA member firms that had either been barred or sanctioned for engaging in fraudulent and/or manipulative trading practices, as well as having knowledge 7 U.S.C. § 21(b)(7) required its rules must be designed to prevent fraudulent and manipulative acts and practices, NFA had no requirements in place to apply stricter oversight to Heneghan's activities given his past associations with such disreputable firms and manipulative trading practices.

. . . .

100.    As a result of NFA's failure to enforce the rules imposed on it under 7 U.S.C. § 21, Troyer suffered financial and emotional damages.

(DE 30 ¶¶ 93-96, 100).

The NFA argues that Troyer's allegations fail to state a claim under § 25(b)(2) because although he cites certain statutory provisions, he does not identify any rule or bylaw that the NFA purportedly violated, which is a necessary element of a § 25(b)(2) claim. The NFA emphasizes that § 21 "only prescribes the type of rules that must be enacted by the NFA, it is not a NFA regulation itself." (DE 37 at 8). The NFA contends that Troyer does not, and presumably cannot, include any reference to an actual NFA bylaw or rule that was violated because "no such bylaw or rule prohibits registration of individuals such as Heneghan based on the facts alleged in the Amended Complaint." (DE 37 at 8).

In response, Troyer contends that the NFA misinterprets the language of § 25(b)(2) by interpreting it to require that the NFA fail to enforce one or more of its own bylaws or rules. Troyer asserts, rather, that § 25(b)(2) permits the NFA to be held liable for losses when it fails to

enforce "any bylaw or rule *that is required under section 21 of this title*." 7 U.S.C. § 25(b)(2) (emphasis added). Troyer clarifies that his claim is that the NFA violated § 25(b)(2) by failing to adopt the necessary rules and bylaws which § 21 mandates that a registered futures association must adopt. Specifically, Troyer contends that the NFA violated § 25(b)(2) by failing to adopt "a rule requiring a person found to have been associated with an expelled firm to appeal to the CFTC in order to maintain that person's continued membership in NFA." (DE 38 at 6). Thus, as Troyer frames his claim, the question is not whether the NFA violated one of its own bylaws or rules, but rather, whether the NFA caused harm by failing to adopt and enforce the rules that Congress mandated it to adopt under § 21.

Succinctly stated, Troyer's claim rests on his personal view of what rules the NFA should adopt, rather than what § 21 actually requires. Section § 25(b)(2) creates a private right of action only for a failure to enforce "any bylaw or rule *that is required under section 21*." 7 U.S.C. § 25(b)(2) (emphasis added). Accordingly, where a bylaw or rule is not required by § 21, there is no private right of action under § 25(b)(2). *See Nicholas v. Saul Stone & Co., LLC*, No. Civ. 97-860(AET), 1998 WL 34111036, at *18 (D.N.J. June 30, 1998) (concluding that Bylaw 1101 of the NFA was not required by the CEA, and thus, that "no private cause of action can be enforced for its non-enforcement"). Neither § 21(b)(3), nor any other subsection of § 21, requires the NFA to adopt a rule providing that when a firm is expelled, any person ever associated with the firm must appeal to the CFTC in order to maintain his or her continued membership in the NFA. Moreover, even if the NFA were to adopt such a rule, Troyer would not have a private right of action under § 25(b)(2) because it is not a rule that is required by § 21 of the CEA. *See id*. Nor is Troyer's citation of § 21(b)(7)—which generally requires that the association's rules be

designed to prevent fraudulent practices, to promote just and equitable principles of trade, and to protect the public interest—adequate to remedy his deficient pleading.

