# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **DENNIS TROYER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 1:16-cv-00146-SLC** |
| | ) | |
| **NATIONAL FUTURES ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

On July 12, 2017, this Court granted a motion to dismiss filed by Defendant National Futures Association ("NFA") pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissing Plaintiff Dennis Troyer's amended complaint without prejudice. (DE 46). Now before the Court is NFA's second motion to dismiss (DE 48), together with a supporting memorandum (DE 49), seeking to dismiss Troyer's second amended complaint (DE 47) under Rule 12(b)(6). Troyer has filed a response in opposition (DE 50), and the NFA has filed a reply brief (DE 51). This motion is ripe for ruling.[1]

For the reasons set forth below, the NFA's motion to dismiss will be GRANTED IN PART and DENIED IN PART.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, or any portion of a complaint, for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state

---

[1] Federal question jurisdiction exists under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (DE 41).

a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)); *see also Ray v. City of Chicago*, 629 F.3d 660, 662-63 (7th Cir. 2011) ("While the federal pleading standard is quite forgiving, . . . the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (citation and internal quotation marks omitted)).  A plaintiff is required to include allegations in the complaint that "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads [himself] out of court." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic Corp.*, 550 U.S. at 554).  Thus, "a plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, *might* suggest that something has happened to [him] that *might* be redressed by the law." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010) (citation omitted).

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

In this suit, Troyer seeks to hold the NFA, a self-regulatory organization ("SRO") for the futures industry, liable for an allegedly fraudulent scheme perpetuated by Thomas Heneghan, a

---

[2] Troyer attached several documents to his response to the NFA's motion to dismiss:  several complaints from actions publicly filed by the NFA (DE 50-1; DE 50-3; DE 50-7); a decision on one of the complaints (DE 50-2); the NFA's articles of incorporation (DE 50-5); two bylaws of the NFA (DE 50-4; DE 50-6); and two compliance rules of the NFA (DE 50-8; DE 50-9).  Generally, "[a] motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information to that is subject to proper judicial notice." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (citations omitted).  "If a moving party relies on additional materials, the motion must be converted to one for summary judgment under Rule 56."  *Id.* (citing Fed. R. Civ. P. 12(d)).

"A plaintiff, however, has much more flexibility in opposing a Rule 12(b)(6) motion . . . ." *Id.*  "[A] party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove."  *Id.* (collecting cases).  Here, Troyer submitted the additional documents in an effort to illustrate the facts that he expects to be able to prove.  Accordingly, the documents will be considered by the Court.  However, as explained *infra* in footnote 3, the Court's outcome in this Opinion and Order would not change even if it did not consider the additional documents.

2

broker and an associate member of the NFA. Troyer alleges that from December 2009 to April

2015, all while Heneghan was an associate member of the NFA, Heneghan solicited and

accepted funds from Troyer for the purpose of purchasing commodities futures. (DE 47 ¶¶ 10-

17, 25-31, 37-39, 43-54). Troyer alleges that he has never received any of the more than

$500,000 in assets purportedly held in his account with Heneghan; nor has he been able to

recover any of the more than $200,000 that he invested through Heneghan. (DE 47 ¶¶ 10-17, 25-

31, 43-41, 63). More particularly, Troyer alleges the following facts in his amended complaint:

In 2009, Heneghan was registered as an associated person ("AP") of Statewide FX Inc.

("Statewide"), an introducing broker registered with the NFA that functioned as an introducing

broker for Vision Financial Markets LLC ("Vision"). (DE 47 ¶¶ 5, 6). At Heneghan's request,

Troyer opened a commodities trading account with Vision, and on December 24, 2009, Troyer

purchased futures contracts by issuing a check to Vision. (DE 47 ¶¶ 6, 7).

On March 18, 2010, Heneghan's registration with Statewide was terminated. (DE 47 ¶

8). Heneghan, however, instructed Troyer to work with another Statewide AP, Oliver Livolsi,

and to continue purchasing commodities futures contracts through Statewide in Troyer's account

at Vision. (DE 47 ¶ 9). Troyer did so, issuing seven more checks to Vision for the purpose of

purchasing commodities futures contracts. (DE 47 ¶¶ 9-16). Throughout this time, Troyer

received monthly statements from Vision showing that he held futures contracts in currencies

and commodities; additionally, Heneghan repeatedly assured Troyer that the value of his account

was increasing. (DE 47 ¶ 17).

On the same day that his registration with Statewide was terminated, Heneghan applied

for registration with Atlantis Trading Corp. ("Atlantis"), an introducing broker registered with

the NFA.  (DE 47 ¶ 22).  The NFA approved Heneghan's registration as an AP and principal with Atlantis.  (DE 47 ¶ 22).

On March 29, 2010, Troyer, at Heneghan's request, opened an account with Peregrine Financial Group Inc., d/b/a PFG Best ("PFG"), an introducing broker registered with the NFA. (DE 47 ¶ 23).  Although Heneghan had been registered with PFG from January 1999 to July 2001, he was not registered with PFG during the time period relevant to this suit.  (DE 47 ¶ 24). From March to October 2010, Troyer issued six checks to PFG for the purpose of purchasing futures contracts, mailing the checks to Heneghan's attention at PFG's address.  (DE 47 ¶¶ 25-31).  Troyer also requested that his accounts at Vision be transferred to PFG.  (DE 47 ¶ 28). Throughout this time, Troyer received monthly statements from PFG showing that he held futures contracts in currencies and commodities; additionally, Heneghan assured Troyer that the value of his account was increasing.  (DE 47 ¶ 32).

In March 2010, December 2010, and January 2011, on Heneghan's recommendation, Troyer issued three checks to Crossland, LLC ("Crossland"), for the purpose of purchasing futures contracts, sending at least two of the checks to Heneghan's attention.  (DE 47 ¶¶ 37-39). Heneghan was never registered with Crossland.  (DE 47 ¶ 37).

In December 2010, unbeknownst to Troyer, the NFA issued a complaint charging Statewide and several of its principals with making deceptive and misleading sales solicitations. (DE 47 ¶ 18).  In May 2011, the NFA issued a complaint against Vision for failing to supervise several of its broker-dealers, including Statewide; the NFA never notified Troyer that it had uncovered issues with Vision at the time Troyer held accounts with Vision.  (DE 47 ¶ 21).  In July 2011, unbeknownst to Troyer, the NFA terminated Statewide's registration and ordered it to

never reapply for NFA membership or to act as a principal of an NFA member.  (DE 47 ¶ 19).

The NFA never notified Troyer that it had terminated Statewide's registration.  (DE 47 ¶ 20).

In July 2012, unbeknownst to Troyer, the Commodities Futures Trading Commission

("the CFTC") filed a complaint against PFG and its owner, Russell Wasendorf, alleging fraud,

misappropriation of customer funds, violation of customer fund segregation laws, and making

false statements.  (DE 47 ¶ 33).  The following month, unbeknownst to Troyer, Wasendorf was

indicted on 31 counts of lying to regulators.  (DE 47 ¶ 34).

In October 2012, Heneghan applied for registration as an AP with Portfolio Managers,

Inc. ("PMI"), an introducing broker registered with the NFA.  (DE 47 ¶ 41).  The NFA approved

Heneghan's registration.  (DE 47 ¶ 41).  By this time, Heneghan had been registered with 13

different NFA-member firms over a 27-year period.  (DE 47 ¶ 42).  Many of those firms had

been accused of serious violations.  (DE 47 ¶ 42).

In February 2013, unbeknownst to Troyer, the CFTC issued an order permanently barring

PFG and Wasendorf from the industry.  (DE 47 ¶ 35).  The NFA never notified Troyer of the

fraud uncovered regarding PFG, and never investigated that PFG was receiving checks from

Troyer in Heneghan's name even though Heneghan was not registered with PFG at the time.

(DE 47 ¶ 36).

At some point in early 2013, while Heneghan was registered as an AP of PMI, Heneghan

encouraged Troyer to participate in a new commodities trading program.  (DE 47 ¶ 43).

Heneghan told Troyer that the program was set up under Heneghan's trading account in order to

avoid account maintenance fees and additional commissions.  (DE 47 ¶ 43).  Heneghan then

instructed Troyer to issue checks directly to Heneghan so that he could deposit them into the

program.  (DE 47 ¶ 43).  Heneghan assured Troyer that his funds would be segregated into a

separate sub-account.  (DE 47 ¶ 43).  From April 2013 to April 2015, Troyer issued 11 checks

payable to Heneghan for the purpose of purchasing commodities futures contracts through this

program.  (DE 47 ¶¶ 44-54).  Throughout this time, Heneghan repeatedly assured Troyer that his

futures contracts were performing well and that the value of his account was increasing.  (DE 47

¶ 55).

　　　　In July 2014, Crossland's registration as an NFA member was terminated.  (DE 47 ¶ 40).

　　　　At some point in 2015, Heneghan informed Troyer that his futures contacts were

performing well and that the value of his account exceeded $500,000.  (DE 47 ¶ 55).  Troyer

instructed Heneghan to close his account and wire the funds to him.  (DE 47 ¶ 56).  Heneghan,

however, repeatedly made excuses as to why he could not transfer the funds to Troyer.  (DE 47 ¶

57).

　　　　In December 2015, Troyer filed a complaint against PMI, its president Amanda Murphy

("Murphy"), Heneghan, and two other APs who worked with Heneghan in PMI's Los Angeles

("LA") branch.  (DE 47 ¶ 59).  In the complaint, the NFA noted, among other things:

> 8.  Heneghan, who, as previously alleged, was an AP at the LA
> branch, had also worked at several firms which were the subject of
> prior disciplinary actions brought by this Committee for sales
> practice fraud.  Like [another AP defendant], Heneghan had also
> worked at Statewide.  Prior to that, Heneghan had worked at a
> number of different firms, including Siegel Trading Co., another
> firm which was permanently barred from NFA for sales practice
> fraud.  Additionally, Heneghan worked at Jack Carl Associates,
> Inc. and Trading Centers of America, Inc., two other firms which
> were the subject of disciplinary Complaints by this Committee.
>
> 9.  In the course of its exam of PMI, NFA reviewed customer
> activity statements and tax forms for the various branch offices.
> NFA's review revealed that between October 2012 and August

> 2015 all but two of the LA branch office's 68 customers lost
> money, totaling about $1.2 million, and paid over $660,000 in
> commissions. Additionally, many of these accounts had
> commission to equity ratios equal to or exceeding 20% and traded
> both outright long options and option spreads, which may be
> indicative of abusive trading practices.

(DE 47 ¶ 60 (alteration in original)). Additionally, as to Heneghan, the NFA's complaint alleged:

> 22. NFA's review of the customer trading activity showed that
> 97% of PMI's LA branch customers had net losses and that 98% of
> all Heneghan's customers had net losses and, on average, lost 94%
> of their investment. NFA's review also found that Heneghan
> routinely made misleading and deceptive sales solicitations that
> downplayed the impact of commissions on profitability;
> exaggerated profit potential and minimized risk of loss; and failed
> to disclose that 97% of PMI's LA branch customers low money
> trading with PM[I].

(DE 47 ¶ 61). As to Murphy, the NFA's complaint alleged that she failed to adequately

supervise the LA branch to ensure that it complied with the NFA's sales practice rules. (DE 47 ¶

62). The NFA also faulted Murphy for failing to apply heightened supervision to Heneghan,

given his past employment with NFA firms that had been disciplined. (DE 47 ¶ 62).

As stated earlier, Troyer has never received any of the more than $500,000 in assets

allegedly held in his account with Heneghan, nor has he been able to recover any of the more

than $200,000 that he invested through Heneghan. (DE 47 ¶ 63). On May 8, 2016, Troyer filed

the instant case against Heneghan, Livolsi, PMI, and the NFA, alleging various violations under

the Commodities Exchange Act ("the CEA"), 7 U.S.C. §§ 1 *et seq*. (DE 1). On January 30,

2017, Troyer filed an amended complaint, dismissing Heneghan and Livolsi and advancing four

claims against PMI and the NFA. (DE 30). On May 7, 2017, Troyer voluntarily dismissed PMI

from this suit (DE 44), leaving the NFA as the sole Defendant.

As explained earlier, on July 12, 2017, the Court granted the NFA's motion to dismiss Troyer's amended complaint, affording him to and including August 2, 2017, to file a second amended complaint against the NFA in an attempt to state a claim upon which relief could be granted. (DE 46). On August 1, 2017, Troyer filed his proposed second amended complaint (DE 47), which is the subject of the instant motion to dismiss (DE 48). In Count 1, Troyer alleges that the NFA failed to enforce a rule or bylaw that it was statutorily required to enforce, in violation of § 25(b)(2) of the CEA; and in Count 2, Troyer alleges that the NFA is vicariously liable for Heneghan's purported violations of §§ 6b(a) and 6b(e) of the CEA and its related regulations.

## III. DISCUSSION

*A. An Overview of Commodities Futures Contracts, the CEA, the NFA, and the CFTC*

It is helpful to begin with a brief overview of commodities futures contracts, the CEA, the NFA, and the CFTC:

"A commodity futures contract is a contract to buy (or sell) a standard quantity of a particular commodity at a specified price and time in the future." *Commodity Futures Trading Comm'n v. Risk Capital Trading Grp., Inc.*, 452 F. Supp. 2d 1229, 1235 (N.D. Ga. 2006). "The owner of a futures contract is exposed to risk beyond the purchase price of the futures contract." *Id.* "If he still owns the contract at maturity, he would be forced to purchase (or sell) the specific commodity at the price set in the contract or to meet his obligation through alternative means." *Id.* "Two types of investors purchase commodity futures contracts: hedgers and speculators. Hedgers buy futures contracts to minimize (or transfer) risk and to lock in a price certain for the underlying commodity; speculators buy futures contracts to take on risk in the hopes of realizing

capital gains on their investments." *Id.* at 1235 n.6. "[S]peculators (especially retail investors . . . ) typically do not hold commodity futures contracts to maturity; speculators purchase futures contracts to make a profit, not to take actual delivery of a large quantity of commodities." *Id.*

"The CEA governs the trading of commodity futures contracts, and grants to the [CFTC] the authority, in large measure, to implement the regulatory regime established therein." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1150 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (1995). "The CEA has been described as a 'comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" *Vitanza v. Bd. of Trade of N.Y.*, No. 00 CV 7393(RCC), 2002 WL 424699, at *3 (S.D.N.Y. Mar. 28, 2002) (quoting *Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*, 735 F.2d 653, 661 (2d Cir. 1984)). "Section 22 of the CEA expressly provides for a private right of action, explicitly enumerating the exclusive circumstances under which a private litigant may assert a right of action for violations of the CEA or CFTC regulations." *Id.* (citing 7 U.S.C. § 25(b)(5)); *see Klein & Co. Futures, Inc. v. Bd. of Trade of New York*, 464 F.3d 255, 259 (2d Cir. 2006) ("CEA § 22 enumerates the only circumstances under which a private litigant may assert a private right of action for violations of the CEA."). "Section 22(a) relates to claims against persons other than registered entities and registered futures associations." *Klein & Co. Futures, Inc.*, 464 F.3d at 259 (citing 7 U.S.C. § 25(a)). "Section 22(b) deals with claims against [registered] entities and their officers[,] directors, governors, committee members and employees." *Id.*; *see* 7 U.S.C. § 25(b).

"[The] NFA is a Registered Futures Association which, pursuant to the [CEA] § 17, 7 U.S.C. § 21, functions as the futures industry's self-regulatory organization[,]" that is, an SRO.

*Nicholas v. Saul Stone & Co., LLC*, 224 F.3d 179, 181 n.6 (3d Cir. 2000); *see also Commodity*

*Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1326 n.3 (11th Cir. 2002)

("[The NFA] is a congressionally authorized futures industry [SRO].").  The NFA operates under

the oversight of the CFTC, the federal government's regulator for the futures industry.  *See U.S.*

*Commodity Futures Trading Comm'n v. Altamount Glob. Partners, LLC*, No. 6:12-cv-1095-Orl-

31TBS, 2014 WL 644693, at *3 (M.D. Fla. Feb. 19, 2014).  "The purpose of the NFA is to

assure high standards of business conduct by its [m]embers and to protect the public interest."

*R.J. Fitzgerald & Co.*, 310 F.3d at 1326 n.3.  "[The NFA] performs screening to determine

fitness to become and remain a member of the NFA, establishes and enforces certain rules and

standards, audits and investigates members, and conducts arbitration in futures disputes."

*Nicholas*, 224 F.3d at 181 n.6.  "Membership in the NFA is mandatory for all entities conducting

business on U.S. futures exchanges."  *Commodity Futures Trading Comm'n v. Levy*, 541 F.3d

1102, 1104 n.4 (11th Cir. 2008); *see also Nicholas*, 224 F.3d at 182.

      To further its goal of creating and implementing a comprehensive program for self-

regulation of the commodity futures industry, "[the] NFA is required to adopt rules governing

the conduct of its membership."  *MBH Commodity Advisors, Inc. v. Commodity Futures Trading*

*Comm'n*, 250 F.3d 1052, 1056 (7th Cir. 2001).  "Pursuant to its statutory mandate, the NFA has

adopted numerous rules governing member conduct."  *Id*. (citation omitted).  "These rules are

subject to [the CFTC's] approval and must provide standards governing the sales practices of

NFA members."  *Id*. (citing 7 U.S.C. § 21(p)(3); 17 C.F.R. § 170.5).  "In addition, these rules

must be 'designed to prevent fraudulent and manipulative acts and practices, to promote just and

equitable principles of trade, in general, to protect the public interest, and to remove

impediments to and perfect the mechanism of free and open futures trading.'" *Id*. (quoting 7 U.S.C. § 21(b)(7)).

### B. Count 1 States a Plausible Claim Under § 25(b)(2) of the CEA

In Count 1, Troyer advances a claim against the NFA under 7 U.S.C. § 25(b)(2), alleging that it violated the CEA by failing to enforce a bylaw or rule required by 7 U.S.C. § 21. The NFA seeks to dismiss Count 1, asserting that Troyer still fails to plausibly allege that the NFA violated a bylaw or regulation required by 7 U.S.C. § 21, and that the NFA acted in "bad faith" as required by § 25(b)(4). (DE 49 at 2).

Section 25(b)(2) states:

> A registered futures association that fails to enforce any bylaw or rule that is required under section 21 of this title or in enforcing any such bylaw or rule violates this chapter or any Commission rule, regulation, or order shall be liable for actual damages sustained by a person that engaged in any transaction specified in subsection (a) of this section to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaw or rule.

7 U.S.C. 25(b)(2). Additionally, § 25(b)(4) requires: "A person seeking to enforce liability under this section must establish that the . . . registered futures association . . . acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss." 7 U.S.C. § 25(b)(4).

In support of his allegations against the NFA, Troyer cites to § 21(b)(3)(C) and NFA Bylaw 301(a)(ii)(D). Section 21(b)(3)(C) states that the association's rules must provide that, except with the approval of the CFTC, "no person shall be admitted to or continued in membership . . . if such person . . . whether prior or subsequent to becoming a member, by his conduct while associated with a member, was a cause of any suspension, expulsion, or order . . .

which is in effect with respect to such member . . . ." 7 U.S.C. § 21(b)(3)(C); (*see* DE 47 ¶ 65).

NFA Bylaw 301(a)(ii)(D) provides, in essence, that no person shall be permitted to become or

remain affiliated with an NFA Member if that person was a cause of any suspension, expulsion,

or order of another NFA Member. (DE 47 ¶ 66; DE 50-4).

In the context of these provisions, Troyer makes the following allegations:

> 67. NFA conducted an audit which found that, in 2009, 95% of Statewide FX's customers lost money because of manipulative trading practices used by the firm's APs and that those losses totaled over $5 million.

> 68. Although NFA brought charges against Statewide FX's President, CEO, and three of its APs, NFA's complaint also noted that ". . . other Statewide AP's consistently recommended trades to customers which were not in their best interest but maximized commissions for Statewide."

> 69. NFA also alleged Statewide's owners "developed this trading strategy, and implemented it through Statewide's sales force."

> 70. According to NFA's membership records, Heneghan was registered as an AP of Statewide FX from January 8, 2007 until March 18, 2010, which meant he was part of the sales force that employed the firm's manipulative trading practices in 2009, resulting in $5 million in customer losses.

> 71. As such, Heneghan's conduct while registered as an AP with Statewide FX was "a cause" of NFA's decision to permanently expel the firm from its membership.

> 72. Therefore, pursuant to 7 U.S.C. §21(b)(3)(C) and NFA Bylaw 301(a)(ii)(D), NFA should have terminated Heneghan's registration when it expelled Statewide FX on July 28, 2011.

(DE 47 ¶¶ 67-72). Troyer then further alleges that had NFA investigated Heneghan at the time it

terminated Statewide's membership, it would have uncovered Heneghan's other alleged

misdeeds, including his using Livolsi as a straw man after Heneghan's registration with Statewide ended, and his soliciting payments to PFG and Crossland when he was not registered with either firm. (DE 47 ¶¶ 73-74). Troyer alleges that had the NFA followed its own membership rules, it would have avoided not only the future losses Troyer suffered as a result of Heneghan's ongoing fraud, but it also would have enabled Troyer to recover those funds that Heneghan wrongfully directed to Statewide, PFG, and Crossland when those firms were still solvent. (DE 47 ¶ 75).

The NFA acknowledges that Troyer's allegations now identify a bylaw that NFA purportedly violated—a deficiency that the Court identified in its Order dismissing Troyer's first amended complaint. (DE 46 at 18). The NFA argues, however, that Troyer's second amended complaint still fails to state a claim under § 25(b)(2) because Troyer's claim that Heneghan was a cause of Statewide's supposed expulsion is "contradicted by the facts of the pleadings" and "is a legal conclusion that must be disregarded for the purposes of this motion." (DE 49 at 3-4). In that regard, the NFA points to the complaint that the NFA filed against Statewide in December 2010.[3] (DE 50-1). The NFA argues that it never mentioned Heneghan by name in the Statewide complaint and never found in the complaint that Heneghan was a cause of Statewide's supposed expulsion. (DE 49 at 3-4).

While "[l]egal conclusions will be ignored where specific facts are pleaded that are to the contrary," *Anderson v. Cornejo*, 199 F.R.D. 228, 247 (N.D. Ill. 2000), Troyer does not plead facts contrary to his allegation that Heneghan was a cause of the NFA's decision to expel

---

[3] The Court observes that even if it excluded the additional documents that Troyer submitted with his response brief, the NFA's argument would still fail, as nothing in Troyer's complaint contradicts his allegation that "Heneghan's conduct while registered as an AP with Statewide FX was 'a cause' of NFA's decision to permanently expel the firm from its membership." (DE 47 ¶ 71).

Statewide from its membership.  (DE 47 ¶ 71).  The Statewide complaint does not, on its face, contradict Troyer's allegation that Heneghan was a cause of Statewide's supposed expulsion. Although the Statewide complaint does not mention Heneghan by name, it does make various allegations about "Statewide's APs," which included Heneghan at the time.

In that regard, the Statewide complaint alleges, in relevant part:

- "For the most part, the trade recommendations that Statewide's APs made to their customers were not in the customers' best interest and were intended, instead, to benefit Statewide by generating high commissions."  (DE 50-1 ¶ 17).

- "Statewide's APS routinely recommended option and bull call option spreads to customers that had little chance of being profitable due to their high break even points."  (DE 50-1 ¶ 18).

- "[A]ll of Statewide's APs recommended and placed trades in their customers' accounts that had extremely high break even points . . . ."  (DE 50-1 ¶ 21).

- "Statewide's strategy of recommending trades to maximize commissions without regard for the best interests of its customers was developed by Hennequin and Colin and implemented by Statewide's APs and constituted a failure on their part to observe high standards of commercial honor and just and equitable principles of trade."  (DE 50-1 ¶ 25).

- "Statewide APs also used misleading sales tactics in order to persuade customers to enter into the recommended trades and/or deposit additional funds into their accounts."  (DE 50-1 ¶ 26).

- "Statewide's APs exaggerated the profit potential and downplayed the risk of loss of trading futures and options and failed to disclose that nearly 95% of Statewide's customers lost money in 2009."  (DE 50-1 ¶ 26).

- "Statewide's APs failed to make adequate disclosures and/or clearly explain the way in which commissions would be charged and how they would affect the trading, including any likelihood of achieving a profit, in customer accounts."  (DE 50-1 ¶ 26).

As such, the Court does not see anything in Troyer's complaint or the additional documents that contradicts his allegation that "Heneghan's conduct while registered as an AP with Statewide FX was 'a cause' of NFA's decision to permanently expel the firm from its membership." (DE 47 ¶ 71). Therefore, the NFA's first argument in support of its motion to dismiss Count I of Troyer's second amended complaint is unpersuasive.

Moving on to the NFA's second argument, the NFA contends that Troyer still fails to plausibly allege that the NFA acted in "bad faith" when failing to enforce its bylaws, as required by 7 U.S.C. § 25(b)(4). In that regard, Troyer makes the following allegations, in relevant part:

> 79. In the complaint it filed against PMI and Murphy, NFA admitted knowledge of Heneghan's past associations with firms NFA had expelled from its membership based upon their fraudulent activities.
>
> 80. In the same action, NFA admitted its own Compliance Manual required consideration of Heneghan's past association with firms it had previously disciplined before he could register with another NFA member.
>
> 81. In fact, pursuant to NFA Bylaw 301(e), given his disqualification, NFA could only permit Heneghan to remain registered as an NFA Associate Member if the CFTC directed it to do so or upon a finding by NFA's Membership Committee that his participation in Statewide FX's manipulative trading scheme did not cause him to pose a threat to Members, Associates or customers.
>
> 82. However, the CFTC did not order NFA to maintain Heneghan's registration and its Membership Committee never investigated his activities to determine if he posed a threat to commit additional fraudulent acts.
>
> 83. Instead, . . . NFA delegated the authority granted to it by the CFTC to determine whether Heneghan would be permitted to maintain his registration to PMI, an introducing broker-dealer, and Murphy, who served as PMI's president.

15

84.     PMI and its President had strong financial interests in allowing Heneghan and other brokers to join their firm – despite their past involvement in fraudulent trading schemes – as they needed APs to generate business for the firm.

85.     Similarly, NFA's operating income consists of dues, assessments, fees and other charges upon its Members. This includes an assessment NFA collects on every commodities futures contract and option trade.

86.     As a result, NFA also had a financial interest in allowing its Member firms to hire APs who had previously engaged in fraudulent trading activity because those APs were needed to solicit trades that financially supported NFA's operations.

. . . .

92.     NFA has an established pattern of ignoring its own membership rules to permits its Members and Associate Members to continue to solicit commodities trades – after finding they had previously participated in conduct that contributed to the expulsion of other Member firms – so they can continue to generate activity that supports NFA's funding.

93.     By abdicating its registration duties to a for-profit Member to maintain its own funding source, NFA acted in bad faith in failing to enforce a rule that required it to dismiss Heneghan based upon his prior involvement in a manipulative trading scheme and led to Troyer suffering financial and emotional damages.

(DE 47 ¶¶ 92-93).

The NFA asserts that Troyer's allegations of bad faith are based on "pure speculation" and consist of "nothing more than a standard negligence claim—alleging that NFA erred in investigating and registering Heneghan." (DE 49 at 5). The NFA argues that allegations of negligence and even gross indifference cannot support a claim under § 25(b). (DE 49 at 5 (citing

*DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 265 F. Supp. 2d 254, 260 (S.D.N.Y. 2003); *W. Capital Design, LLC v. N.Y. Mercantile Exch.*, 180 F. Supp. 2d 438, 441 (S.D.N.Y. 2001)).

The Seventh Circuit Court of Appeals in *Bosco v. Servant*, 836 F.2d 271 (7th Cir. 1987), employed a dual standard when considering the term "bad faith" as used in § 25(b)(4):

> "[I]n the present setting, involving an exchange's failure to enforce its rule in accordance with the exchange's own interpretation, the courts, including our own, have treated the term "bad faith" as if it read negligence. . . .  Thus, if an exchange's regulation imposes a duty that the exchange *should* know is being flouted, the exchange is acting wrongfully—in an attenuated sense, perhaps, but one sufficient under the cases we have cited to demonstrate bad faith.  The test is different if the exchange injures a trader through the exercise of a discretionary power, such as the power to take emergency actions to prevent substantial losses; then more must be shown to constitute bad faith—either that the exchange acted unreasonably or that it had an improper motivation.

*Id*. at 277-78  (citations omitted).  Here, the NFA asserts that its continuation of Heneghan's membership without an investigation was an exercise of its discretionary power, and as such, the term "bad faith" requires "a showing of something more than mere negligence." *Braman v. CME Grp., Inc.*, 149 F. Supp. 3d 874, 892 (N.D. Ill. 2015) (citing *Bosco*, 836 F.2d at 276).  The NFA, however, fails to cite to any authority to support its assertion that the NFA's consideration of Heneghan's membership was an exercise of its discretionary power.

Furthermore, contrary to the NFA's assertion, Troyer has alleged more than that the NFA simply erred in investigating and registering Heneghan.  Troyer alleges that the NFA, knowing that Heneghan had participated in conduct that contributed to the expulsion of other Members, deliberately ignored its own membership rules in order to permit Heneghan to continue to solicit commodities trades.  (DE 47 ¶¶ 79, 80, 92).  Troyer further alleges that the NFA ignored its own

membership rules so that it could continue to generate sales activity to support the NFA's funding. (DE 47 ¶¶ 85, 92). Thus, Troyer alleges that the NFA failed to enforce its own bylaw or rule, and that it did so for "an improper motivation," *Bosco*, 836 F.2d at 278, or "self-interest," *Holladay v. CME Group*, No. 11-cv-8226, 2012 WL 3096698, at *4 (N.D. Ill. July 30, 2012). *See also Vitanza v. Bd. of Trade of City of New York*, No. 00 CV 7393(RCC), 2002 WL 424699, at *6 (S.D.N.Y. Mar. 18, 2002); *W. Capital Design, LLC*, 180 F. Supp. 2d at 441-42.

In sum, on this record, the Court concludes that Troyer has alleged enough to state a plausible claim against the NFA under 7 U.S.C. § 25(b)(2) that it failed to enforce a bylaw or rule required by 7 U.S.C. § 21. Accordingly, the NFA's motion to dismiss will be DENIED as to Count I of Troyer's second amended complaint.

### C. Count 2 Fails to State a Plausible Claim Under § 2(a)(1)(B) of the CEA

In Count 2 of his second amended complaint, Troyer seeks to hold the NFA vicariously liable for the purportedly fraudulent actions committed by Heneghan, a broker and an associate member of the NFA. In its motion to dismiss, the NFA argues that Heneghan's status as an associate member of the NFA, without more, does not make him an agent of the NFA.

Section 2(a)(1)(B), the CEA's vicarious liability provision, states:

> The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 2(a)(1)(B). Section 2(a)(1)(B) "enacts a variant of the common law principle of respondeat superior." *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 965 (7th Cir. 1986). "The common law principle makes an employer strictly liable—that is to

say, regardless of the presence or absence of fault on the employer's part—for torts committed by his employees in the furtherance of his business[.]" *Id.* (citation omitted); *see also Bosco*, 836 F.2d at 280 ("Section 2(a)(1) of the [CEA] . . . imputes liability for an agent's violations of the Act to the agent's principal . . . , consistently with usual notions of respondeat superior." (citation omitted)); *U.S. Commodity Futures Trading Comm'n v. Byrnes*, 58 F. Supp. 3d 319, 324 (S.D.N.Y. 2014) (collecting cases). This provision "varies from the common law only to the extent that it may be interpreted as a quasi-criminal statute and that it applies to torts committed by agents that are not necessarily employees of the princip[al]." *Shroff v. Rosenthal Collins Grp., LLC*, No. 08 C 929, 2009 WL 2704582, at *4 (N.D. Ill. Aug. 25, 2009) (citations omitted); *see, e.g.*, *Commodity Futures Trading Comm'n v. Commodities Fluctuations Sys., Inc.*, 583 F. Supp. 1382, 1383-85 (S.D.N.Y. 1984) (imputing violations of the CEA salespersons not only to their employer, but also to the clearing firm with whom the salespersons were registered as associated persons).

"The language of § 2(a) is broad, and extends vicarious liability to 'any individual, association, partnership, corporation, or trust.'" *U.S. Commodity Futures Trading Comm'n v. Yumin Li*, No. 15 C 5839, 2016 WL 8256392, at *8 (N.D. Ill. Dec. 9, 2016) (quoting 7 U.S.C. § 2(a)(1)(B)). "Principals are strictly liable for their agents' acts—even if the agents are not employees—if the principals authorize or ratify the acts or even just create an appearance that the acts are authorized."[4] *Rosenthal & Co.*, 802 F.2d at 966; *see Commodity Futures Trading*

---

[4] To elaborate, "[a]n agent's authority may be actual or apparent; if it is actual, it may be express or implied." *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 865-66 (7th Cir. 1998) (citing Restatement (Second) of Agency §§ 7-8 and § 7 cmt. c). "Implied authority is that authority which is inherent in an agent's position and is, simply, actual authority proved through circumstantial evidence." *Id.* "Actual authority 'to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act

*Comm'n v. Gibraltar Monetary Corp.,* 575 F.3d 1180, 1182 (11th Cir. 2009) (Under §

2(a)(1)(B), "the test for vicarious liability is common law agency."). "This is so even though in

a case of ratification or apparent authority the principal does not himself direct the act and may

indeed know nothing about it when it occurs . . . ." *Rosenthal & Co.*, 802 F.2d at 966. A court

makes an "overall assessment of the totality of the circumstances" to determine whether an

agency relationship exists. *Shroff*, 2009 WL 2704582, at *4 (quoting *Stotler & Co. v.*

*Commodity Futures Trading Comm'n*, 855 F.2d 1288, 1292 (7th Cir. 1988)); *see also Gibraltar*

*Monetary Corp., Inc.*, 575 F.3d at 1187 (discussing the legal standards for vicarious liability

under the CEA); *Yumin Li*, 2016 WL 8256392, at *7 (same).

Troyer argues that he has adequately pled an agency relationship between Heneghan and

the NFA under § 2(a)(1)(B). In support, Troyer points to the following allegations in his

amended complaint:

> 117. NFA manifested its consent for Heneghan to act as its
> agent by accepting his application to conduct commodities
> trades as an NFA Member. In fact, pursuant to NFA
> Compliance Rule 2-22, Heneghan had NFA's permission to
> advertise his status as an NFA Associate Member.
>
> 118. Pursuant to NFA Bylaw 301(F)(ii)(c), Heneghan's
> application to bec[o]me an NFA Associate Member
> constituted,
>
> > . . . an express agreement by the applicant
> > that, if admitted to NFA membership or
> > registered as an Associate, the applicant
> > shall become and remain bound by all NFA

---

on the principal's account.'" *Id.* (quoting Restatement (Second) of Agency § 26). "In contrast, 'apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purported to act for him.'" *Id.* (quoting Restatement (Second) of Agency § 26).

requirements as are then and thereafter in effect and that such agreement shall apply each time the applicant becomes a Member or Associate.

119.    Therefore, NFA consented to allow Heneghan to operate as its agent and Heneghan accepted NFA's authority to control his trading activities by requiring that he comply with its conduct rules.

120.    NFA exercised further control over Heneghan by assigning an NFA Member and Associate Member to supervise his activities pursuant to NFA Compliance Rule 2-9(a).

121.    NFA's control over Heneghan in this regard is best exhibited by the fact – based in part on the allegations in this complaint – NFA permanently barred him from its membership for violating its rules. . . .

. . . .

126.    In addition, Troyer reasonably relied upon Heneghan's representation he was an Associate Member of NFA as indicating Heneghan's trading activities were valid and authorized by NFA.

127.    NFA supported that belief by asserting on its website:

Investor confidence is crucial to the success of the derivatives markets, and the best way to gain investor confidence is to demand the highest levels of integrity of all market participants and intermediaries.

***Rigorous registration screening***.  NFA thoroughly screens all firms and individuals wishing to register with the CFTC and become Members of NFA.  Applicants must meet stringent fitness requirements and must provide fingerprint cards for FBI background checks.  In addition, individual registrants must pass comprehensive proficiency testing requirements.  NFA has the authority to deny, revoke, suspend,

restrict or condition any firm's or
individual's registration.

128. Troyer reasonably believed that, when Heneghan [was]
advertising his services as an "NFA Associate Member," he
was authorized to act on NFA's behalf in providing those
services.

. . . .

130. By allowing Heneghan to advertise as an NFA Associate
Member and making public representations that its
members were thoroughly screened and subject to its strict
oversight, NFA created a reasonable impression in Troyer's
mind that Heneghan was operating under NFA's auspices –
thus establishing an apparent agency.

131. Therefore, Heneghan was acting as the actual, inherent, and
apparent agent of NFA when he perpetrated his fraudulent
acts on Troyer and, pursuant to 7 U.S.C. § 2(a)(1)(B), NFA
is vicariously liable for the damages Troyer suffered as a
result of Heneghan's violations of the CEA.

(DE 47 ¶¶ 117-131).

Here, even if a private right of action were to exist under the CEA for a vicarious liability

claim against a registered futures association,[5] Troyer fails to plead a plausible agency

relationship between Heneghan and the NFA, because Troyer's allegations in his second

amended complaint still rest solely on Heneghan's status as an associate member of the NFA.

As this Court held in its Order (DE 46) dismissing Troyer's first amended complaint,

Heneghan's status as an associate member of the NFA, without more, does not make him an

agent of the NFA for purposes of vicarious liability under the CEA.  Troyer is conflating

Heneghan's registration as an NFA associate member (apparently, the NFA has tens of

---

[5] *See generally DGM Investments, Inc. v. N.Y. Futures Exch., Inc.*, 288 F. Supp. 2d 519, 524 (S.D.N.Y. 2003).

thousands of associate members (DE 49 at 8)), with permission to act on the NFA's behalf. As the NFA persuasively asserts, merely issuing a license or registration to an individual does not constitute an approval by the registering agency for the licensee to act on the registering entity's behalf. Expanding agency law in this manner would reach an absurd result where any licensing agency would become vicariously liable for the acts of all of its licensees, merely by the fact that it issued a license to the professionals.

To cut to the chase, there are no allegations in the amended complaint that the NFA ever employed Heneghan, directed his day-to-day activities, or authorized him to act on the NFA's behalf. *See Gibraltar Monetary Corp.*, 575 F.3d at 1187-89 (discussing the legal test for vicarious liability under the CEA); *see Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1334 (7th Cir. 1995) ("[T]he Indiana courts have held that the mere existence of a formal licensing or dealership agreement will not create an agency relationship in the absence of evidence that the principal is exercising control over the details of the purported agent's work." (citation omitted)); *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 675 (Ind. 2001) ("[A]pparent authority refers to a third party's reasonable belief that the principal has authorized the acts of its agent; it arises from the principal's indirect or direct manifestations to a third party and not from the representations or acts of the agent." (citations omitted)). Nor is Troyer's assertion that the language on the NFA's website offering assurances of high standards of professional conduct by the NFA's members sufficient to create a reasonable belief that Heneghan was authorized to act on the NFA's behalf.

Perhaps most telling is that Troyer has not cited *any* case in which a broker and associate member has been viewed as an agent of the NFA. *See Asa-Brandt, Inc. v. ADM Inv'r Servs.,*

23

*Inc.*, 344 F.3d 738, 749 (8th Cir. 2003) (acknowledging that a party's "mere status" as an introducing broker, without more, was insufficient to plausibly plead an apparent agency relationship with a futures commissions merchant); *Lacovara v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 551 F. Supp. 601, 604 (E.D. Pa. 1982); *see generally* Jerry W. Markham, *Commodities Regulation: Fraud, Manipulation & Other Claims*, 13 Commodities Reg. § 4:1 (2017); Jerry W. Markham, *Judicial Decisions on Respondeat Superior Under the Commodity Exchange Act*, 13 Commodities Reg. § 4:14 (2017); Deborah Sprenger, J.D., *Who Is "Agent," so as to Subject Principal to Liability, Under § 2(a)(1)(a) of Commodity Exchange Act (7 U.S.C.A § 4)*, 98 A.L.R. Fed 588 (1990).

In short, Troyer has not pled facts sufficient to create a plausible claim that Heneghan's status as an associate member of the NFA—without more—equates to the NFA's consent to have Heneghan act on the NFA's behalf in soliciting futures commodities. *See Stotler & Co.*, 855 F.2d at 1292 ("The real question is whether Allen was acting as Stotler's agent for soliciting customers to trade commodity futures accounts."). As such, Troyer fails to state a plausible claim of vicarious liability against the NFA under § 2(a)(1)(B) of the CEA, and therefore, Count 2 of his second amended complaint will be dismissed.

"Whether to permit a plaintiff to amend [his] pleadings is a matter committed to the Court's 'sound discretion.'" *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 547-48 (S.D.N.Y. 2008) (quoting Fed. R. Civ. P. 15(a)). When dismissing Troyer's first amended complaint, the Court stated that it would afford him one additional opportunity to amend his complaint in an attempt to state a plausible claim, observing that he had already amended his complaint once in response to the NFA's first motion to dismiss. (DE 46 at 25); *see*

*Bianchi v. McQueen*, 917 F. Supp. 2d 822, 835 (N.D. Ill. 2013) ("Plaintiffs who meet resistance to their complaint through a successful Rule 12(b)(6) motion generally are allowed at least one opportunity to replead . . . ."). Because Troyer has now been given three opportunities to plead a plausible claim of vicarious liability under the CEA and has still failed to do so, the dismissal of Count 2 will be without leave to re-plead.

## IV.  CONCLUSION

For the foregoing reasons, the NFA's motion to dismiss (DE 48) is GRANTED with prejudice as to Count II (vicarious liability under the CEA), but is DENIED as to Count I (failure to enforce the CEA), which survives.  The Court sets this case for a telephonic scheduling conference on March 1, 2018, at 10:00 a.m.

SO ORDERED.

Entered this 14th day of February 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge