**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| DENNIS TROYER, | Civil Action No. 16-CV-146 |
| Plaintiff, | MAGISTRATE JUDGE SUSAN L. COLLINS |
| vs. | |
| NATIONAL FUTURES ASSOCIATION, | |
| Defendant. | |

**DEFENDANT NATIONAL FUTURES ASSOCIATION'S JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

Introduction .................................................................................................................................1

Summary Of Undisputed Facts .......................................................................................................3

    A.  The Parties. ..........................................................................................................................3

        1.  NFA ...............................................................................................................................3

        2.  Troyer ...........................................................................................................................5

    B.  Troyer Places Investments Through Heneghan. ..................................................................5

    C.  NFA's Disciplinary Action Against Statewide FX ...........................................................7

    D.  NFA's Discipline Of Heneghan. .......................................................................................8

Legal Standard ...............................................................................................................................8

Argument .......................................................................................................................................8

I.    The Undisputed Facts Demonstrate That Troyer's Claim Is Meritless. ..................................8

    A.  This Court Should Grant Summary Judgment To NFA Because NFA Did Not
        Expel Statewide FX. ........................................................................................................8

    B.  This Court Should Grant Summary Judgment To NFA Because Heneghan Was
        Not "A Cause Of" The Statewide FX Disciplinary Action. .............................................12

    C.  This Court Should Grant Summary Judgment To NFA Because It Did Not Act In
        Bad Faith. ........................................................................................................................14

        1.  NFA's Actions Complied With The CFTC's Direction In *Peterson*...........................15

        2.  Application Of Bylaw 301(a)(ii)(D) Involves Discretion............................................16

    D.  This Court Should Grant Summary Judgment to NFA Because NFA Did Not
        Cause Troyer's Losses. ...................................................................................................20

II.  This Court Should Grant Summary Judgment To NFA Because Troyer's Claim Is Time-
    Barred............................................................................................................................................21

Conclusion .....................................................................................................................................24

## TABLE OF AUTHORITIES

**CASES**

*American Home Products Corp. v. Liberty Mut. Ins. Co.*,
   748 F.2d 760 (2d Cir. 1984) ................................................................................. 20

*Billhofer v. Flamel Techs., SA* ,
   663 F. Supp. 2d 288 (S.D.N.Y. 2009) .................................................................. 20

*Bosco v. Serhant*,
   836 F.2d 271 (7th Cir. 1987) ......................................................................... *passim*

*Braman v. CME Grp., Inc.*,
   149 F. Supp. 3d 874 (N.D. Ill. 2015) ................................................................... 18

*Brawer v. Options Clearing Corp.*,
   807 F.2d 297 (2d Cir. 1986) ................................................................................. 20

*Cameron v. I.R.S.*,
   593 F. Supp. 1540 (N.D. Ind. 1984), *aff'd*, 773 F.2d 126 (7th Cir. 1985)............... 18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)............................................................................................... 8

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)............................................................................................. 11

*Chicago Bd. Options Exch., Inc. v. Sec. & Exch. Comm'n*,
   889 F.3d 837 (7th Cir. 2018) ............................................................................... 11

*Collins v. BAC Home Loans Servicing LP*,
   912 F. Supp. 2d 997 (D. Colo. 2012).................................................................... 15

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*,
   233 F.3d 981 (7th Cir. 2000) ............................................................................... 11

*D'Alessio v. N.Y. Stock Exch., Inc.*,
   258 F.3d 93 (2d Cir. 2001) ............................................................................. 3, 16

*Daniel v. Board of Trade of City of Chicago*,
   164 F.2d 815 (7th Cir. 1947) ............................................................................... 19

*Dietchweiler by Dietchweiler v. Lucas*,
   827 F.3d 622 (7th Cir. 2016) ................................................................................. 8

*Dyer v. Miller Lynch, Pierce, Fenner & Smith, Inc.*,
   928 F. 2d 238 (7th Cir. 1991) ............................................................................... 22

*Holladay v. CME Grp.*,
   2012 WL 3096698 (N.D. Ill. July 30, 2012)............................................................ 18

*Hupp v. Gray*,
   500 F.2d 993 (7th Cir. 1974) ................................................................................. 22

*Limestone Development Corp. v. Village of Lemont*,
   520 F.3d 797 (7th Cir. 2008) ................................................................................. 23

*Martin v. City of Fort Wayne*,
   No. 15-CV-274, 2017 WL 131724 (N.D. Ind. Jan. 12, 2017) ................................. 8

*Peterson v. National Futures Association*,
   No. CRAA-91-1, 1992 WL 289773 (CFTC Oct. 7, 1992) ............................. *passim*

*Sam Wong & Son, Inc. v. New York Mercantile Exchange*,
   735 F.2d 653 (2d Cir. 1984) .................................................................................. 19

*Shultz v. S.E.C.*,
   614 F.2d 561 (7th Cir. 1980) ................................................................................. 16

*Teamsters Local 282 Pension Trust Fund v. Angelos*,
   624 F. Supp. 959 (N.D. Ill. 1985) .................................................................... 22, 24

*Tomlinson v. Goldman, Sachs & Co.*,
   682 F. Supp. 2d 845 (N.D. Ill. 2009) ............................................................... 22, 24

*Troyer v. Nat'l Futures Ass'n*,
   290 F. Supp. 3d 874 (N.D. Ind. 2018) ......................................................... *passim*

*W. Capital Design, LLC v. New York Mercantile Exch.*,
   180 F. Supp. 2d 438 (S.D.N.Y. 2001), *aff'd*, 25 F. App'x 63 (2d Cir. 2002)......................... 18

*Zimmerman v. Chicago Board of Trade*,
   360 F.3d 612 (7th Cir. 2004) ........................................................................... 18, 19

**STATUTES**

7 U.S.C. § 12a .............................................................................................. 4, 5, 10

7 U.S.C. § 17(m) ................................................................................................ 10

7 U.S.C. § 21 ............................................................................................... 1, 3, 11

7 U.S.C. § 25(b) ............................................................................................ 1, 9, 20

7 U.S.C. § 25(c) ........................................................................................... 22, 23

**OTHER AUTHORITIES**

*In re Lake Shore Asset Management Limited*,
  NFA Case No. 09-BCC-004 (May 14, 2009) .......................................................................... 11

*In re Portfolio Managers, Inc.*,
  NFA Case No. 15-BCC-034 (Feb 25, 2016) .......................................................................... 11

*In re Statewide FX, Inc.*,
  NFA Case No. 10-BCC-036 (Jul. 28, 2011).......................................................................... 11

NFA Bylaw 1101 .......................................................................................................................... 10

NFA Bylaw 301 ................................................................................................................... *passim*

**REGULATIONS**

17 C.F.R. § 170.15 ...................................................................................................................... 10

17 C.F.R. § 170.17 ...................................................................................................................... 10

17 C.F.R. Pt. 3, Appx. A.............................................................................................................. 12

## GLOSSARY

In support of NFA's Joint Memorandum in Opposition to Plaintiff's Motion For Summary Judgment And In Support Of Its Motion For Summary Judgment, the following abbreviations shall be used:

| NAME | ABBREVIATION |
|------|--------------|
| INDIVIDUAL ASSOCIATED WITH MEMBER AND REGISTERED WITH CFTC | AP |
| INDIVDUAL ASSOCIATED WITH MEMBER AND MEMBER OF NFA | ASSOCIATE |
| ATLANTIS TRADING CORP. | ATC |
| BACKGROUND AFFILIATION STATUS INFORMATION CENTER | BASIC |
| NFA BUSINESS CONDUCT COMMITTEE | BCC |
| GREGORY M. BOYLE DECLARATION | BOYLE |
| COMMODITY EXCHANGE ACT | CEA |
| COMMODITY FUTURES TRADING COMMISSION | CFTC |
| DANIEL A. DRISCOLL DECLARATION | DRISCOLL |
| JACK CARL ASSOCIATES, INC. | JCA |
| NATIONAL FUTURES ASSOCIATION | NFA |
| NFA MEMBER FIRM | NFA MEMBER |
| NEW YORK MERCANTILE EXCHANCE | NYMEX |
| PEREGRINE FINANCIAL GROUP INC. | PFG |
| PLAINTIFF'S MEMORANDUM OF SUPPORT FOR MOTION FOR SUMMARY JUDGMENT | PL. BR. |
| PORTFOLIO MANAGERS, INC. | PMI |
| PLAINTIFF'S STATEMENT OF FACTS | PSOF |
| NFA'S REGISTRATION, LEGAL, AND COMPLIANCE COMMITTEE | RCL COMMITTEE |

| NAME | ABBREVIATION |
|------|--------------|
| SECOND AMENDED COMPLAINT | SAC |
| SECURITIES AND EXCHANGE COMMISSION | SEC |
| NFA STATEMENT OF MATERIAL FACTS | SOF |
| NFA STATEMENT OF GENUINE DISPUTES | SOGD |
| SELF-REGULATORY ORGANIZATION | SRO |
| STATEWDE FX, INC. | STATEWIDE FX |

**INTRODUCTION**

This Court's February 14, 2018 ruling dismissed all but one of Plaintiff Dennis Troyer's claims in this case. His sole surviving claim seeks damages under Section 22(b) of the Commodity Exchange Act (CEA), 7 U.S.C. § 25(b), based on NFA's alleged bad-faith failure to terminate Thomas Heneghan's as an Associate Member of NFA[1] in July 2011. Both parties have moved for summary judgment. Because the undisputed facts establish that Troyer's claim fails as a matter of law, this Court should grant summary judgment to NFA.

Troyer's only path to recovery is a narrow one. As a "registered futures association" under the CEA, *see* 7 U.S.C. § 21, NFA plays a central and unique role in Congress' plan for regulating futures trading. But that role requires breathing room to balance priorities, exercise discretion, and apply expert judgment, with oversight coming principally from "the CFTC, the federal government's regulator for the futures industry," rather than from courts and juries in litigation. *Troyer v. Nat'l Futures Ass'n*, 290 F. Supp. 3d 874, 881 (N.D. Ind. 2018). Recognizing as much, Congress carefully limited the available damages claims against registered futures associations such as NFA.

To establish liability under the CEA, a plaintiff must prove (i) that the association "fail[ed] to enforce [a] bylaw or rule that is required under section 21 of [the CEA]," (ii) that the association "acted in bad faith in failing to take action or in taking such action as was taken," and (iii) that "such failure or action caused the loss." 7 U.S.C. § 25(b)(2), (4). Here, the undisputed evidence establishes that no reasonable fact finder could conclude that Troyer can prove any of these elements. Troyer's claim rests on NFA Bylaw 301(a)(ii)(D), which prohibits the continued membership of any Associate who "was . . . a cause of" the "expulsion" of a Member. (*See* SAC

---

[1] NFA Members are firms and NFA Associates are individuals who are associated with NFA Members.

¶¶ 65, 92.)  With the benefit of hindsight, Troyer argues that NFA improperly failed to enforce that bylaw against Heneghan after he allegedly "contributed to [NFA's] expulsion of Statewide FX." (Pl. Br. 12.)  But the undisputed evidence shows that NFA did not expel Statewide FX—eliminating the critical factual predicate of Troyer's theory.  In fact, NFA reached an agreement with Statewide FX that it would never reapply for NFA membership.  Troyer seeks to conflate the two sanctions, but the CFTC—NFA's regulator and the appellate tribunal for NFA's decisions and orders—has specifically held that the two sanctions are distinct, and confirmed that distinction in interpretive guidance.  That CFTC construction of the CEA is entitled to deference by this Court and, in any event, is binding on NFA.  Thus, Troyer is simply incorrect that NFA had an obligation to enforce Bylaw 301(a)(ii)(D) at all in this case.

The undisputed evidence also establishes that any failure to enforce that bylaw could not have been in bad faith.  Troyer argues that the "bad faith" element requires a showing only of negligence.  (Pl. Br. at 14–17.)  But first, even if that standard applied, it could not be negligent for NFA to hew to the approach adopted by the CFTC: Surely it was at least reasonable for NFA to interpret its rules in light of the controlling authority from its federal regulator.  Second, Troyer is wrong to equate "bad faith" with "negligence" in the context of this case in the first place.  The summary judgment record eliminates any doubt that NFA not terminating Heneghan's membership was, if not compelled by the CFTC's legal rulings, at least "an exercise of [NFA's] discretionary power" to interpret and apply its own rules.  *Troyer*, 290 F. Supp. 3d at 885.  Accordingly, Troyer must prove NFA's knowledge and ulterior motive; negligence is not enough.  But his allegations on both of those points—which this Court assumed to be true at the motion-to-dismiss stage, *see id.*, have now proved to be false.

Still more, Troyer has failed to introduce any evidence of causation, and has admitted that he cannot.  (PSOF ¶ 21.)  In fact, it is undisputed that more than $160,000 of Troyer's alleged losses occurred *before* the time NFA allegedly failed to enforce Bylaw 301.  (SOF ¶¶ 34–37.)  And Troyer offers no evidence to satisfy his burden that NFA's actions rather than other factors (such as market forces) caused his damages.

Finally, and regardless of Troyer's failure of proof, his claim is plainly barred by the CEA's two-year statute of limitations.  All the information that Troyer offers to support his claim was known to him or publicly available by no later than April 2013—more than three years before he filed suit in 2016.  For that reason alone, this Court should grant summary judgment to NFA.

SUMMARY OF UNDISPUTED FACTS[2]

A.   *The Parties.*

1.   <u>NFA</u>

NFA is the industry-wide, independent, congressionally authorized, SRO for the derivatives industry, and has been registered with the CFTC as a futures association under the CEA, 7 U.S.C. § 21, since September 22, 1981.  (SOF ¶ 1.)  SROs "perform[] regulatory functions that would otherwise be performed by" an agency like the CFTC or SEC.  *See D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105 (2d Cir. 2001) (citation omitted).  NFA's regulatory activities include screening, rulemaking, auditing, investigation, and enforcement functions for the futures industry.  (SOF ¶ 2.)  NFA has maintained a public website since 1997, and since 1999, the website has linked to BASIC, which publicly displays information regarding NFA regulatory actions, CFTC actions, futures exchange disciplinary actions, and other non-disciplinary information such

---

[2] To avoid unnecessary duplication, NFA incorporates by reference the facts in its SOF, and provides below facts specific to the arguments made in this memorandum.

3

as CFTC registration and NFA membership status and history, business addresses and identities of principals.  (*Id*. ¶¶ 25–26.)

NFA is comprised of approximately 3,600 Members and 49,000 Associates.  (*Id*. ¶ 4.)  Its operations are carried out by a staff that has ranged in size from approximately 300 employees between 2008 and 2013, to over 500 employees today.  (*Id*. ¶ 5.)  Several groups, departments, and committees within NFA play critical roles in performing its regulatory functions, including the Registration Department, Fitness Investigations Group, and Compliance Department.  (*See id*. ¶¶ 11–17.)  Each year, these departments process an average of approximately 1,000 Member and 10,000 Associate registrations, initiate an average of over 1,300 fitness investigations, and conduct approximately 550 regulatory examinations.  (*Id*. ¶¶ 12–13, 15.)

Through a series of delegation orders beginning on August 3, 1983, the CFTC delegated to NFA the responsibility to process registrations for futures commission merchants, commodity pool operators, commodity trading advisors, and introducing brokers, along with APs of those entities.  (*Id*. ¶ 8.)  On August 1, 1985, with CFTC approval, NFA implemented and began enforcing Bylaw 301(b), and pursuant to Bylaw 301(b), all individuals then currently registered as APs, and all individuals subsequently registering as APs, became NFA Associates, subject to NFA Requirements.  (*Id*. ¶¶ 9, 10, 51.)

Sections 8a(2) and (3) of the CEA set forth specific standards for the CFTC to apply when considering whether an individual is fit for AP registration.  *See generally* 7 U.S.C. §§ 12a(2), (3). For example, those sections provide that a person's registration can be denied or revoked if they have been convicted of felony criminal offenses or have been found in a proceeding brought by certain governmental agencies or other governmental bodies to have violated the CEA or federal securities laws.  *See id.*  Because the CFTC has delegated its registration duties to NFA, and

because CFTC registrants are required to be NFA Members or Associates, the standards of Sections 8a(2) and (3) effectively apply to all NFA's registration and membership decisions.  (SOF ¶¶ 8–10.)  Those standards for registration with the CFTC are also mirrored in NFA bylaws, which generally provides notice to Members and APs of what facts could be the basis for revoking or refusing NFA Membership or Associate Membership.  (*Id.*)  The provision of Bylaw 301 relevant here provides in part that "no person shall be eligible to become or remain a Member or associated with a Member who . . . was, by the person's conduct while associated with a Member, *a cause of any suspension, expulsion*" or is himself subject to a suspension, expulsion or permanent bar from membership.  NFA Bylaw 301(a)(ii)(D) (emphasis added).

NFA itself is subject to CFTC oversight, including CFTC review of NFA policies and procedures, rule changes, and of its decisions in disciplinary matters or final orders in registration actions.   NFA Members and Associates may appeal NFA disciplinary decisions and final registration orders to the CFTC, and the CFTC maintains the right to initiate its own proceedings and to review NFA's decisions and final orders.  (SOF ¶¶ 27–28.)

2.    Troyer

Troyer is a business owner and former banker in Indiana.  (*Id.* ¶¶ 29–30.)  He has financial market investment experience dating back to the 1990s.  (*Id.* ¶ 31.)  Since the early 2000s, Troyer has invested hundreds of thousands of dollars in financial derivatives through NFA Members and their APs, and continues to hold hundreds of thousands of dollars in securities investments today.  (*Id.* ¶ 31.)  Troyer is familiar with the risks attendant with investing in the financial markets.  (*Id.*)

B.    *Troyer Places Investments Through Heneghan.*

In approximately October 2008, Troyer received an unsolicited call from Heneghan, who made investment recommendations to Troyer.  (*Id.* ¶ 33.)  From October 2008 through March

5

2011, Troyer deposited more than $160,000 into trading accounts with two NFA Member firms, Statewide FX and ATC.  (*Id*. ¶¶ 34.)  Heneghan recommended trades for Troyer to make, and Troyer authorized Heneghan to make trades on his behalf.  (*Id*. ¶ 35.)  Troyer received account statements showing that these investments were consistently losing value.  (*Id*. ¶ 36.)  Despite losing more than 97% of his investment between 2008 and 2011, Troyer continued accepting Heneghan's investment advice and depositing money in his trading accounts until around March 2011.  (*Id*. ¶¶ 36–37.)

Troyer then stopped investing with Heneghan for two years.  (*Id*. ¶ 38.)  However, in or about April 2013, Heneghan contacted Troyer again to solicit additional investment funds from Troyer.  (*Id*. at ¶ 43.)  Troyer then began sending money to Heneghan personally, purportedly so Troyer could continue to trade based on Heneghan's recommendations while taking advantage of fee discounts available to Heneghan as a trading firm employee.  (*Id*. ¶¶ 43–44.)  Between April 2013 and April 2015, based on requests from Heneghan, Troyer sent Heneghan $82,000.  (*Id*. ¶¶ 45, 46.)  Unlike before, where Troyer sent checks directly to NFA Member firms that held his accounts, the checks Troyer sent between 2013 and 2015 were in Heneghan's name and went directly to Heneghan's home.  (*Id*. ¶¶ 43–44.)  And also unlike before, Troyer did not receive a single account statement during this period.  (*Id*. ¶ 48.)  Troyer admits that while he was never "completely comfortable" with this arrangement with Heneghan in 2013 through 2015, and while knowing that Heneghan was lying to him about the value of his investments, Troyer nonetheless voluntarily continued to send Heneghan money until 2015.  (*Id*. ¶¶ 47–48.)

By no later than 2003, Troyer knew about, had access to, and at times visited NFA's website, which provided access to the information contained in BASIC.  (*Id*. ¶ 32.)  At no time before or during the time that Troyer invested with Heneghan did Troyer access BASIC, nor did

he use any other means to seek information regarding Heneghan or the firms with which Heneghan was affiliated.  (*Id.* ¶ 50.)  Troyer admits that knowing the history of Heneghan's affiliation with various NFA firms would have had no impact on his decision to invest.  (*Id.* ¶ 53.)

C.      *NFA's Disciplinary Action Against Statewide FX.*

On or about June 7, 2010, NFA's Compliance Department commenced an unannounced examination of Statewide FX.  (*Id.* ¶ 73.)  The examination included an analysis of all Statewide FX traders' activity between February and May 2010, customer interviews, and employee interviews.  (*Id.* ¶ 74.)  The Compliance Department reported the results of the examination to NFA's BCC on October 26, 2010 and recommended disciplinary action against Statewide FX, its two principals, and three of its APs (though not Heneghan), and on December 9, 2010, while Statewide FX was in the process of voluntarily withdrawing its NFA membership, the BCC issued a disciplinary complaint.  (*Id.* ¶ 75.)

Although NFA's examination included an analysis of trades made by all of Statewide FX's APs, 15 of those APs, including Heneghan, were not named in the complaint.  (*Id.* ¶¶ 74–75.)  Like a prosecutor or government enforcement attorney, NFA exercises its discretion in evaluating what charges it brings and against whom it brings them based on several factors, including among other things the quality of the proof, such as witness testimony or documentary evidence that NFA's enforcement attorneys might present to the neutral BCC and hearing panel charged with deciding the case.  (*Id.* ¶¶ 22, 76, 78.)

On or about July 28, 2011, pursuant to a settlement offer, and having already voluntarily withdrawn its membership with NFA, Statewide FX agreed never to reapply for NFA membership. (*Id.* ¶ 79.)  Statewide FX was not expelled.  (*Id.* ¶¶ 79–81.)

D.      *NFA's Discipline Of Heneghan.*

Heneghan became an AP of PMI on or about October 16, 2012.  (*Id*. ¶ 89.)  On December 21, 2015, after PMI had already terminated Heneghan's association with it, the BCC issued a complaint against PMI, Amanda Murphy, Christopher Hogan, Andrew Zhukov, and Heneghan, alleging, among other things, the use of "high-pressure sales tactics" and "materially misleading and deceptive statements during sales solicitations."  (*Id*. ¶ 92.)  Heneghan never responded to the complaint, and on February 26, 2016, NFA issued a decision "permanently bar[ring] . . . Heneghan from NFA membership . . . ."  (*Id*. ¶ 94.)  Troyer filed this action on May 8, 2016.  (Dkt. 1.)

## LEGAL STANDARD

"Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."  *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016).  "If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated."  *Martin v. City of Fort Wayne*, No. 15-CV-274, 2017 WL 131724, at *2 (N.D. Ind. Jan. 12, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ARGUMENT

I.      **THE UNDISPUTED FACTS DEMONSTRATE THAT TROYER'S CLAIM IS MERITLESS.**

A.      *This Court Should Grant Summary Judgment To NFA Because NFA Did Not Expel Statewide FX.*

Troyer's claim against NFA is grounded in his theory that Heneghan was "a cause" of a purported expulsion of Statewide FX from NFA membership in 2011, and therefore, NFA not terminating Heneghan's membership constituted an actionable failure to enforce NFA Bylaw 301(a)(ii)(D).  (SAC ¶¶ 71, 77; Pl. Br. 20.)  But the undisputed evidence demonstrates that NFA did not expel Statewide FX.

8

To establish liability under the CEA, Troyer must prove that NFA "fail[ed] to enforce [a] bylaw or rule that is required under section 21 of [the CEA]."  7 U.S.C. § 25(b)(2), (4).  Here, Troyer alleges that NFA failed to enforce NFA Bylaw 301(a)(ii)(D).  (SAC ¶ 72.)  That bylaw provides that "no person shall be eligible to become or remain a Member [of NFA] or associated with a Member who. . . was, by the person's conduct while associated with a Member, a cause of any suspension, expulsion" or is himself subject to a suspension, expulsion or permanent bar from membership.  In alleging that NFA failed to enforce Bylaw 301(a)(ii)(D) against Heneghan, Troyer asserts that "NFA permanently expelled Statewide FX from as [sic] an NFA Member."  (PSOF ¶ 16.)  In support of that contention, Troyer cites Part IV of NFA's decision in the Statewide FX disciplinary action, which states in relevant part that "Statewide [FX] . . . submitted [an] Offer[] in which [it] neither admitted or denied the allegations and proposed to settle the charges against [it]" by "agree[ing] that Statewide FX shall never reapply for NFA membership or act as a principal of an NFA Member, effective immediately."  (*Id.* (citing Pl. Ex. 17 at 4); (Pl. Ex. 7 at 2.).)  But the sanction set forth in that decision was not an "expulsion" under well-established CFTC authority that NFA is required to follow.  Because NFA did *not* expel Statewide FX, Bylaw 301(a)(ii)(D) does not apply by its own terms.  As such, Troyer has not shown that NFA failed to enforce a bylaw, and summary judgment should be granted to NFA.

The distinction between an "expulsion" and Statewide FX's agreement to voluntarily withdraw and never reapply for membership is straightforward.  An expelled member does not have to make any promises not to reapply; rather, the expulsion order, by its own force, prevents the member from regaining membership.  Here, by contrast, the Statewide FX order contains no penalty expelling Statewide FX from NFA membership.  (Driscoll Ex. 7.)  Instead, Statewide FX

*agreed* never to reapply, and it was that agreement, rather than an NFA order of expulsion, that is the legal basis for preventing Statewide FX from reapplying in the future.

Binding CFTC authority confirms that an expulsion is not the same as an agreement to withdraw from membership and not reapply.  In *Peterson v. National Futures Association*, No. CRAA-91-1, 1992 WL 289773, at *3 (CFTC Oct. 7, 1992), NYMEX, an exchange and SRO, charged Leslie Peterson with violating certain exchange rules.  *Id.* at *1−2.  Peterson settled those charges without admitting or denying wrongdoing, but withdrew from and agreed never to reapply for NYMEX membership, which both NFA and the CFTC characterized as agreeing to a permanent bar from NYMEX membership—a bar indistinguishable from the bar imposed on Statewide FX in this case.  *Id.*.  Peterson then applied for CFTC registration.[3]  *Id.*  NFA denied Peterson's registration application because it found that "an agreement to a permanent bar from an exchange membership" "should be treated like an expulsion," which is a statutory disqualification from registration under Section 8a(3)(J) of the CEA, 7 U.S.C. § 12a(3)(J).  *Peterson*, 1992 WL 289773 at *1–*2.

The CFTC reversed NFA's order.  *Id.* at *3.  The CFTC expressly rejected NFA's argument that "there is no significant distinction between expulsion from an exchange and agreement to a permanent bar from exchange membership," holding that NFA's argument would "eliminate

---

[3]  Although *Peterson* involved CFTC registration rather than NFA membership, it is nonetheless directly applicable here.  NFA is responsible for processing both NFA membership and CFTC registration.  (SOF ¶¶ 8−10.)  The fitness standards for NFA membership and CFTC registration are effectively the same because NFA membership is compulsory and the effect of a denial of NFA membership is the same as a denial of CFTC registration.  (SOF ¶ 14.)  *See* 7 U.S.C. § 17(m) (registered futures association may, with CFTC approval, enact rules requiring all CFTC registrants to be association members); 17 C.F.R. §§ 170.15, 170.17 (requiring membership in a registered futures association for futures commission merchants, introducing brokers, commodity pool operators, and commodity trading advisors); *see also* NFA Bylaw 1101 (mandating membership by prohibiting NFA Members from doing business with non-members).

distinctions reflected in the language Congress adopted." *Id.* It further reasoned that conflating a permanent bar with an expulsion "fail[ed] to give appropriate weight to the bargain struck by the parties to the NYMEX settlement." *Id.* It noted that "Peterson apparently bargained for a sanction that would not raise a presumption of unfitness for registration or membership in NFA," and that NFA could not "in effect, unilaterally rewrite the terms of the parties' agreement." *Id.*

NFA is legally required to follow *Peterson*: CFTC decisions are binding on NFA. *See generally* 7 U.S.C. § 21. Consistent with that obligation, NFA's disciplinary decisions are careful to distinguish between and precisely describe which of the two penalties is being imposed. *Compare In re Lake Shore Asset Management Limited*, NFA Case No. 09-BCC-004 (May 14, 2009) (Boyle Ex. 13) ("Lake Shore [Asset Management Limited] is **permanently expelled** from NFA as of the effective date of this Decision") (emphasis added) *with In re Statewide FX, Inc.*, NFA Case No. 10-BCC-036 (Jul. 28, 2011) (Driscoll Ex. 7) ("Statewide [FX] is ordered never to reapply or act as a principal of an NFA Member, effective immediately"); *accord In re Portfolio Managers, Inc.*, NFA Case No. 15-BCC-034 (Feb 25, 2016) (Boyle Ex. 14) ("PMI shall withdraw from NFA membership and, thereafter, shall be permanently barred from NFA membership.") Moreover, even if NFA was authorized to disagree with the CFTC, it had no basis for doing so: the CFTC's interpretation of "expulsion" in *Peterson* is reasonable, and is hence entitled to deference by NFA in the same way it is entitled to *Chevron* deference by this Court. *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 233 F.3d 981, 987 (7th Cir. 2000) ("The CFTC's construction of the CEA is entitled to *Chevron* deference.") (citation omitted); *see also Chicago Bd. Options Exch., Inc. v. Sec. & Exch. Comm'n*, 889 F.3d 837, 841 (7th Cir. 2018) (SEC's interpretation of the Securities Exchange Act of 1934 was entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).

This analysis dooms Troyer's case.  NFA never expelled Statewide FX; rather, Statewide FX successfully bargained for an order in which it agreed not to reapply for membership.  Troyer's argument hinges on the theory that "there is no significant distinction between expulsion from an exchange and agreement to a permanent bar from exchange membership," which is the exact argument that the CFTC has rejected.  *See Peterson*, 1992 WL 289773 at *3.[4]  NFA therefore did not "fail to enforce" NFA Bylaw 301(a)(ii)(D), as required for Troyer to establish liability under the CEA, and NFA's summary judgment motion should be granted.

>    B.    *This Court Should Grant Summary Judgment To NFA Because Heneghan Was Not "A Cause Of" The Statewide FX Disciplinary Action.*

NFA Bylaw 301(a)(ii)(D) prohibits the continued membership of any member who "was . . . a cause of" the "expulsion" of another member.  Troyer's claim should be dismissed on the independent ground that he has not met his burden to show that Heneghan's conduct was a "cause" of NFA's disciplinary action against Statewide FX.

To support his claim that Heneghan's conduct was "a cause" of NFA's disciplinary action, Troyer's brief relies exclusively on NFA's documents; he conducted no deposition discovery and has no supporting declarations.  (Pl. Br. 12–14.)  None of the documents upon which Troyer relies even arguably proves that Heneghan was a cause of NFA's discipline of Statewide FX.

---

[4] The CFTC reaffirmed this distinction between the two penalties in 1996, when it amended its Interpretative Statement With Respect to Sections 8a(2)(C) and (E) and Section 8a(3)(J) and (M) of the Commodity Exchange Act ("Interpretative Statement").  17 C.F.R. Pt. 3, Appx. A.  Consistent with *Peterson*, rather than interpreting an agreement to withdraw and not to reapply as an expulsion that by its own force allows for disqualification, the CFTC instead stated that a subsequent *breach* of such an agreement by failing to withdraw or reapplying would be an independent basis for disqualification.  *Id*. ("The failure to withdraw or the attempt to register in the face of such an undertaking would indicate the lack of fair and honest dealing which the Commission believes constitutes 'other good cause' for denying, revoking or conditioning registration under the Act.").  No such statement would have been necessary if an agreement to withdraw and to not reapply was equivalent to an expulsion.

Troyer first cites the allegation in NFA's complaint against Statewide FX that 95% of Statewide FX's customers lost money in 2009, along with an exhibit NFA used in an evidentiary hearing against one of Statewide FX's APs. From those documents, Troyer concludes that, because Heneghan's customers were among the 95% who lost money in 2009, Heneghan must have been a cause of the purported expulsion of Statewide FX. (Pl. Br. 12–14.) That is wrong. NFA charged Statewide FX and its two principals with developing a plan in which the *principals* instructed Statewide FX APs as to which trades to make for customers based on what would generate the highest commissions to Statewide FX. (SOF ¶¶ 73–77.) NFA additionally charged only three APs who NFA was able to show engaged in extreme actions in trying to coerce trades, including lying to a customer about his education level and experience as a trader. (*Id*.) Heneghan was not one of the APs charged. No fair reading of the Statewide FX complaint supports Troyer's assertion that Heneghan was a cause of Statewide FX's discipline.

Troyer also contends that two pre-complaint NFA analyses of all Statewide FX traders' activity show that Heneghan was a cause of the purported expulsion of Statewide FX. (Pl. Br. 12–14.) Troyer again is wrong. The fact that NFA analyzed a wide range of transactions of all Statewide FX APs, including Heneghan, does not show that Heneghan was a cause of Statewide FX's discipline. To the contrary, NFA's complaint offers no suggestion that Heneghan's conduct caused NFA to take disciplinary action against Statewide FX.

Finally, Troyer cites an NFA memorandum dated February 9, 2011 (*i.e.*, after the Statewide FX complaint date), in which former NFA staff member Mark Arnold discusses the results from a preliminary investigation of ATC, the NFA Member with which Heneghan was associated after Statewide FX. (*Id*.) Troyer argues that this document proves that two NFA Members that employed Heneghan used similar trading strategies, and therefore, that Heneghan was a cause of

13

the earlier Statewide FX disciplinary action.  Troyer offers no evidence to support that leap of logic, and there is none.

Following Arnold's memorandum, NFA initiated an examination of ATC.  (SOGD ¶ 15.) That examination showed that many of the signs of abusive trading practices identified in Arnold's memorandum no longer existed at ATC.  (SOF ¶ 87.)  As part of its examination of ATC, NFA interviewed customers of the firm, including Troyer.  (*Id.* ¶¶ 39–41.)  Despite having lost significant amounts of money, Troyer had nothing negative to say regarding Heneghan.  (*Id.*)  After his initial interview with NFA, Troyer was unwilling to assist NFA further with its examination of ATC.  (*Id.* ¶ 42.)  Following the examination, NFA decided to send ATC a staff letter and place the firm on investigative monitoring; it did not decide to take any disciplinary action against ATC or any of its APs, including Heneghan.[5]  (*Id.* ¶¶ 87–88.)  The Arnold memorandum, therefore, does not demonstrate that Heneghan was a cause of NFA's disciplinary action against Statewide FX.

Because Troyer can put forth no facts to tie the purported expulsion of Statewide FX to Heneghan's conduct, this Court should deny his motion for summary judgment, and grant NFA's motion for summary judgment.

      C.    *This Court Should Grant Summary Judgment To NFA Because It Did Not Act In Bad Faith.*

At the motion to dismiss stage, this Court held that Troyer could meet his burden of proof by showing that NFA was merely negligent in enforcing Bylaw 301(a)(ii)(D) if NFA's actions were not discretionary in nature.  *See Troyer*, 290 F. Supp. 3d. at 885.  This Court need not decide

---

[5] Throughout his motion, Troyer alleges that NFA failed to investigate Heneghan and certain NFA Members at various points.  Troyer ignores the several other instances in which NFA did review Heneghan's registration.  (SOF ¶¶ 51–72.)

whether a negligence standard applies in this case, because even if that standard does apply, it was not negligent for NFA to follow the CFTC's regulatory directive in *Peterson* and subsequent interpretive guidance.  In any event, NFA's actions here were discretionary, thus requiring application of a more stringent bad-faith standard that Troyer cannot satisfy.

      1.     <u>NFA's Actions Complied With The CFTC's Direction In *Peterson*.</u>

Even if a negligence standard applied, NFA's decision to follow binding authority from its regulator was not negligent.

NFA acts through a grant of authority from the CFTC, which includes an express delegation to NFA to make registration decisions.  (SOF ¶¶ 8–10.)  Pursuant to that grant of authority, and because NFA membership is mandatory, the standards NFA applies to registration decisions and membership decisions are effectively the same.  (*Id*. ¶ 12.)  The CFTC regulates NFA, reviewing and approving NFA's rules, and oversees NFA's performance of its duties through periodic audits.  (*Id*. ¶¶ 27–28.)  As shown above, *supra* at 9–12, in reviewing NFA's decision in *Peterson*, the CFTC expressly rejected NFA's treatment of an agreed sanction to withdraw from and never reapply for exchange membership as the equivalent of an expulsion.  1992 WL 289773, at *3.  In doing so, the CFTC directed that NFA registration and membership determinations recognize a distinction between the effect of such an agreed sanction and an expulsion.  *Id.*

Here, it is undisputed that Statewide FX voluntarily withdrew from and agreed never to reapply for NFA membership.  (SOF ¶ 79.)  Under *Peterson*, therefore, NFA was not permitted to treat that agreement as an expulsion.

Acting in a manner consistent with the CFTC's direction demonstrates neither "bad faith" nor negligence: it shows that NFA followed the law.  *Cf. Collins v. BAC Home Loans Servicing*

*LP*, 912 F. Supp. 2d 997, 1017 (D. Colo. 2012) (holding that company's compliance with FCRA could not have been negligent). Troyer's contrary view—that an SRO can act in "bad faith" when it follows its regulator's decisions—would undermine the entire regulatory rubric Congress established through the CEA. SROs would be paralyzed if following their regulators' guidance could expose them to liability in private suits. Because NFA's decision to follow the CFTC's guidance was not negligence—let alone bad faith—summary judgment should be granted to NFA.

### 2.    Application Of Bylaw 301(a)(ii)(D) Involves Discretion.

In any event, the appropriate standard here is traditional bad faith, not negligence. A bad-faith standard, going beyond mere negligence, applies if "the [SRO] [allegedly] injures a trader through the exercise of a discretionary power." *Bosco v. Serhant*, 836 F.2d 271, 278 (7th Cir. 1987); *see Troyer*, 290 F. Supp. 3d at 885. At the motion to dismiss stage, this Court held that it was unable to determine whether NFA's alleged actions with respect to Heneghan were discretionary in nature. *Troyer*, 290 F. Supp. 3d at 885. The fully developed factual record now demonstrates that NFA's actions were an exercise of its discretionary authority.

First, NFA plainly did not have the *nondiscretionary* duty to ignore its regulator's guidance. Even if there was some scenario in which NFA could disregard the CFTC, which there is not, NFA would at least have to exercise *discretion* to take that extraordinary step.

Second, Troyer's claim is that NFA failed to enforce Bylaw 301(a)(ii)(D), which prohibits the membership of any person who was "a cause" of any suspension or expulsion of another member. (Pl. Br. 13.) What it means to be "a cause" is not defined in NFA's rules or in the CEA. As a result, interpreting and applying Bylaw 301(a)(ii)(D) necessarily requires NFA to exercise discretion when deciding whether an individual was "a cause" of a prior suspension or expulsion. *See D'Alessio*, 258 F.3d at 106 (noting that interpreting and enforcing Exchange Act rules and regulations involves the exercise of discretion); *Shultz v. S.E.C.*, 614 F.2d 561, 571 (7th Cir. 1980)

16

(affirming finding that appellant violated SRO rules and noting that "because these are rules of the [SRO], the [SRO] should be allowed discretion in determining their meaning").  Where, as here, the documentary record does not state whether an individual is a "cause" of a suspension or expulsion, the question of whether someone was "a cause" will require NFA to exercise its regulatory discretion to interpret its rules based on the facts before it to determine whether Bylaw 301(a)(ii)(D) applies.  Such a determination is discretionary.

Troyer's reliance on *Bosco* to avoid that conclusion is misplaced.  (Pl. Br. 14.)  In *Bosco*, the plaintiff investors alleged that the defendant SRO (an exchange) failed to enforce a rule requiring the defendant trader to include certain customer information on orders the trader placed by telephone to a floor broker at the exchange "at the time of execution."  836 F.2d at 277.  The exchange had previously interpreted its rule to allow for recording customer information shortly after order execution.  *Id.*  However, evidence showed that the defendant often waited hours after order execution to note the information, violating even the exchange's own interpretation of its rule, and that the exchange was aware of the often hours-long delays, thus eliminating any discretionary element of the plaintiff's claim in *Bosco*.  *Id.* at 277–78.  The court therefore held that because "there was no scope for the exercise of discretion [there was] hence no excuse" for the exchange failing to enforce its own interpretation of the rule.  *Id.* at 278.  Here, by contrast, there was more than an "excuse"—there was binding CFTC guidance in *Peterson* and the Interpretive Statement—and even setting aside that guidance, the "causation" determination was imbued with discretion.

Because NFA's decision was discretionary, Troyer must establish bad faith by NFA, not mere negligence—and he plainly cannot do so here.  Under the traditional bad faith standard, Troyer must prove that NFA "knew that a rule [it] [was] required to enforce was being violated

17

or—what is in fact a form of knowledge—deliberately closed [its] eyes so that [it] would not discover what [it] strongly suspected was going on." *Braman v. CME Grp., Inc.*, 149 F. Supp. 3d 874, 891–92 (N.D. Ill. 2015) (citing *Bosco*, 836 F.2d at 276); *see also Holladay v. CME Grp.*, No. 11-CV-8226, 2012 WL 3096698, at \*4 (N.D. Ill. July 30, 2012) ("negligent indifference . . . is insufficient to state a claim under Section 22(b) of the CEA."); *W. Capital Design, LLC v. New York Mercantile Exch.*, 180 F. Supp. 2d 438, 442 (S.D.N.Y. 2001), *aff'd*, 25 F. App'x 63 (2d Cir. 2002).   Troyer also must show that "self-interest or other ulterior motive unrelated to proper regulatory concerns. . . constitute[d] the sole or the dominant reason for" NFA's actions.  *See Zimmerman v. Chicago Board of Trade*, 360 F.3d 612, 624 (7th Cir. 2004); *accord Holladay*, 2012 WL 3096698, at \*4.   Troyer can satisfy neither requirement of the bad faith standard because Troyer has not even attempted to introduce evidence as to NFA's motives for its alleged actions between 2011 and 2016.

Instead, Troyer argues that NFA's registration activity related to Heneghan between 1985 and 2000 demonstrates that NFA acted in a manner that would "meet the heightened standard of *unreasonableness* set forth in the *Bosco* case."  (Pl. Br. 16–17 (emphasis added).)  That is wrong for several reasons.  As an initial matter, the sole claim that Troyer pleads in his complaint focuses specifically on NFA's alleged failure to enforce "Bylaw 301(a)(ii)(D) [because] NFA should have terminated Heneghan's registration when it expelled Statewide FX on July 28, 2011."  (SAC ¶ 72.) NFA's conduct *before* the Statewide FX disciplinary action is irrelevant to Troyer's claim that NFA failed to enforce Bylaw 301(a)(ii)(D) as to Heneghan *after* the Statewide FX disciplinary action.[6]  Moreover, no court has ever applied this purported "unreasonableness" standard; *Bosco*

---

[6] In addition, Troyer's attempt to expand his claim in his summary judgment motion beyond what he pled in his complaint is improper, and this Court should disregard it.  *See Cameron v. I.R.S.*, 593 F. Supp. 1540, 1555 (N.D. Ind. 1984), *aff'd*, 773 F.2d 126 (7th Cir. 1985) (limiting analysis

was merely describing the holdings of the two leading cases it cited—both of which require knowledge (or willful blindness) and ulterior motive.  *See Sam Wong & Son, Inc. v. New York Mercantile Exchange*, 735 F.2d 653, 670–71 (2d Cir. 1984); *Daniel v. Board of Trade of City of Chicago*, 164 F.2d 815, 819–20 (7th Cir. 1947).  And the *Bosco* court itself rejected this argument, holding that an exercise of discretion that "was incorrect *or even unreasonable* [] would not be in bad faith under the demanding standard suggested."  836 F.2d at 277 (emphasis added).

And, in any event, Troyer wholly fails to meet the distinct requirement of showing that NFA's sole or dominant motive was "ulterior."  It is well-established that "[i]n order to constitute bad faith, [Troyer] must show that self-interest or other ulterior motive unrelated to proper regulatory concerns is alleged to constitute *the sole or the dominant reason* for the exchange action."  *Zimmerman*, 360 F.3d at 624 (quotation marks omitted; emphasis in original).  Although not discussed in Troyer's motion, the only allegation of motive contained in the SAC is that NFA continued to permit Heneghan's registration after the Statewide FX disciplinary action in order to collect fees from Heneghan's trades.  (SAC ¶ 92.)  Even if Troyer had evidence of the fees NFA collected from Heneghan's trades (which he does not), such evidence cannot, as a matter of law, be sufficient to establish bad faith because if it were, the heightened bad-faith requirement would be meaningless, collapsing into negligence.  "[T]here should not be liability [for SROs] simply because the action has the incidental effect of advancing their [] interests."  *Zimmerman*, 360 F.3d at 624 (quoting *Sam Wong*, 735 F.2d at 677) (internal quotation marks omitted).  This is so even though SROs "may to a degree have potentially mixed motives in taking action," *Zimmerman*, 360 F.3d at 624, because "[i]f such a degree of self-interest were allowed to demonstrate bad faith,

---

of summary judgment motion only to allegations in complaint where party's "Memorandum in Support of his summary judgment motion expands the claim" and includes theories not identified in the complaint).

[SROs] . . . would inevitably be subject to bad-faith charges, and the concept of [] self-regulation would be undermined." *See Brawer v. Options Clearing Corp.*, 807 F.2d 297, 303 (2d Cir. 1986) (internal citation omitted).

Because Troyer lacks any evidence that NFA acted in bad faith or any evidence reflecting NFA's alleged ulterior motive, this Court should deny his motion and grant summary judgment to NFA.

> D.   *This Court Should Grant Summary Judgment to NFA Because NFA Did Not Cause Troyer's Losses.*

Finally, Troyer cannot show that NFA's conduct caused his losses.  7 U.S.C. § 25(b)(2).  Troyer cannot meet his causation burden for the simple reason that he has admitted that he does not know who—or what—caused him to lose his investments.  (PSOF ¶ 21.)  Even if it were not for that fatal admission, the undisputed facts show that NFA's alleged failure to enforce Bylaw 301(a)(ii)(D) as to Heneghan in 2011 did not cause Troyer's alleged losses.

First, as to the more than $160,000 Troyer invested through Heneghan before NFA's disciplinary proceeding against Statewide FX, it is impossible for NFA's subsequent alleged failure to enforce Bylaw 301(a)(ii)(D) to have caused those losses.  That is, Troyer cannot say that his losses from October 2008 through June 2011 were caused by NFA's alleged failure in July 2011; to do so would defy the "inescapable rule of causality that a cause must precede its effect." *See Billhofer v. Flamel Techs., SA*, 663 F. Supp. 2d 288, 297 (S.D.N.Y. 2009); *see also American Home Products Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir. 1984).

Second, as to the $82,000 Troyer sent to Heneghan between April 2013 and April 2015, again, Troyer offers no evidence that NFA's alleged failure to enforce Bylaw 301(a)(ii)(D) is what caused his losses.  In fact, Troyer admits that he has no idea what caused his losses.  (PSOF ¶ 21.)  Troyer bears the burden of proving that in a world in which NFA did discipline or deny registration

20

to Heneghan soon after July 2011, Troyer's losses from April 2013 to April 2015 would not have occurred. Troyer has offered literally no evidence on that score.

To the contrary, the evidence shows that Troyer would have done exactly the same things that he did, regardless of whether NFA had disciplined or denied registration to Heneghan before April 2013. Troyer would not have known about this discipline or denial of registration: he has admitted that he never once did any research regarding Heneghan or NFA Member firms (SOF ¶ 50), and that Heneghan's registration history would not have impacted Troyer's investment choices (*Id.* ¶ 53). Moreover, even if Heneghan's registration had been denied, nothing would have prevented Troyer from doing exactly what he actually did: contacting Troyer and convincing him to voluntarily send $82,000 in checks to Heneghan personally at his home address. (*Id.* ¶¶ 43–47.) Additionally, even if NFA's alleged failure to discipline or deny NFA Associate membership to Heneghan was a cause of Troyer's losses, Troyer has put forward no evidence of what portion of those losses was caused by NFA's actions, as opposed to other factors like market forces or poor investment decisions. In fact, he has admitted that he does not know. (PSOF ¶ 21.)

Troyer's case appears to be premised on the intuition that if Heneghan's registration had been denied, things would have gone differently for Troyer in some unspecified way. But as the plaintiff, Troyer bears the burden of proving causation. Having put forward *zero* evidence on what would have happened in the alternate world where Heneghan's registration had been denied, no reasonable fact-finder could conclude that Troyer met his burden as to causation.

## II.   THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO NFA BECAUSE TROYER'S CLAIM IS TIME-BARRED.

Finally, NFA's summary judgment motion should be granted because Troyer's claim is time-barred.

Claims under the CEA are subject to a two-year limitations period.  7 U.S.C. § 25(c).  A plaintiff must file their lawsuit within two years of when they became aware of—or with the exercise of diligence could have become aware of—the facts that give rise to their claim.  *See Dyer v. Miller Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991).  The limitations period begins when a plaintiff knows or should know of the facts underlying his claim.  *Id*. at 240 (limitations period begins when "in the exercise of reasonable diligence [plaintiff] should have known of defendant's alleged misconduct.").  A prospective plaintiff bears the obligation to conduct diligence into their potential claims.  *See Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir. 1974) ("the statutory period does not await appellant's leisurely discovery of the full details of the alleged scheme.") (internal quotation marks omitted); *Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 846 (N.D. Ill. 2009) (similar).  This is especially so when there are red flags that would have alerted an ordinary person to their potential claim.  *Teamsters Local 282 Pension Trust Fund v. Angelos*, 624 F. Supp. 959, 964 (N.D. Ill. 1985) (holding that the plaintiff cannot "ignore obvious danger signals . . . [and] [t]here is 'no license to ignore events giving rise to strong suspicion'").

The gist of Troyer's claim is that he lost money because NFA failed "to have terminated Heneghan's registration based upon the fact [that] [sic] he contributed to its decision to expel Statewide FX."  (Pl. Br. 20.)  The undisputed facts show that the alleged misconduct was complete, and all the facts that form the basis of Troyer's claim were either known by or readily available to him by April 2013.

No later than April 2011, Troyer was aware that Heneghan had been associated with Statewide FX between 2007 and 2010 because Troyer had received monthly investment statements from Statewide FX related to his investments with Heneghan.   (SOF ¶ 36; SAC ¶ 17.)  Additionally, prior to April 2011, NFA's Rulebook, which contains the text of Bylaw

22

301(a)(ii)(D), was (and still is today) available on NFA's website.  (SOF ¶¶ 24–26; SAC ¶ 66.)

NFA's records of its disciplinary action against Statewide FX, including the NFA complaint and

the decision that Troyer cites throughout his complaint, were available publicly on NFA's website

no later than July 2011.  (SOF ¶¶ 24–26; SAC ¶¶ 71–72.)  Thus, by no later than July 2011, Troyer

knew or with reasonable diligence could have known that (a) Heneghan had been associated with

Statewide FX, (b) NFA initiated a disciplinary action against Statewide FX, (c) Statewide FX had

agreed never to reapply for membership with NFA, (d) NFA operated pursuant to Bylaw

301(a)(ii)(D), and (e) that Heneghan remained an NFA Associate after NFA disciplined Statewide

FX.  (*See* SAC ¶¶ 67, 70–72.)

On April 1, 2013, Troyer began making purported investments again with Heneghan, and

losing money on those investments.  (SOF ¶ 43.)  Thus, shortly after April 1, 2013, Troyer knew

or could have known of all the facts underlying his claims here.

Not only could Troyer have discovered his potential claim in or around April 2013, under

his own theory, there were ample red flags that should have alerted him to his claim here.  Troyer

admits that he thought his arrangement with Heneghan between April 2013 and April 2015 was

suspect, and that he believed that Heneghan was lying to him about the value of his investments.

(SOF ¶¶ 47–49.)  Despite these red flags, Troyer took no steps to discover his claim.[7]

As a result, Troyer had until April 2015 to file this action.  Because Troyer did not file this

suit until May 2016, his claim is barred by the CEA's statute of limitations, 7 U.S.C. § 25(c).  *See*

---

[7] All elements of Troyer's claim were fixed by April 2013, the first time that Troyer lost investment
funds after NFA's alleged failure to expel Heneghan.  That Troyer experienced additional
investment losses after April 2013 does not impact the running of the statute of limitations.  *See
Limestone Development Corp. v. Village of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008) ("The
statute of limitations begins to run upon injury . . . and is not tolled by subsequent injuries.").

*Tomlinson*, 682 F. Supp. 2d at 848; *Teamsters Local 282 Pension Trust Fund,* 624 F. Supp. at 964–5.

## CONCLUSION

For the foregoing reasons, this Court should deny Troyer's motion for summary judgment and grant summary judgment in favor of NFA.

Dated: February 8, 2019

Respectfully submitted,

NATIONAL FUTURES ASSOCIATION

By:  /s/ Gregory M. Boyle
      Gregory M. Boyle (*pro hac vice*)
      David P. Saunders (*pro hac vice*)
      Amit B. Patel (*pro hac vice*)
      JENNER & BLOCK LLP
      353 N. Clark Street
      Chicago, IL 60654-3456
      Phone:  (312) 222 9350
      Facsimile:  (312) 527-0484

      *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney of record in this case, hereby certifies that on February 8, 2019, a true and correct copy of the foregoing **DEFENDANT NATIONAL FUTURES ASSOCIATION'S JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was served on counsel of record for Plaintiff by this Court's CM/ECF system.


Dated: <u>February 8, 2019</u>


<u>/s/ Gregory M. Boyle</u>