Furthermore, Troyer does not allege that the NFA acted in "bad faith" by failing to take the action that he endorses—that is, by failing to adopt a rule requiring that when a firm is expelled, any person ever associated with the firm must appeal to the CFTC in order to maintain his or her continued membership in the NFA. 7 U.S.C. § 25(b)(4); *cf. Bishop v. Commodity Exch., Inc.*, 564 F. Supp. 1557, 1559 (S.D.N.Y. June 13, 1983) ("The complaint is of rulemaking in bad faith[.]"). In that regard, all of the NFA's rules are subject to the CFTC's approval. *See* 7 U.S.C. § 21(j); *MBH Commodity Advisors, Inc.*, 250 F.3d at 1056. Under § 21(a), part of the registration process for a futures association is that it must submit its bylaws and rules to the CFTC for "review and approval." 7 U.S.C. § 21(a)(2). Likewise, § 21(j) requires that a registered futures association submit any changes to its rules to the CFTC for approval. 7 U.S.C. § 21(j); *MBH Commodity Advisors, Inc.*, 250 F.3d at 1068 (citations omitted). The CFTC "shall approve such rules if such rules are determined by the Commission to be consistent with the requirements of [§ 21(j)]." 7 U.S.C. § 21(j). In that same vein, the CFTC is authorized to abrogate any rule of a registered futures association if it appears to the CFTC that such abrogation is necessary or appropriate to assure fair dealing by the members of the association. 7 U.S.C. § 21(k)(1).

As explained earlier, the CFTC is the federal government's regulator for the futures industry. As such, the CFTC is charged with protecting the public interest, and the "CFTC granted NFA registration as a registered futures association in 1981." *Weinberg v. Commodity Futures Trading Comm'n*, 699 F. Supp. 808, 812 (C.D. Ca. 1988). It is "inherent in the grant as

a registered futures association" that the CFTC found that the NFA's rules satisfied the requirements of § 21. *Weinberg*, 699 F. Supp. at 812. "If this was not done expressly at least the [CFTC] gave tacit approval by its acceptance of [the] NFA as a registered futures association." *Id.* (citation omitted). That Troyer believes different rules should be required pursuant to § 21 does not state a claim under § 25(b)(2), much less state a claim that the NFA acted in bad faith by failing to adopt the rules that he endorses.

As an additional matter, toward the end of Count 3, Troyer tacks on the following allegations concerning the NFA's auditing practices, seemingly intending to create another cause of action:

> 98. One reason Wasendorf was able to avoid detection for over 20 years was that NFA employed young, inexperienced individuals to audit its Member firms.

> 99. NFA knew, or reasonably should have known, these inexperienced auditors would be ill-equipped to protect the investing public from fraudulent enterprises such as PFG. However, PFG continued to use inexperienced auditors because it either: (1) wanted to ensure there were sufficient funds in its budget to pay exorbitant compensation to its executive staff; or (2) did not take its legal obligation to protect the public from such frauds seriously. Either way, NFA's use of poorly trained, inexperienced auditors constituted a bad faith violation of its duties under 7 U.S.C. §21.

(DE ¶¶ 98-99). But these allegations by Troyer of improper motive, that is, bad faith, on the part of the NFA are "speculative allegations." *W. Capital Design, LLC v. N.Y. Mercantile Exch.*, 180 F. Supp. 2d 438, 441 (S.D.N.Y. 2001), *aff'd*, 25 F. App'x 63 (2d Cir. 2002). No specific facts have been pled to support the claim that the NFA hired auditors so that it could "pay exorbitant compensation to its executive staff" or because the NFA does "not take its legal obligation to

protect the public . . . seriously." (DE ¶ 99). As such, Troyer's allegations regarding inexperienced auditors fail to state a plausible claim. *See id.* ("The allegation is pure speculation, insufficient to satisfy the rule of pleading bad faith by specific facts." (citation omitted)); *see also Holladay v. CME Grp.*, No. 11-cv-8226, 2012 WL 3096698, at *4-5 (N.D. Ill. July 30, 2012) (finding that plaintiffs failed to adequately plead a case of bad faith under § 25(b)(4)); *Vitanza*, 2002 WL 424699, at *7 (same).

In sum, Troyer's claim against the NFA under Count 3—which fails to cite any NFA rule or bylaw that the NFA purportedly violated which was required by ¶ 21—fails to state a plausible claim under § 25(b)(2). *See Bell Atlantic Corp.*, 550 U.S. at 1960. Accordingly, Count 3 will also be dismissed.

### D. Count 4 Alleging a State Law Fraud Claim Is Preempted by the CEA

In Count 4, Troyer advances a state law fraud claim against the NFA under Indiana Code § 35-43-5-3(a)(2), Indiana's criminal deception statute, and Indiana Code § 34-24-3-1, Indiana's Crime Victims' Compensation Act. In this claim, Troyer alleges that the NFA fraudulently represented on its website that it "thoroughly screens all firms and individuals wishing to register with the CFTC and become Members of NFA," and that the NFA did so to induce the public to invest through its members. (DE 30 ¶¶ 102, 105). The NFA seeks to dismiss this state law claim, arguing that the claim is preempted by the CEA, and furthermore, that the NFA has absolute immunity when performing regulatory, adjudicatory, or prosecutorial functions.

As to the NFA's preemption argument, "Congress, in the 1974 amendments to the CEA, established the CFTC and vested it with exclusive jurisdiction over 'accounts, agreements . . . and transactions' involving commodity futures markets." *Am. Grain Ass'n v. Canfield, Burch &*

*Mancuso*, 530 F. Supp. 1339, 1346 (W.D. La. 1982) (citing 7 U.S.C. § 2). "Congress' intent to

bring the markets under a uniform set of regulations followed from a fear that states might

attempt to regulate futures markets themselves and thus subject the national futures trading

apparatus to conflicting regulatory demands." *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, No.

01 CIV. 11602(RWS), 2002 WL 31356362, at *4 (S.D.N.Y. Oct. 17, 2002) (citation and internal

quotation marks omitted).

In *American Agriculture Movement, Inc. v. Board of Trade of Chicago*, the Seventh

Circuit examined the scope of state law preemption under the CEA. 977 F.2d 1147 (7th Cir.

1992). The Court concluded that "Congress intended to preempt some, but not all, state laws

that bear upon the various aspects of commodity futures trading." *Id*. at 1155. More

specifically, the Court opined:

> In sum, the structure and history of the CEA indicate that the
> propriety of conflict preemption depends upon the particular
> context in which a plaintiff seeks to bring a state law action. When
> application of state law would directly affect trading on or the
> operation of a futures market, it would stand as an obstacle to the
> accomplishment and execution of the full purposes and objectives
> of Congress, and hence is preempted. When, in contrast, the
> application of state law would affect only the relationship between
> brokers and investors or other individuals involved in the market,
> preemption is not mandated.

*Id*. at 1156-57 (citations and internal quotation marks omitted). Thus, "the crucial inquiry . . . is

the context in which a law is applied." *Id*. at 1157. "State laws specifically directed towards the

futures markets naturally operate in an arena preempted by the CEA." *Id*. "Laws of general

application of course operate in a variety of arenas, and are preempted only when plaintiffs

attempt to use them in a manner that would, in effect, regulate the futures markets." *Id*. More

succinctly stated, "[w]hen application of state law would directly affect trading on or the

operation of a futures market, it . . . is preempted." *DGM Invs., Inc.*, 2002 WL 31356362, at *5 (citation omitted))

The NFA argues that Troyer's state law claim is preempted because he advances it against the NFA, and as such, it does not "affect only the relationship between brokers and investors or other individuals involved in the market." *Am. Agric. Movement, Inc.*, 977 F.2d at 1157 (citation omitted). Troyer, in response, fails to even acknowledge the binding authority of *American Agriculture Movement, Inc*., much less try to distinguish it. (*See* DE 38 at 3-5). Rather, Troyer generally argues that "numerous courts have held the CEA does not preempt state common law fraud claims," and he cites a string of cases in support of that premise. (DE 38 at 4 (collecting cases)). While Troyer's contention is not inaccurate, it is asserted out of context; the cases Troyer cites involve state law fraud claims against brokers and other professionals, *not* claims against an SRO. (DE 38 at 4-5). As such, these cases are not persuasive authority with respect to a state law fraud claim against the NFA, a not-for-profit industry SRO that has been designated by the CFTC to discharge certain regulatory functions. *See* 7 U.S.C. § 21; *U.S. Commodity Futures Trading Comm'n v. Yorkshire Grp., Inc*., No. 13-CV-5323 (AMD) (ST), 2016 WL 8256380, at *5 n.5 (E.D.N.Y. Aug. 19, 2016) (explaining that the NFA is a "not-for-profit membership corporation and self-regulatory organization").

Moreover, in his state law claim, Troyer directly challenges the NFA's performance of its regulatory functions, contending that "[the] NFA has no 'rigorous registration screening' process as promised on its website." (DE 30 ¶ 105). The Court views the NFA's statement on its website to be incidental to its regulatory and general oversight functions, and as such, the claim

is preempted by the CEA.[4]  *See DGM Invs.*, 2012 WL 31356362, at *3 (finding that state law

claims of gross negligence, bad faith, and *respondeat superior* against the New York Futures

Exchange, its parent company, its corporate affiliate, and a committee of the exchange and its

members were preempted by the CEA because the claims were based on allegations that the

defendants "failed to fulfill their obligation to regulate the market"); *W. Capital Design, LLC*,

180 F. Supp. 2d at 443 ("A claim that lies not on separate and distinct duties established under

common law, but rather in an Exchange's representations about its federal statutory duties, is not

a separate and distinct claim.").  Accordingly, Count 4 alleging a state law claim for fraudulent

misrepresentation will also be dismissed.[5]

### E.  Troyer Will Be Afforded Leave to Replead

"Whether to permit a plaintiff to amend its pleadings is a matter committed to the Court's

'sound discretion.'"  *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 547-48

(S.D.N.Y. 2008) (quoting Fed. R. Civ. P. 15(a)).  Federal Rule of Civil Procedure 15(a) states

that the court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a); *see, e.g.*,

---

[4] Troyer attempts to analogize *Weissman v. National Association of Securities Dealers, Inc.*, 468 F.3d 1306 (11th Cir. 2006), to the instant circumstances.  In *Weissman*, the Eleventh Circuit Court of Appeals concluded that the defendants, two SROs created under the Securities Exchange Act, did not have absolute immunity where plaintiff alleged that the defendants' advertising activities "fraudulently touted WorldCom's stock in order to profit from resulting increases in trading volume."  *Id.* at 1312.  In doing so, the Court viewed plaintiff's allegations as relating exclusively to the defendants' for-profit commercial activity, not their delegated disciplinary or regulatory authority.  *Id.* at 1311-12.  Here, in contrast, the NFA is a not-for-profit organization; the challenged statement is an entry on the NFA's website, rather than a $74 million print and television advertising campaign as in *Weissman*; the statement does not mention, much less tout, specific futures commodities contracts; and Troyer's amended complaint challenges the NFA's regulatory activity.  Therefore, the Court does not view *Weissman* as persuasive authority.

[5] Having concluded that Troyer's state law fraud claim against the NFA is preempted by the CEA, the Court need not reach the NFA's additional argument for dismissing Count 4—that the NFA is entitled to absolute immunity when performing regulatory, adjudicatory, or prosecutorial functions.

*Standard v. Nygren*, 658 F.3d 792, 800-01 (7th Cir. 2011). "[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d at 548; *see Bianchi v. McQueen*, 917 F. Supp. 2d 822, 835 (N.D. Ill. 2013) ("Plaintiffs who meet resistance to their complaint through a successful Rule 12(b)(6) motion generally are allowed at least one opportunity to replead . . . .").

Troyer has already amended his complaint once in response to the NFA's first motion to dismiss. (DE 26; DE 30). Nevertheless, to afford him every reasonable opportunity, Troyer will be granted one additional opportunity to amend his complaint in an attempt to state a claim upon which relief can be granted. *See Holladay*, 2012 WL 3096698, at *5. In doing so, Troyer is advised not to needlessly consume the Court's time and resources in causing it to review claims initially asserted against other defendants, where such claims are simply not plausible against the NFA, the sole remaining Defendant.

## IV. CONCLUSION

For the foregoing reasons, the NFA's motion to dismiss (DE 34) is GRANTED. Troyer is afforded up to and including August 2, 2017, to file a second amended complaint against the NFA in an attempt to state a claim upon which relief can be granted.

SO ORDERED.

Entered this 12th day of July 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge