**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **DENNIS TROYER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-cv-00146-SLC** |
| | ) | |
| **NATIONAL FUTURES ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court are cross-motions for summary judgment filed by Plaintiff Dennis
Troyer and Defendant National Futures Association ("NFA") on Count I of the second amended
complaint, the sole remaining claim in this case. (ECF 91; ECF 101). In that claim, Troyer
alleges that NFA failed to enforce a rule or bylaw that it was statutorily required to enforce, in
violation of § 25(b)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-27. The cross-
motions are now ripe for ruling.[1] (ECF 92; ECF 102-ECF 106).

For the following reasons, NFA's motion for summary judgment will be GRANTED, and
Troyer's motion for summary judgment will be DENIED.

## I. PROCEDURAL BACKGROUND

On May 8, 2016, Troyer filed a four-count complaint against NFA, a self-regulatory
organization ("SRO") for the futures industry; Thomas Heneghan, a broker and an NFA
associate member; Olivier Livolsi, an NFA associate member, and Portfolio Managers, Inc.
("PMI"), an introducing broker and NFA member, seeking to hold them liable for an allegedly

---

[1] Federal question jurisdiction exists under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate
Judge is based on 28 U.S.C. § 636(c), all parties consenting. (ECF 41).

fraudulent scheme perpetuated by Heneghan, in which Heneghan solicited and accepted funds from Troyer for the purpose of purchasing commodities futures.[2] (ECF 1). Troyer contends that he has never been able to recover any of the more than $200,000 he invested through Heneghan, much less receive any of the more than $500,000 in assets purportedly held in his account by Heneghan. (*Id*.). Troyer alleged in Counts I and II of the complaint that Heneghan and Livolsi violated the CEA; in Count III, that PMI and NFA should be vicariously liable for Heneghan's and Livolsi's violations of the CEA; and in Count IV, that NFA failed to enforce the CEA.[3] (*Id*.).

On October 10, 2016, Troyer filed a motion to dismiss Heneghan and Livolsi without prejudice, which the Court granted. (ECF 9; ECF 11). On January 30, 2017, Troyer filed an amended complaint against NFA and PMI. (ECF 30). On February 21, 2017, NFA filed a motion to dismiss for failure to state a claim upon which relief can be granted. (ECF 34). On May 7, 2017, Troyer moved to dismiss PMI with prejudice pursuant to a settlement agreement between the parties, which the Court granted, leaving NFA as the sole remaining Defendant in this case. (ECF 44; ECF 45).

On July 12, 2017, the Court granted NFA's motion to dismiss, affording Troyer an opportunity to replead his claims against NFA. (ECF 46). On August 1, 2017, Troyer filed a two-count second amended complaint against NFA; in Count I, Troyer restated his prior Count IV claim, failure to enforce the CEA, and in Count II, he restated his prior Count III claim,

---

[2] "A commodity futures contract is a contract to buy (or sell) a standard quantity of a particular commodity at a specified price and time in the future." *CFTC v. Risk Capital Trading Grp., Inc.*, 452 F. Supp. 2d 1229, 1235 (N.D. Ga. 2006).

[3] Neither party has a made a jury demand in this case.

vicarious liability for Heneghan's violations of the CEA.  (ECF 47).  Two weeks later, NFA again moved to dismiss Troyer's amended complaint for failure to state a claim.  (ECF 48).

On February 14, 2018, the Court granted NFA's motion to dismiss as to Count II, vicarious liability for Heneghan's violations of the CEA, but denied NFA's motion as to Count I, failure to enforce the CEA.  (ECF 52).  The Court held a scheduling conference on March 1, 2018, setting a discovery deadline of September 1, 2018, which was later extended to December 21, 2018.  (ECF 53; ECF 80).  On November 26, 2018, the Court entered a scheduling Order agreed upon by the parties, which included dispositive motions deadlines.  (ECF 85).

On December 8, 2018, Troyer timely filed his motion for summary judgment together with a supporting memorandum and evidence on his sole remaining claim, failure to enforce the CEA.  (ECF 91; ECF 92).  On February 8, 2019, NFA filed its cross-motion for summary judgment together with a supporting memorandum and evidence.  (ECF 101-ECF 103).  The parties then timely filed their respective response and reply briefs.  (ECF 104-ECF 106).

## II.  LEGAL STANDARD

Summary judgment may be granted only if there are no disputed genuine issues of material fact.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."  *Id.* (citations omitted).  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party,

summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and "avoid[] the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citations omitted). "[A] party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

"When, as here, cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)); *see also M.O. v. Ind. Dep't of Educ.*, 635 F. Supp. 2d 847, 850 (N.D. Ind. 2009). "The contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent the entry of judgment as a matter of law against it." *M.O.*, 635 F. Supp. 2d at 850 (citation omitted); *see Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir. 1984).

That is, cross-motions for summary judgment do not alter each party's burdens in the summary-judgment analysis; each responsive party must establish a triable issue of fact to defeat the moving party's cross-motion for summary judgment. *See Rhino Linings USA, Inc. v. Harriman*, 658 F. Supp. 2d 892, 897 (S.D. Ind. 2009); *M.O.*, 635 F. Supp. 2d at 850. "[T]he court must consider the evidence through separate lenses, always allowing the non-moving party

the benefit of all conflicts in the evidence and choices among reasonable inferences from that evidence." *Rhino Linings USA, Inc.*, 658 F. Supp. 2d at 897.

## III. FACTUAL BACKGROUND

### A. Troyer

Troyer has been investing in financial products since the 1990s. (ECF 103-4 at 11). Since the early 2000s, Troyer has invested hundreds of thousands of dollars in financial derivatives through NFA members and their associates, including through brokers other than Heneghan. (*Id.* at 15-18). Since that time, Troyer has been aware of NFA and has visited its website. (*Id.* at 21-22).

For the past 20 years, Troyer has owned and operated three businesses in Shipshewana, Indiana, and his responsibilities include performing the bookkeeping for his businesses. (*Id.* at 4, 10, 13-14). Troyer previously worked as a loan officer at a bank, where he was responsible for performing due diligence on loan applicants. (*Id.* at 5-9).

### B. NFA

NFA has been a registered futures association with the Commodity Futures Trading Commission ("CFTC") under the CEA since September 22, 1981. (ECF 103-19 ¶ 5). NFA is the industry-wide, independent, SRO for the derivatives industry. (*Id.* ¶ 5). NFA's regulatory activities include screening, rule-making, auditing, investigation, and enforcement functions for the futures industry. (*Id.* ¶¶ 8, 14, 15, 17-20).

CFTC oversees NFA's compliance with the regulations governing its activities as an SRO, along with CFTC's delegation of responsibilities. (*Id.* ¶ 24). In doing so, CFTC reviews NFA's policies and procedures, the work performed by NFA staff, and final orders issued in

adverse registrations actions and decisions issued in disciplinary matters.  (*Id.*).  NFA is required to submit all new rules and amendments to existing rules to CFTC for review, and CFTC has the authority to approve or decline the new or amended rule.  (*Id.* ¶ 25).

NFA's membership consists of futures commission merchants, swap dealers, commodity pool operators, commodity trading advisors, introducing brokers, and retail foreign exchange dealers.  (*Id.* ¶ 6).  Persons or entities registered with CFTC in these capacities are required to be "members" of NFA, and individuals associated with such members (other than swap dealers) are required to register with CFTC as "associated persons" ("APs") and be "associate members" of NFA.  (*Id.*).  As of December 31, 2018, NFA had approximately 3,600 member firms and 49,000 associates.[4]  (*Id.* ¶ 7).

### 1. NFA's Registration Responsibilities

Through a series of delegation orders beginning in August 1983, CFTC delegated to NFA the responsibility to process registrations for futures commission merchants, commodity pool operators, commodity trading advisors, and introducing brokers, along with associated persons of those entities.  (*Id.* ¶ 9).  On August 1, 1985, with CFTC approval, NFA Bylaw 301(b) became effective, and all individuals then currently registered as APs of CFTC  became NFA associates, subject to NFA requirements.  (*Id.* ¶ 10).  In a delegation order effective September 30, 1985, CFTC expanded NFA's registration responsibilities and authorized NFA to conduct proceedings to deny, condition, suspend, restrict, or revoke the registration of any person applying for registration as a futures commission merchant, introducing broker, commodity pool operator, commodity trading advisor, and APs of such entities.  (*Id.* ¶ 11).

---

[4] NFA is financed primarily by membership dues and fees.  (*Id.* ¶ 8).

Since 2012, NFA has granted CFTC registration and NFA membership to approximately 5,800 members and 99,000 associates.  (*Id.* ¶ 13).  The fitness standards for NFA membership and CFTC registration are effectively the same because NFA membership is compulsory and the effect of a denial of NFA membership is the same as a denial of CFTC registration.  (*Id.*).  NFA is prohibited from applying more stringent membership fitness standards than CFTC registration fitness standards.  (*Id.*).

2. NFA's Disciplinary Responsibilities

NFA may institute a disciplinary action against any member or associate for violation of NFA's compliance rules, financial requirements, or bylaws.  (*Id.* ¶ 17).  NFA's compliance department conducts regulatory examinations of members' and associates' compliance with NFA requirements.  (*Id.* ¶ 18).  Those examinations can be periodic or in response to information NFA learns from its members, CFTC, the public, or NFA's own internal operations.  (*Id.*).  If NFA's compliance department believes that the findings of an examination or investigation warrant further disciplinary action, it refers the matter to an internal committee comprised of representatives of NFA's legal and compliance departments to determine whether to recommend instituting a formal disciplinary action.  (*Id.* ¶ 19).  Disciplinary actions may ultimately be resolved through settlement or through an evidentiary hearing, where a neutral hearing panel renders a written decision.  (*Id.* ¶ 21).

NFA has maintained a public website (http://www.nfa.futures.org/) since 1997.  (*Id.* ¶ 26).  Since 1999, NFA through its website has made available information regarding all disciplinary actions taken since NFA's inception in 1982, all administrative and injunctive actions taken by CFTC since 1975, and all formal disciplinary actions issued by U.S. futures

exchanges since 1990.  (*Id.* ¶ 27).  The website also includes other non-disciplinary information, including registration, membership status and history, business addresses, identities of principals, and other assumed business names.  (*Id.* ¶ 27).  Prior to 1999, this information was available from NFA via telephone and email inquiry.[5]  (*Id.* ¶ 28).

### C. Troyer Invests Funds Through Heneghan

In October 2008, Troyer received an unsolicited telephone call from Heneghan, an associate of Statewide FX, Inc. ("Statewide"), at the time.  (ECF 103-4 at 23, 37-38).  During the call, Heneghan made trade recommendations to Troyer.  (*Id.*).

From October 2008 through March 2011, Troyer deposited more than $160,000 into trading accounts with Statewide, where Heneghan was associated from 2007 to 2010, and with Atlantis Trading Corp. ("ATC"), where Heneghan was associated from 2010 to 2012.  (*Id.* at 37-38, 43-44; ECF 103-9).  During this time period, Heneghan discussed with Troyer about once a week the trades that he made on Troyer's behalf.  (ECF 103-4 at 27, 32).  Although Troyer "didn't know always where [he] stood with [Heneghan]," Troyer was still comfortable telling Heneghan "no," and Heneghan did not place any trades that Troyer did not authorize.  (*Id.* at 34, 41, 49).

Between 2008 and 2011, Troyer received account statements from the NFA members with which he invested (Statewide and ATC), which reflected that his investments were losing value.  (*Id.* at 38-42).  Troyer nevertheless kept investing through Heneghan and authorizing Henegan's trades.  (*Id.* at 40, 42-44).  By March 2011, the roughly $160,000 in investments that

---

[5] This information remains available from NFA via telephone and email inquiry as an alternative to its website.  (*Id.* ¶ 28).

Troyer had made through Heneghan were effectively worthless. (*Id.* at 42). Because of those losses, Troyer did not invest any more funds through Heneghan from March 2011 to April 2013. (*Id.* at 45-46).

In April 2011, NFA interviewed Troyer in connection with its examination of ATC, where Heneghan was an associate and a principal. (ECF 103-5 at 3-4; ECF 103-6 at 2-3). In that interview, Troyer told NFA that overall his experience with Heneghan had been very good, even though his account was down in value. (ECF 103-5 at 3; ECF 103-6 at 2-3). Troyer also told NFA that he spoke with Heneghan several times a week, had received monthly account statements, did not feel pressured to make investments, and always confirmed trades with Heneghan prior to Heneghan placing the trades. (ECF 103-6 at 2-3). After this initial interview, NFA tried to contact Troyer numerous times, but Troyer was unwilling to communicate further with NFA. (ECF 103-5 at 3).

In April 2013, Troyer began sending money to Heneghan personally, purportedly so that Heneghan could make trades authorized by Troyer and take advantage of alleged discounted fees that were available to Heneghan as a trading firm employee. (ECF 103-4 at 19-20, 47; ECF 47 ¶ 43). Troyer alleges that he sent approximately $82,000 to Heneghan from April 2013 to April 2015. (ECF 47 ¶ 95). While Troyer was never completely comfortable sending these funds to Heneghan personally, he continued to do so because Heneghan was "very convincing." (ECF 103-4 at 48-49). Having said that, Troyer never felt pressured in any way to send these funds to Heneghan. (*Id.* at 50). Troyer never received any statements or other documentation related to the $82,000, and he never asked Heneghan for any such documentation. (*Id.* at 35-36).

"[T]owards the end of [the 2013 to 2015] time period," Troyer began disbelieving

Heneghan's oral representations that Troyer's trading account had increased in value. (*Id.* at 52-53). This was after Heneghan told Troyer that he had made a large amount of money on one investment, and such amount kept "climbing and climbing and climbing" every few days, to the point that "it was pretty much an unbelievable number." (*Id.* at 52-53). At some point in the summer of 2015, Heneghan informed Troyer that his trading account had increased to about $525,000. (ECF 103-8). Troyer then directed Heneghan to "cash out" and send him all the funds in his trading account. (ECF 103-4 at 52-54). Troyer states that "that's when all hell broke loose between [Heneghan] and [him]." (*Id.* at 53).

### D. NFA's Registration, Examination, and Disciplinary History of Heneghan and His Associated Firms

Heneghan was an AP of 14 different NFA member firms between 1983 and 2015. (ECF 92-2; ECF 103-9). On March 14, 1985, CFTC found that Heneghan had churned a customer's account in violation of § 4(b) of the CEA, and Heneghan and his employer, Madda Trading Co., were ordered, jointly and severally, to pay the customer $6,389, plus interest and costs. (ECF 92-3 at 17).

When NFA Bylaw 301(b) became effective on August 1, 1985, Heneghan was an AP of NFA member Jack Carl Associates, Inc. ("JCA"), and thus, Heneghan automatically became an NFA associate on that date. (ECF 103-19 ¶ 29). On or about September 27, 1985, NFA received a notice of termination from JCA, indicating that Heneghan had voluntarily terminated his association with JCA on August 30, 1985. (*Id.* ¶ 30; ECF 103-20). With the notice of termination, JCA enclosed documentation of several former customer complaints that it had

received regarding Heneghan.[6]  (ECF 92-5; ECF 103-19 ¶ 30; ECF 103-21).

NFA was not aware of these customer complaints previously, so it contacted JCA on

October 29, 1985, for additional information regarding the complaints.  (ECF 103-2; ECF 103-

19 ¶¶ 30-31).  During Heneghan's time with JCA, CFTC investigated JCA concerning whether

JCA had unregistered APs who were the subject of various customer complaints.  (ECF 103-10;

ECF 103-19 ¶ 32).  On February 7, 1986, CFTC informed NFA via telephone that Heneghan was

not a subject of the investigation, that the result of its investigation "will not hinder or cause any

charges to be filed against Heneghan," and that the investigation "should not prevent Heneghan

from being registered."  (ECF 103-10; *see* ECF 103-19 ¶ 32).

Heneghan was an associate of Peregrine Financial Group, Inc. ("PFG"), from January 22,

1999, to July 27, 2001.  (ECF 103-9 at 4).  Between June 30, 2000, and September 14, 2000,

NFA learned through a routine examination of PFG that Heneghan was telling potential

investors that he had never had a customer complaint with CFTC or NFA.  (ECF 92-7 at 2-3;

ECF 103-12 at 4; ECF 103-19 ¶ 34).  NFA contacted PFG about these statements and issued a

letter to PFG, noting PFG's representation that "corrective action has been or will be taken with

---

[6] One customer complained that after Heneghan raised the possibility of trading Eurodollars, he claimed to be an expert in Eurodollars and said that he and his friends on the trading floor were buying large blocks and "making the market" in the currency; the customer, however, lost his entire $5,000 that he invested through Heneghan.  (ECF 92-5 at 2-7; ECF 103-21 at 3-8).  Another complaint involved a customer's attorney calling JCA and threatening to sue the firm due to Heneghan's alleged unauthorized trading and churning of the customer's account, which resulted in the customer losing $20,000 in one month.  (ECF 92-5 at 8-9; ECF 103-21 at 9-10).  Another customer reported that Heneghan convinced her to invest $8,200 in silver contracts because she would "make a fortune," but Heneghan purchased more silver options than she had authorized; Heneghan then sold the silver options and reinvested the proceeds in S&P 500 options without the customer's permission.  (ECF 92-5 at 10-21; ECF 103-21 at 11-22).  The customer later received a statement showing that $3,475 of the $8,200 was paid out in commissions and the remainder of her investment had disappeared in market losses.  (ECF 92-5 at 10-21; ECF 103-21 at 11-22).  JCA paid this customer $8,200 to settle her claims against Heneghan.  (ECF 92-5 at 10-21; ECF 103-21 at 11-22).

respect to these items, therefore, no further response is necessary." (ECF 103-11; *see* ECF 92-7 at 3; 103-19 ¶ 34).

On January 17, 2008, NFA received a customer complaint regarding Heneghan, alleging that Heneghan had made misleading sales solicitations and used high-pressure sales tactics when he was an associate of Statewide. (ECF 92-8; ECF 103-19 ¶ 36; ECF 103-22). NFA conducted an investigation, which included multiple phone interviews with the complainant, a review of the complainant's account documentation, and information gathered from Statewide. (ECF 92-8; ECF 103-19 ¶ 37; ECF 103-22). NFA concluded that the evidence did not show a clear pattern of Heneghan using misleading or high pressure sales tactics; NFA closed the matter with no further action, stating that it would "continue to monitor Statewide[] and Heneghan for any futures sales practice problems." (ECF 92-8 at 6; ECF 103-19 ¶ 37; ECF 103-22 at 7).

In 2009, NFA received a customer complaint in which the customer alleged that Heneghan and another broker made unauthorized trades on the customer's behalf in 2005. (ECF 92-9; ECF 103-19 ¶ 39; ECF 103-23). The customer invested $5000, but the account was left with just $85.81 two months later. (ECF 92-9 at 2). NFA investigated this complaint, but it was unable to obtain the trading authorizations indicating who placed the trades for the customer's account. (*Id.* at 3; ECF 103-19 ¶ 19; ECF 103-23 at 4). Consequently, NFA was unable to determine if the unauthorized trades had been placed in the customer's account, and NFA closed the matter with no further action. (ECF 92-9 at 3; ECF 103-19 ¶ 39; ECF 103-23 at 4).

On June 7, 2010, NFA began an examination of Statewide, which included reviewing account and company records, interviewing customers and employees, and analyzing approximately 17 Statewide APs, including Heneghan. (ECF 92-10; ECF 103-13; ECF 103-19

¶¶ 41, 42; ECF 103-24).  On October 26, 2010, NFA's compliance department recommended

that NFA's business conduct committee initiate a disciplinary action against Statewide, its

principals and three of its APs, none of whom were Heneghan.  (ECF 92-10 at 10; ECF 103-19 ¶

42; ECF 103-25).  In doing so, NFA's compliance committee stated:

> Upon review of the firm's monthly internal tracking of trades
> placed in customer accounts by each broker (which is used by
> Statewide to determine the commission earnings of APs), NFA
> noted that all of the brokers appeared to place similar trades in
> their customer accounts.  Specifically, from February 2010 through
> May 2010, NFA noted it appeared that the majority of brokers
> recommend the same types of contracts each month, most
> commonly the RBOB contract that were traded as spreads,
> essentially doubling the commission charged to each customer.
> From NFA's analysis, it appears that the firm was using a
> "template" formula regarding what trades to place for each
> customer that was not based on real market conditions.

(ECF 92-10 at 3).  NFA's compliance committee further noted that in 2009, "477 of 504

customers (94.6%) during the year suffered overall losses totaling $5,041,828, while only 27

customers (5.4%) experienced profits equal to a total of about $56,000."  (*Id.* at 2).  Heneghan's

customers were included in that calculation.  (*See* ECF 92-12; ECF 92-13; ECF 92-14).  NFA's

compliance committee also observed that "even though the firm claimed to have commission

rate structures of both $79 and $59, the majority of customers were charged the $79 commission

rate."  (ECF 92-10 at 3-4).  In February 2010, most of Heneghan's trades were at the $79 rate,

and in March 2010, all of Heneghan's trades were at the $79 rate.  (ECF 92-12; ECF 92-13).

Accordingly, NFA's business conduct committee initiated a disciplinary action against

Statewide on December 9, 2010, while Statewide was in the process of voluntarily withdrawing

from NFA membership.  (ECF 92-10 at 1; ECF 103-19 ¶ 42; ECF 103-25 ¶ 5).  Count 1 of the

Statewide complaint alleged:

13

> For the most part, the trade recommendations that Statewide's APs
> made to their customers were not in the customers' best interest
> and were intended, instead, to benefit Statewide by generating high
> commissions.  Hennequin and Colin developed this trading
> strategy and instructed Statewide's APs to carry out this strategy
> through the trade recommendations they made to their customers.
>
> With the knowledge and encouragement of Hennequin and
> Colin, Statewide's APs routinely recommended option and bull
> call option spreads to customers that had little chance of being
> profitable due to their high break even points.

(ECF 92-11 ¶¶ 17-18).  Heneghan was not registered with Statewide when NFA conducted the

audit, but the conduct alleged in NFA's complaint took place while Heneghan was employed at

Statewide.  (ECF 103-19 ¶ 42).  Two principals and three APs of Statewide were named in the

complaint, but 14 other APs, including Heneghan, were not.  (ECF 92-10 at 2-3; ECF 92-11;

ECF 103-25).

Also in 2010, NFA placed ATC in NFA's enhanced surveillance program ("ESP"),

which is used to monitor the sales solicitation of NFA members and their associates.  (ECF 103-

16; ECF 103-19 ¶ 47).  Under the ESP, NFA's compliance department staff posed as prospective

customers to receive sales solicitations from the monitored NFA member or its associates.  (ECF

103-19 ¶ 48).  On February 9, 2011, in a memo to file, Mark Arnold of NFA wrote:

> Per review of NFA's Online Registration system ("ORS"), NFA
> noted multiple APs who were previously registered at Statewide  .  .
> .  are currently registered with [ATC].  As of the date of this memo,
> NFA noted there are 3 APs currently registered at ATC:  Robert
> Lewis (. . . former [Statewide] AP), Thomas Heneghan (. . . former
> [Statewide] AP), and Mogar Telesca . . . .
>
> Given the recent disciplinary action taken against [Statewide] . . . ,
> NFA referred ATC to NFA's Enhanced Surveillance Program
> ("ESP") to determine the type of solicitation practices currently in
> use by the firm.  Per review of the 2 ESP Matters opened as a
> result of such referral . . . , NFA noted in both matters the firm
> utilized misleading sales solicitations.

14

(ECF 92-16 at 1).  Arnold then expressed the following concern:

> NFA noted that once a decision is reached in the [Statewide] Case,
> ATC may qualify for NFA's Enhanced Supervision Requirements
> ("ESR"), providing that the firm's disciplined AP ratio remains
> constant.  In the event that ATC is aware of the potential for
> triggering ESR, NFA noted the firm may be tempted to engage in
> certain actions as to avoid such requirements by hiring several new
> APs, or by purposely deregistering disciplined APs from ORS.

(*Id.* at 3).  At the close of his memo, Arnold suggested that NFA conduct an audit of ATC in the

coming months.  (*Id.*).

In or around June 2011, NFA completed an examination of ATC.  (ECF 103-17; ECF

103-19 ¶ 49).  NFA noted that two ATC principals or APs—Rob Lewis and Heneghan—had

worked for disciplined firms in the past, most recently, Statewide.  (ECF 92-17 at 1; ECF 103-17

at 2).  NFA found that while 95% of ATC's customers lost money in 2010, 68% either made

money or broke even in the early months of 2011, and commission-to-equity and break-even

ratios decreased significantly compared to the previous year.  (ECF 92-17; ECF 103-17; ECF

103-19 ¶ 49).  Based on this finding, NFA decided to place ATC on investigative monitoring.

(ECF 103-17; ECF 103-19 ¶ 49).

On July 28, 2011, NFA's complaint against Statewide was resolved pursuant to a

settlement offer that NFA accepted, whereby Statewide agreed never to reapply for NFA

membership.  (ECF 92-18 at 2; ECF 103-19 ¶ 44; ECF 103-26 at 3).  Specifically, NFA's

disciplinary decision as to Statewide included the following language:  "Statewide is ordered

never to reapply for NFA membership or act as a principal of an NFA Member, effective

immediately."  (ECF 103-26 at 5).

On June 15, 2012, Rachel Brandenburg, a manager in NFA's compliance department,

sent an email instructing a colleague to place an approval hold on several NFA members, including Heneghan, Lewis, and ATC. (ECF 92-19). Several days later, Brandenburg sent the following email: "I would like to clarify this request. For the firms, if they should seek membership, the Compliance Investigations Group should be contacted. If any of the individuals seek membership or associate membership or any form of registration, then please also contact the Compliance Investigations Group." (*Id.*).

Approximately four months later, on October 11, 2012, PMI filed an application to register Heneghan as an AP of the firm. (ECF 92-20). Five days later, one of Brandenburg's colleagues emailed her that an application had been filed for Heneghan and asked whether the approval hold could be lifted. (ECF 92-21). An hour later, Brandenburg lifted the hold on Heneghan's membership, and he was approved to operate as an AP of PMI. (ECF 92-2; ECF 92-21; ECF 103-9).

NFA's compliance department initiated examinations of PMI on November 10, 2014, and September 8, 2015. (ECF 103-19 ¶ 51). PMI did not have an account listed in either Troyer's or Heneghan's name. (ECF 103-18 ¶ 50). On December 21, 2015, NFA issued a complaint against PMI, Amanda Murphy, Christopher Hogan, Andrew Zhukov, and Heneghan, alleging that "the LA branch [of PMI] routinely used high-pressure sales tactics and made materially misleading and deceptive statement during sales solicitations to customers." (ECF 92-24 ¶ 10; ECF 103-30 ¶ 10; *see* ECF 103-19 ¶ 51). The complaint further alleged that Murphy "had received a series of extremely serious customer complaints against Heneghan alleging that he had misappropriated customer funds," but that Murphy "never disclosed these complaints to NFA even though she knew NFA was actively investigating Heneghan." (ECF 92-24 ¶ 12; ECF 103-30 ¶ 12).

As to Heneghan, the complaint alleged that "[w]hen soliciting customers, Heneghan misrepresented the amount of commissions charged by PMI." (ECF 92-24 ¶ 23; ECF 103-30 ¶ 23). The complaint also alleged:

> In addition to Heneghan's misstatements regarding commissions, Heneghan also frequently claimed that he could minimize losses and risk while at the same time promising customers huge profit potential. Such promises had no basis in fact as 97% of PMI's LA branch customers and 98% of Heneghan's customers had net losses and on average lost 94% of their total investment.

(ECF 92-24 ¶ 30; ECF 103-30 ¶ 30). Additionally, NFA asserted in the complaint that "[n]ot only did Heneghan make outsized profit projections with no basis in fact, but he also significantly downplayed risk and promised customers that he would limit their losses." (ECF 92-24 ¶ 36; ECF 103-30 ¶ 36). Finally, the complaint recited that "Heneghan and Zhukov also used high-pressure sales tactics in an effort to persuade customers to invest with PMI or make additional investments, including calling customers multiple times a day and swearing at customers if they expressed hesitation about investing." (ECF 92-24 ¶ 41; ECF 103-30 ¶ 41).

On February 26, 2016, as a resolution to the PMI complaint, NFA issued a decision "permanently bar[ring] . . . Heneghan from NFA membership, associate membership, and from acting as a principal of an NFA Member." (ECF 103-32 at 5; *see* ECF 103-19 ¶ 52). In the ruling, NFA's business conduct committee noted that "[a]ll but two of the LA branch office's 68 customers (most of whom were Heneghan's customers) lost money, with losses totaling $1.2 million, including $660,000 in commissions." (ECF 103-32 at 4).

### III. DISCUSSION

Troyer bears the burden to establish the three elements of his CEA claim: (1) that NFA "fail[ed] to enforce [a] bylaw or rule that is required under section 21 of [the CEA]," (2) that

NFA "acted in bad faith in failing to take action or in taking such action as was taken," and (3) that "such failure or action caused the loss." 7 U.S.C. § 25(b)(2), (4); *see Celotex Corp.*, 477 U.S. at 322 (explaining that Federal Rule of Civil Procedure 56 requires the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). The Court will discuss each of these elements in turn.

*A. Failure to Enforce a Rule or Bylaw*

Troyer argues that NFA violated its own rule, 7 U.S.C. § 21(b)(3)(C), and its own Bylaw 301(a)(ii)(D), by allowing Heneghan to remain as an NFA AP when Heneghan's activities were allegedly "a cause of NFA's decision to expel Statewide" in July 2011. (ECF 92 at 14). NFA responds that Troyer cannot establish this first element of his CEA claim because NFA did not "expel" Statewide as required by § 21(b)(3)(C) and Bylaw 301(a)(ii)(D). (ECF 102 at 9). Ultimately, NFA's arguments are persuasive, which dooms Troyer's CEA claim.

1. Section 21(b)(3)(C) and Bylaw 301(a)(ii)(D)

Section 21(b)(3)(C) of the CEA states, in relevant part:

> [N]o person shall be admitted to or continued in membership in such association, if such person –
>
> . . . .
>
> (C) whether prior or subsequent to becoming a member, by his conduct while associated with a member, was a cause of any suspension, expulsion, or order of the character described in clause (A) or (B) which is in effect with respect to such member, and in entering such a suspension, expulsion, or order, the Commission or any such registered entity or association shall have jurisdiction to determine whether or not any person was a cause thereof . . . .

7 U.S.C. ¶ 21(b)(3)(C).[7]  In turn, NFA Bylaw 301(a)(ii)(D) states:

> "[N]o person shall be eligible to become or remain a Member or associated with a Member who:
>
> . . . .
>
> (D)    Whether before or after becoming a Member or associated with a Member, was, by the person's conduct while associated with a Member, a cause of any suspension, expulsion or order described in paragraphs (a)(ii)(A)-(C) above that was in effect with respect to the person . . . .

(ECF 50-4 at 1).[8]  Because NFA adopted Bylaw 301(a)(ii)(D) to track the language of §

---

[7] Sections 21(b)(3)(A) and (B), which are referenced in § 21(b)(3)(C), state:

(A) has been and is suspended or expelled from a registered futures association or from a registered entity or has been and is barred or suspended from being associated with all members of such association or from being associated with all members of such registered entity, for violation of any rule of such association or registered entity which prohibits any act or transaction constituting conduct inconsistent with just and equitable principles of trade, or requires any act the omission of which constitutes conduct inconsistent with just and equitable principles of trade;

(B) is subject to an order of the Commission denying, suspending, or revoking his registration pursuant to section 9 of this title, or expelling or suspending him from membership in a registered futures association or a registered entity, or barring or suspending him from being associated with a futures commission merchant.

7 U.S.C. § 21(b)(3)(A), (B).

[8] Bylaws 301(a)(ii)(A)-(C), which are referenced in Bylaw 301(a)(ii)(D), state:

(A) Has been and is suspended or expelled from a registered futures association or contract market for violating any rule of the association or contract market that:

(1) prohibits any act or transaction constituting conduct inconsistent with just and equitable principles of trade; or

(2) requires any act which, if omitted, constitutes conduct inconsistent with such principles;

(B) Has been and is barred or suspended from being associated with all members of a registered futures association or contract market for violating a rule described in paragraph (A) above;

21(b)(3)(C), the Court hereinafter in this Opinion and Order will simply refer to NFA's alleged failure to enforce Bylaw 301(a)(ii)(D), as the parties do in their briefs.

2. Troyer Contends That Heneghan Was "A Cause" of Statewide's "Expulsion"

Troyer claims that Heneghan mishandled client accounts at Statewide and participated in the manipulative trading practices that led NFA to discipline Statewide. (ECF 92 at 12-13). As such, Troyer contends that Heneghan was "a cause" of Statewide's purported "expulsion," and that NFA was required to immediately terminate Heneghan's NFA membership under Bylaw 301(a)(ii)(D) in connection with its disciplinary action against Statewide. (*Id.*)

NFA responds that Troyer's arguments in support of the first element of his CEA claim are critically flawed because NFA did not expel Statewide, but instead "reached an agreement" with Statewide that it would never reapply for NFA membership. (ECF 102 at 9). Specifically, in its decision on Statewide's disciplinary action issued on July 28, 2011, NFA states, in relevant part: "Statewide . . . submitted [an] Offer[] in which [it] neither admitted nor denied the allegations and proposed to settled the charges against [it] . . . [and] agreed that Statewide shall never reapply for NFA membership or act as a principal of an NFA Member, effective immediately." (ECF 92-18 at 2). NFA argues that the sanctions of expulsion and an agreement not to reapply cannot be conflated as Troyer seeks to do here, because CFTC has specifically held that the two sanctions are distinct. (ECF 102 at 9). NFA emphasizes that CFTC

---

(C) Is subject to an order of the Commission denying, suspending or revoking the person's registration under Section 6(b) of the Act; expelling or suspending the person from membership in a registered futures association or contract market; or barring or suspending the person from being associated with an FCM[.]

(ECF 50-4 at 1).

construction is binding on NFA and entitled to deference by this Court. (ECF 102 at 18); *see* 7

U.S.C. § 21; *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 987 (7th Cir. 2000) ("The

CFTC's construction of the CEA is entitled to *Chevron* deference." (citations omitted)).

In support of its argument, NFA cites *Peterson v. National Futures Ass'n*, CFTC No.

CRAA-91-1, 1992 WL 289773 (Oct. 7, 1992), in which Peterson had settled charges advanced

by the New York Mercantile Exchange ("NYMEX"), an exchange and SRO, that he had violated

certain exchange rules. *Id*. at *1-2. In the settlement, Peterson withdrew from NYMEX

membership and agreed never to reapply for NYMEX membership. *Id*. Peterson then applied

for CFTC registration, but NFA denied his registration application, concluding that there was

"no significant distinction between expulsion from an exchange and an agreement to a

permanent bar from exchange membership." *Id*. at *3. CFTC, however, reversed NFA's

decision, explaining that NFA's conflation of a permanent bar with an expulsion "fail[ed] to give

appropriate weight to the bargain struck by the parties to the NYMEX settlement." *Id*. CFTC

explained that "Peterson apparently bargained for a sanction that would not raise a presumption

of unfitness for registration or membership in NFA," and that NFA could not "in effect,

unilaterally rewrite the terms of the parties' agreement." *Id*.

Here, NFA claims that Troyer is advancing the exact argument that CFTC already

rejected in *Peterson*. (ECF 102 at 19). NFA asserts that *Peterson* dooms Troyer's CEA claim

because, as explained above, CFTC construction is binding on NFA and entitled to deference by

this Court. Troyer makes several responsive arguments to NFA, all attempting to establish that

NFA violated its own rule and bylaw. The Court will address each of Troyer's arguments in

turn.

### a. 17 C.F.R. § 3.33(f)(1) and NFA Registration Rule 601

First, Troyer cites 17 C.F.R. § 3.33(f)(1) and NFA Registration Rule 601(c)(1), which

provide that an NFA member firm cannot withdraw from NFA membership while the firm is

subject to a proceeding to suspend or revoke its registration.[9]  (ECF 104 at 3-8).  Based on this

regulation and rule, Troyer contends that once NFA initiated its action against Statewide on

December 9, 2010, Statewide could no longer voluntarily withdraw from NFA membership,

rendering NFA's purported distinction between an "expulsion" and a "voluntary withdrawal" a

meaningless fiction.  (*Id.*)

But Troyer's argument is misplaced.  NFA's complaint initiating disciplinary

proceedings against Statewide reflects that Statewide's withdrawal from NFA was "currently

pending" at the time NFA issued the complaint.  (ECF 103-25 ¶ 5).  Therefore, 17 C.F.R. §

3.33(f)(1) and NFA Registration Rule 601(c)(1) did not preclude Statewide from voluntarily

withdrawing its NFA membership.

In any event, as NFA points out and Troyer does not refute, NFA instituted a disciplinary

action against Statewide, not an action to suspend or revoke CFTC registration.  (*Id.* ¶ 1).  NFA's

Compliance Rules apply to disciplinary actions, while NFA's Registration Rules, such as

---

[9]  17 C.F.R. § 3.33(f)(1) states:

> (f) A request for withdrawal from registration will become effective on the
> thirtieth day after receipt of such request by the [NFA], or earlier upon written
> notice from the [NFA] (with the written concurrence of the Commission) of the
> granting of such request, unless prior to the effective date:
>
> > (1) The Commission or the [NFA] has instituted a proceeding to
> > suspend or revoke such registration.

The text of Registration Rule 601(c)(1) is substantially the same.  *See* NFA Registration Rules,
https://www.nfa.futures.org/rulebook/rules.aspx?RuleID=RULE%20601&Section=8 (last visited Sept. 26, 2019).

Registration Rule 601(c)(1), apply to actions to suspend or revoke a member's registration. *Compare* NFA Compliance Rules, https://www.nfa.futures.org/rulebook/rules.aspx ?Section=4 (last visited Sept. 26, 2019), *with* NFA Registration Rules, https://www.nfa.futures. org /rulebook/rules.aspx?Section=8 (last visited Sept. 26, 2019). NFA's complaint and decision in the Statewide action bolsters this point, as both of these documents specifically refer to Statewide having violated "NFA's Compliance Rules." (ECF 92-18; ECF 103-25). Therefore, contrary to Troyer's assertion, 17 C.F.R. § 3.33(f)(1) and NFA Registration Rule 601(c)(1) did not preclude Statewide from voluntarily withdrawing its NFA membership.

### b. Bylaw 301(a)(ii)(D)

Next, Troyer argues that regardless of whether Statewide was "expelled," NFA still violated Bylaw 301(a)(ii)(D) because in its decision dated July 28, 2011, NFA not only barred Statewide from reapplying for NFA membership, but also from "act[ing] as a principal of an NFA Member, effective immediately." (ECF 92-18 at 4). As Troyer's argument goes, because Heneghan was "a cause" of NFA barring Statewide from acting as a principal of an NFA member, NFA violated Bylaw 301(a)(ii)(D), which incorporates Bylaw 301(a)(ii)(B) by reference.[10] (ECF 104 at 7-8).

But Troyer's reading of Bylaw 301(a)(ii)(B) glosses over the distinction in the plain language of this bylaw and NFA's disciplinary decision concerning Statewide. Bylaw 301(a)(ii)(B) on its face pertains to a person who "[h]as been and is barred or suspended from being associated with *all* members of a registered futures association . . . ." (ECF 50-4 at 1 (emphasis added)). Here, however, NFA's disciplinary decision precluded Statewide from

---

[10] The text of Bylaw 301(a)(ii)(B) is set forth *supra* in footnote 8.

"act[ing] as a *principal* of an NFA Member." (ECF 92-18 at 4 (emphasis added)). Therefore,

NFA's decision as to Statewide does not fall within the type of actions identified in Bylaw

301(a)(ii)(B).

### c. The CFTC Interpretative Statement

Next, Troyer argues that on October 31, 1995, four years after it issued the *Peterson*

decision, CFTC amended Title 17 of the Code of Federal Regulations, Chapter 1, Appendix A to

Part 3, Interpretative Statement With Respect to Section 8A(2)(C) and (E) and Section 8A(3)(J)

and (M) of the [CEA] (the "Interpretative Statement") to insert the following language:

> Similarly, the Commission interprets paragraph (M) to authorize
> the Commission to refuse to register, register conditionally or
> otherwise affect the registration of any person if such person has
> consented, in connection with an agreement of settlement with a
> contract market, a registered futures association, or any other
> [SRO], to comply with an undertaking to withdraw all forms of
> existing or pending registration and/or not to apply for registration
> with the [NFA] or the Commission in any capacity. Such person's
> effort to violate his or her prior undertaking to withdraw from
> and/or not to apply for registration shall be considered to constitute
> "other good cause" under paragraph (M). The Commission
> believes that allowing such a person to be registered would be
> inappropriate and inconsistent with the intention of parties to the
> prior settlement agreement. The failure to withdraw or the attempt
> to register in the face of such an undertaking would indicate the
> lack of fair and honest dealing which the Commission believes
> constitutes "other good cause" for denying, revoking or
> conditioning registration under the Act. The Commission also
> believes that allowing registration in such a situation would be
> inconsistent with both Section 8a(2)(A), which authorizes the
> Commission to refuse to register, to register conditionally, or to
> revoke, suspend or place restrictions upon the registration of any
> person if such person's prior registration has been suspended (and
> the period of such suspension has not expired) or has been
> revoked, and Section 8a(3)(J), which authorizes the Commission to
> refuse to register or to register conditionally any person if he or she
> is subject to an outstanding order denying, suspending, or
> expelling such person from membership in a contract market, a

registered futures association, or any [SRO].

17 C.F.R. Pt. 3, App'x A.  Troyer contends that in issuing the Interpretative Statement, CFTC "effectively reversed" its position in *Peterson*, by concluding, in essence, that a permanent bar should be treated as equivalent to an expulsion in the application of § 8a(3)(J) of the CEA.  (ECF 104 at 9).

But the Interpretative Statement describes a scenario in which "other good cause" exists under § 8a(3)(M) of the CEA, because a person has violated "an undertaking to withdraw all forms of existing or pending registration and/or not to apply for registration" by failing to withdraw or later reapplying.  17 C.F.R. Pt. 3, App'x A.  Here, neither Peterson nor Statewide fall within the scope of the Interpretative Statement, as neither violated his or its respective agreement to withdraw membership and never reapply.  Rather, Peterson withdrew from NYMEX membership and then applied to be an NFA member, and Statewide withdrew from NFA membership and never reapplied.  Therefore, the Interpretative Statement does not effectively overrule *Peterson* and is distinguishable from the instant circumstances. Consequently, Troyer's third argument seeking to show that NFA violated Bylaw 301(a)(ii)(D) is unavailing.

### d.  NFA Bylaw 301(c)(iii)(A)

Finally, Troyer argues for the first time that NFA also violated NFA Bylaw 301(c)(iii)(A), which states:

> A person may be deemed disqualified to become or remain a Member or associated with a Member-
>
> . . . .
>
> (iii) If such person is permanently or temporarily enjoined

25

> by order, judgment, or decree of any court of competent jurisdiction, including an order entered pursuant to an agreement or settlement to which the Commission or any Federal or State agency or other governmental body is a party, from:
>
> > (A) acting as a futures commission merchant, introducing broker, floor broker, commodity trading advisor, commodity pool operator, leverage transaction merchant, associated person of any registrant under the Act, securities broker, securities dealer, municipal securities broker, municipal securities deal, transfer agent, clearing agency, securities information processor, investment adviser, investment company or affiliated person or employee of any of the foregoing . . . .

https://www.nfa.futures.org/rulebook/rules.aspx?Section=3&RuleID=Bylaw%20301 (last visited Sept. 26, 2019).  Troyer contends that NFA Bylaw 301(c)(iii)(A) permits NFA to treat an order permanently barring a person from NFA membership as the basis for disqualifying that person from NFA membership, even if the order was issued pursuant to a settlement agreement.  (ECF 104 at 8-11).

But again Troyer's argument overreaches.  NFA Bylaw 301(c)(iii) pertains to an order, judgment, or decree entered by *a court of competent jurisdiction*.  Here, there is no court order pertaining to Statewide, and therefore, NFA Bylaw 301(c)(iii) is inapplicable.  Consequently, Troyer's argument based on Bylaw 301(c)(iii) also fails.

In sum, under CFTC precedent, Statewide's voluntary withdrawal from NFA membership pursuant to a settlement agreement cannot be conflated with an expulsion as contemplated by NFA Bylaw 301(a)(ii)(D).  Nor is there a court order pertaining to Statewide as required by NFA Bylaw 301(c)(iii).  Consequently, even when viewing the facts in the light most favorable to Troyer, and affording him every reasonable inference, Troyer has not

established the first element of his CEA claim—that NFA violated its own rule or bylaw. As a result, Troyer's CEA claim fails at the outset, and summary judgment will be entered in NFA's favor.

While the Court could end its analysis here, for purposes of completeness the Court will go on to consider Troyer's other arguments.

### B. Acted in Bad Faith

Even if Troyer could establish the first element of his CEA claim—that NFA failed to enforce its own rule or bylaw, and the Court has concluded that Troyer has not—Troyer also has to show that NFA "acted in bad faith in failing to take action or in taking such action as was taken." 7 U.S.C. § 25(b)(2), (4). As to this second element, the parties disagree about whether Troyer must show that NFA acted negligently or whether a higher, more traditional bad-faith standard applies.

### 1. Applicable Legal Authority

The Seventh Circuit Court of Appeals in *Bosco v. Serhant* employed a dual standard when considering the term "bad faith" for purposes of 7 U.S.C. § 25(b)(4):

> [I]n the present setting, involving an exchange's failure to enforce its rule in accordance with the exchange's own interpretation, the courts, including our own, have treated the term "bad faith" as if it read "negligence."
>
> Thus, if an exchange's regulation imposes a duty that the exchange *should* know is being flouted, the exchange is acting wrongfully—in an attenuated sense, perhaps, but one sufficient under the cases we have cited to demonstrate bad faith. The test is different if the exchange injures a trader through the exercise of a discretionary power, such as the power to take emergency actions to prevent substantial losses; then more must be shown to constitute bad faith—either that the exchange acted unreasonably or that it had an improper motivation. Discretion implies latitude

for judgment, and commodity exchanges must not be deterred from exercising judgment by the prospect of heavy liability if they make a mistake.

Thus, in the present case, if the alleged bad faith were just the Mercantile Exchange's interpreting its rule to allow Serhant to place customer designation on orders shortly after rather than before or at the moment of execution, the higher standard for proving bad faith would be applicable. Interpretation is often, and was here, discretionary, and the Exchange's interpretation, while somewhat free, was not unreasonable, and there is no evidence of improper motivation. But with regard to Serhant's violations of Rule 536 (as interpreted by the Exchange), there was no scope for the exercise of discretion and hence no excuse (under the cases) for the Exchange's carelessness in ignoring evidence that such violations were being committed.

836 F.2d 271, 277-78 (7th Cir. 1987) (citations omitted); *see also In re Chi. Bd. Options Exch.*

*Volatility Index Manipulation Antitrust Litig.*, No. 18-cv-4171, 2019 WL 2289903, at *9-10

(N.D. Ill. May 29, 2019) (citing *Bosco*, 836 F.2d at 278); 79A C.J.S. *Securities* § 621 (Sept.

2019) ("Inaction has been regarded as in bad faith where an exchange should know that its

regulation is being flouted, but in the case of an exercise of discretionary power, an exchange

acts in bad faith only if it acts unreasonably or with improper motivation." (citing *Bosco*, 836

F.2d 271)).

2. The Parties' Positions Regarding "Bad Faith"

Troyer argues that NFA lacked any discretion under Bylaw 301(a)(ii)(D) to permit

Heneghan to remain a member once it learned that Heneghan had participated in the abusive

trading scheme that caused it to discipline Statewide. That is, Troyer contends that Bylaw

301(a)(ii)(D) *dictated* that NFA immediately terminate Heneghan's NFA membership.

Alternatively, Troyer argues that even if NFA had discretion to allow Heneghan to remain a

member, NFA's failure to terminate Heneghan's membership would still satisfy the heightened

standard of bad faith articulated in *Bosco,* because NFA repeatedly failed to take appropriate disciplinary action against Heneghan in response to multiple allegations and findings spanning several decades that Heneghan violated NFA's rules.  (*See* ECF 92 at 16-17).

NFA responds that its actions concerning Heneghan were discretionary in nature, and thus, require the more stringent bad-faith showing, which Troyer cannot satisfy.  NFA alternatively argues that even if a negligence standard applies, NFA was not negligent by following CFTC's regulatory directive in *Peterson* and subsequent interpretative guidance. (ECF 102 at 21-22).

### 3.  NFA's Duty to Enforce Bylaw 301(a)(ii)(D) Was Not Discretionary

Applying the Seventh Circuit's rule in *Bosco*, if NFA's actions were discretionary in nature, then Troyer must meet a heightened bad-faith standard by showing that NFA acted unreasonably or with an improper motivation in failing to enforce Bylaw 301(a)(ii)(D).  On the other hand, if NFA's actions were not discretionary in nature, Troyer could meet his standard of proof on the second element of his CEA claim by showing that NFA was merely negligent in failing to enforce Bylaw 301(a)(ii)(D).

Recently, in *In re Chicago Board Options Exchange Volatility Index Manipulation Antitrust Litigation*, the Northern District of Illinois addressed the nature of an exchange's duties when enforcing, versus interpreting, its own rules.  The court stated:  "While an exchange has discretion to *interpret* its own rules, where a market participant violates a rule—and the exchange knows (or should know) about the violation—the failure to enforce suggests wrongfulness.  2019 WL 2289903, at *10 (emphasis added) (citing *Bosco*, 836 F.2d at 278).  The court further observed:  "[The exchange] points to nothing in the text of Rules 601 or 603, or

elsewhere, showing that their *enforcement* is discretionary . . . ." *Id.* (emphasis added).

Similarly here, NFA points to nothing in the text of Bylaw 301(a)(ii)(D) that indicates NFA's enforcement of this bylaw is discretionary. (*See* ECF 102 at 23-27; ECF 106 at 13-15). Accordingly, following the guidance set forth in *Bosco* and *In re Chicago Board Options Exchange Volatility Index Manipulation Antitrust Litigation*, the Court concludes that NFA's duty to enforce Bylaw 301(a)(ii)(D) was not discretionary in nature. As a result, Troyer need only establish that NFA's failure to enforce Bylaw 301(a)(ii)(D) was due to negligence, rather than a heightened bad-faith standard.

### 4. NFA Was Not Negligent in Enforcing Bylaw 301(a)(ii)(D)

Troyer argues that NFA knew that Heneghan had participated in the abusive trading scheme that caused it to discipline Statewide in July 2011, and that because NFA lacked any discretion under Bylaw 301(a)(ii)(D) to permit Heneghan to remain a member, NFA acted in "bad faith" when it did not immediately terminate Heneghan's membership.[11] *See* 7 U.S.C. § 25(b)(4). In response, NFA reiterates its argument that it did not expel Statewide, which renders Bylaw 301(a)(ii)(D) inapplicable. As stated earlier, the Court has already agreed with NFA on

---

[11] Additionally, Troyer catalogs the other allegations and findings concerning Heneghan from 1985 to 2012 of which NFA was aware, including: (1) that several JCA customers in 1985 complained that Heneghan made material misrepresentations, used high pressure sales tactics, churned customer accounts, and performed unauthorized trading, resulting in customers losing thousands of dollars; (2) that Heneghan was telling potential PFG investors in 2000 that he had never had a customer complaint with CFTC or NFA; (3) that a Statewide customer complained in 2008 that Heneghan had made misleading sales solicitations and used high-pressure sales tactics; (4) that a Statewide customer complained in 2009 that Heneghan had made unauthorized trades on the customer's behalf in 2005; and (5) that an audit of ATC in June 2011 showed 95% of ATC's customers lost money in 2010 and two ATC principals, one of which was Heneghan, had worked for disciplined firms in the past, including Statewide. (*See* ECF 104 at 14).

But the actions that NFA took, or did not take, in response to the foregoing allegations and findings are not particularly relevant to Heneghan's sole claim in this case—that NFA failed to enforce Bylaw 301(a)(ii)(D) as to Heneghan in connection with its disciplinary action against Statewide on July 28, 2011—because they predate Heneghan's claim. At best, these prior allegations and findings are relevant to NFA's position that Heneghan was not "a cause" of Statewide's disciplinary action, as that term is used in Bylaw 301(a)(ii)(D).

this point *supra*, but for purposes of completeness, it will also consider NFA's other arguments.

First, NFA argues that because it followed CFTC binding authority in *Peterson*, it cannot have been negligent, because under *Peterson* it was not permitted to treat Statewide's voluntary agreement to withdraw as an expulsion. (*See* ECF 102 at 22-23 (citing *Collins v. BAC Home Loans Servicing LP*, 912 F. Supp. 2d 997, 1017 (D. Colo. 2012) (finding that lender's credit reporting was not negligent because it was in compliance with the Fair Credit Reporting Act))). As this Court observed earlier, NFA has discretion to *interpret* its Bylaw 301(a)(ii)(D), but it lacks discretion to enforce this bylaw. *See In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 2019 WL 2289903, at *9-10 (citing *Bosco*, 836 F.2d at 278).

Here, NFA focuses on its discretion to interpret the text of Bylaw 301(a)(ii)(D). *See generally Shultz v. S.E.C.*, 614 F.2d 561, 571 (7th Cir. 2980) ("[B]ecause these are rules of the Exchange, the Exchange should be allowed discretion in determining their meaning." (citations omitted)). NFA interprets the term "expel" in the text of Bylaw 301(a)(ii)(D) in accordance with CFTC authority in *Peterson*, reiterating that the bylaw is not triggered because Statewide voluntarily withdrew its membership. If the Court ought to give the CFTC interpretation deference, *see Commodity Trend Serv., Inc.*, 233 F.3d at 987, it would seem contradictory to hold NFA negligent for doing so. Accordingly, the Court agrees that NFA was not negligent in failing to enforce Bylaw 301(a)(ii)(D) where Statewide voluntarily withdrew from NFA membership.

Second, NFA emphasizes that it must exercise discretion in interpreting "a cause" as used in Bylaw 301(a)(ii)(D), because the term is not defined in NFA's rules or the CEA. (7 U.S.C. § 21; ECF 50-4 at 1). NFA, however, never really offers in its briefs an interpretation of "a cause"

as used in Bylaw 301(a)(ii)(D).  Instead, NFA emphasizes that its complaint against Statewide "makes clear that it was Statewide['s] principals and three of its APs (not including Heneghan) who were engaged in misconduct that resulted in disciplinary action."[12]  (ECF 106 at 12).

In connection therewith, NFA offers the affidavit of Daniel A. Driscoll, NFA's chief operating officer, in which Driscoll indicates that NFA's decision not to name Heneghan in the Statewide complaint reflects "NFA's exercise of prosecutorial discretion based on, for example, an evaluation of the quality of proof, such as witness testimony or documentary evidence, that NFA's enforcement attorneys might present to the independent hearing panel that would decide the case."  (ECF 103-19 ¶ 43; *see also id.* at ¶ 45).  This suggests that NFA's interpretation of "a cause" as used in Bylaw 301(a)(ii)(D) turns on the amount of evidence it gathers about that person's misconduct.  The obvious inference, then, is that after its audit of Statewide, NFA did not have enough evidence to conclude that Heneghan was "a cause" of Statewide's misconduct.

NFA also emphasizes that it is Troyer who bears the burden of producing sufficient evidence to establish that Heneghan was "a cause" of Statewide's disciplinary action, and argues that Troyer has not carried that burden here.  In an effort to show that Heneghan was "a cause" of Statewide's disciplinary action, Troyer points to two documents:  (1) a spreadsheet that includes several of Heneghan's customers accounts, which NFA introduced as a trial exhibit during its prosecution of Statewide to support its allegation that 95% of Statewide's customers lost money in 2009 (ECF 92-12; ECF 92-13); and (2) NFA's complaint against Statewide, which alleged that "the trade recommendations that Statewide's APs made to their customers were not

---

[12] At the same time, NFA concedes that the fact that NFA did not specifically name Heneghan in the Statewide complaint is not proof that Heneghan was uninvolved in Statewide's deceptive practices.  (*See* ECF 106 at 12).

in the customers' best interest and were intended, instead, to benefit Statewide by generating high commissions"; and Statewide's APs "routinely recommended option and bull call option spreads to customers that had little chance of being profitable due to their high break even points." (ECF 92 at 12-13 (citing ECF 92-11 ¶¶ 17, 18)). In producing this evidence, Troyer emphasizes that the plain language of Bylaw 301(a)(ii)(D) requires only that the person be "a cause" of another NFA member's expulsion, not the "sole" or "primary" cause. (ECF 92 at 13).

In connection with these two documents, Troyer speculates that NFA's decision to name two principals and three APs of Statewide in its complaint, but not Heneghan, had more to do with the fact that Heneghan was no longer associated with Statewide when NFA conducted its audit.[13] (*Id.*). "[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion." *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). In any event, Troyer's proffered reasoning on this point quickly breaks down, as he does not account for the fact that NFA also chose not to name 13 other Statewide APs in the complaint, some of whom presumably were still associated with Statewide at the time.

Ultimately, the record produced by *either* party is rather thin on the issue of whether Heneghan was "a cause" of Statewide's disciplinary action. As a result, on this record, when viewing the two documents that Troyer produced in the light most favorable to Troyer, and affording him every reasonable inference, a reasonable factfinder could conclude that Heneghan was "a cause" of Statewide's disciplinary action as the term is used in Bylaw 301(a)(ii)(D). At

---

[13] Troyer cites to an internal memo to file drafted by Mark Arnold of NFA on February 9, 2011, while its action against Statewide was pending. (*Id.* at 13-14 (citing ECF 92-16)). In the memo, Arnold notes that two out of three APs at ATC (one of which was Heneghan) were previously associated with Statewide, and that ATC may be tempted to engage in certain actions to avoid enhanced supervision requirements once Statewide was disciplined. (*Id.* (citing ECF 92-16)). Troyer contends that this memo reflects Arnold's assumption that Heneghan and the other AP would indeed be disciplined for their involvement in Statewide's manipulative trading practices. (*Id.*)

the same time, in light of NFA's election not to name Heneghan in the Statewide complaint, a reasonable factfinder could conclude the opposite—that the evidence of record is insufficient to show that Heneghan was "a cause" of Statewide's disciplinary action as the term is used in Bylaw 301(a)(ii)(D). Consequently, if the outcome of Troyer's CEA claim hinged on determining whether Heneghan was "a cause" of Statewide's disciplinary action, such determination would best be left to the factfinder after further development of the record.

But as already explained above, the outcome of Troyer's CEA claim is not reliant on whether Heneghan was "a cause" of NFA's disciplinary action against Statewide. Even if Heneghan was "a cause" of NFA's disciplinary action against Statewide, NFA was not negligent in allowing Heneghan to remain an NFA member where Statewide voluntarily withdrew its membership and agreed never to act as a principal of an NFA member. (*See* ECF 92-18 at 4). Because NFA was not negligent in failing to enforce Bylaw 301(a)(ii)(D), NFA did not act in "bad faith" as that term is used in 7 U.S.C. § (b)(4), by failing to terminate Heneghan's membership after it took disciplinary action against Statewide. Therefore, Troyer has not established the second element of his CEA claim, offering an additional basis for the entry of summary judgment in NFA's favor.

### C. Whether Heneghan Caused Troyer's Losses

Even if Troyer could establish the first two elements of his CEA claim, which the Court has already concluded he has not, he must also show that NFA's failure to comply with Bylaw 301(a)(ii)(D) caused his losses. 7 U.S.C. § 25(b)(2), (4). To that end, Troyer contends that "but for" NFA's failure to comply with Bylaw 301(a)(ii)(D) and terminate Heneghan's membership, Heneghan would not have solicited trades in commodities futures from Troyer, and Troyer

34

would not have sustained the losses.  (ECF 104 at 15).

Troyer's proffered standard of causation, however, is truncated.  The proper standard to apply in this context is proximate causation because the CFTC's interpretation of the CEA deference must be afforded deference.  *See Belom v. NFA*, No. 01 C 3951, 2001 WL 1098046, at *3 (N.D. Ill. Sept. 17, 2001) (acknowledging that *Chevron's* rule requires deference to the CFTC's interpretation of its regulations (citing *Geldermann, Inc. v. CFTC*, 836 F.2d 310, 315-16 (7th Cir. 1987); *R.J. O'Brien Assocs., Inc. v. Pipkin*, No. 93 C 3154, 1994 WL 96649, at *3 (N.D. Ill. Mar. 23, 1994))).

That is, Troyer must show that NFA's failure to comply with its own rule or bylaw "proximately caused the injury."  *Peter Beck v. Bjorn Henry Jonasson*, CFTC No. 08-R027, 2009 WL 290970, at *3 (Feb. 4. 2009) (citation omitted); *see James Muniz v. Arthur D. Lassila, E.F. Hutton & Co., Inc., Computerized Portfolio Mgmt., Co. Commodities Mgmt. Corp. & I.C.S.C., Inc.*, CFTC No. 87-R-395, 1992 WL 10629, at *6 (Jan. 17, 1992) (finding that there must be a cause-and-effect relationship between a violation of the CEA and the damages claimed in reparations).  "Proximate causation generally requires evidence that a defendant's conduct was not only the 'but for' cause of a plaintiff's damages, but also a 'substantial factor' in bringing about such damages."  *S & A Farms, Inc. v. Farms.com, Inc.*, 862 F. Supp. 2d 898, 908 (S.D. Iowa 2011), *aff'd*, 678 F.3d 949 (8th Cir. 2012) ("While Plaintiff has arguably demonstrated 'but-for' causation by alleging that it would not have contracted with Defendant had it known Defendant was not registered as a [commodity trading advisor], it has failed to demonstrate that Defendant's failure to register was a 'substantial factor' in bringing about the Plaintiff's loss.").

At the outset, Troyer's assertion that NFA's failure to comply with Bylaw 301(a)(ii)(D) caused the approximately $160,000 in losses he sustained from October 2008 to March 2011 fails. These losses preceded NFA's decision on July 28, 2011, to impose disciplinary action on Statewide, which Troyer contends triggered NFA's duty to terminate Heneghan's membership under Bylaw 301(a)(ii)(D). (*See* ECF 92-18). An "inescapable rule of causality [is] that a cause must precede its effect." *Billhofer v. Flamel Techs., SA*, 663 F. Supp. 2d 288, 297 (S.D.N.Y. 2009); *see Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d. Cir. 1984) ("An effect never precedes its cause.").

Troyer's assertion that NFA's failure to terminate Heneghan's membership caused the approximately $82,000 in losses Troyer sustained from April 2013 to April 2015, too, is unpersuasive. "[T]he mere fact that an advisor is required to be registered, but is not, does not naturally, proximately, and foreseeably support a belief that an investor will be financially damaged by relying on the unregistered advisor's advice." *S & A Farms, Inc*., 862 F. Supp. 2d at 910. On this record, no reasonable factfinder could conclude that Troyer's investment of funds through Heneghan hinged upon Heneghan's status as an NFA member or Heneghan's association with an NFA firm. Rather, Troyer testified that he invested with Heneghan because Heneghan was "very convincing" (ECF 103-4 at 48-49), and that Troyer "didn't think it mattered which firm [Heneghan] was at" (*id.* at 33). So much so, that from 2013 to 2015, Troyer wrote checks to Heneghan personally and communicated with Heneghan through Heneghan's personal email account. Despite what Troyer admits were "red flag[s]" (*id.* at 19), Troyer continued to send money to Heneghan, and at no point did Troyer investigate Heneghan's NFA membership status through online research or otherwise. (*Id.* at 19, 22, 24-26, 30-34).

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation omitted). When viewing the facts in the light most favorable to Troyer, Troyer has failed to put forth sufficient evidence upon which a reasonable factfinder could infer that NFA's failure to terminate Heneghan's NFA membership after July 28, 2011, proximately caused Troyer's losses. As such, Troyer's failure to establish the third element of his CEA claim—that NFA's "failure or action caused the loss," 7 U.S.C. § 25(b)(2), (4)—warrants additional grounds for the entry of summary judgment in NFA's favor.

### D. Whether Troyer's Claim Is Barred by the Statute of Limitations

Finally, NFA argues that Troyer's CEA claim is time-barred under the applicable statute of limitations. For the following reasons, NFA's statute-of-limitations argument has merit, but only in part.

Claims under the CEA have a two-year statute of limitations. 7 U.S.C. § 25(c); *see also Stephan v. Goldinger*, 325 F.3d 874, 876 (7th Cir. 2003); *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991); *Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 846 (N.D. Ill. 2009). "The proper standard for determining the commencement of the limitations period is when the plaintiff knew or in the exercise of reasonable diligence should have known of defendant's conduct." *Dyer*, 928 F.2d at 240 (citations omitted). "It is well established that a plaintiff may not merely rely on his own unawareness of the facts or law to toll the statute." *Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir. 1974) (citations omitted).

"The plaintiff, rather, has the burden of showing that he exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Id.* (citation and internal quotation marks omitted). "The statutory period [does] not await [a plaintiff's] leisurely

discovery of the full details of the alleged scheme." *Id.* (first alteration in original) (citation and internal quotation marks omitted). "The statute of limitations begins to run upon injury (or, as is standardly the case with federal claims, upon discovery of the injury), and is not tolled by subsequent injuries." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008) (citations omitted).

NFA argues that all the elements of Troyer's claim were fixed by April 2013—the first time that Troyer lost investment funds after NFA's alleged failure to expel Heneghan. (ECF 102 at 29-30). Thus, NFA contends that Troyer had until April 2015 to file this action but failed to do so, as he filed this suit on May 9, 2016. (ECF 1). NFA cites the following evidence in support of this premise: (1) no later than April 2011 Troyer was aware of Heneghan's association with Statewide from 2007 to 2010, because Troyer received monthly investment statements from Statewide during that period; (2) NFA's complaint against Statewide was posted on NFA's website no later than July 2011; and (3) Troyer testified that he was never completely comfortable with writing checks to Heneghan personally between April 2013 and April 2015, and that he believed Heneghan was lying to him about the value of his investments. (ECF 102 at 29-30). NFA emphasizes the fact that Troyer continued to experience investment losses after April 2013 does not toll the running of the statute of limitations.

First, as already explained above, Troyer cannot recover for his losses from 2008 through 2011 because his CEA claim stems from NFA's alleged violation of Bylaw 301(a)(ii)(D) on or about July 28, 2011. *See Billhofer*, 663 F. Supp. 2d at 297. And to the extent that Troyer attempts to expand the basis of his claim to include NFA's purported failure to enforce certain compliance rules against Heneghan from 1985 to 2012 (*see* ECF 92 at 16-20), that too lacks

38

traction.[14]  A plaintiff "may not amend his complaint through arguments in his brief in

opposition to a motion for summary judgment."  *Shanahan v. City of Chicago*, 82 F.3d 776, 781

(7th Cir. 1996) (citation omitted).  In any event, Troyer testified that he knew by March 2011

that he had lost approximately 80% of the $160,000 he had invested through Heneghan by that

time, so much so that he did not invest with Heneghan for the next two years—that is, from April

2011 to April 2013.  (ECF 103-4 at 42-46).

"A plaintiff does not need to know that his injury is actionable to trigger the statute of

limitations—the focus is on the discovery of the harm itself, not the discovery of the elements

that make up a claim."  *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674

(7th Cir. 2009) (citation omitted); *accord Tomlinson*, 682 F. Supp. 2d at 847.  "At the very least,

these [losses from 2008 to 2011] should have aroused suspicion or curiosity on the part of

[Troyer]" to investigate the representations that Heneghan made to him.  *Hupp*, 500 F.2d at 996-

97 (citation omitted).  Therefore, Troyer's claim for his losses from October 2008 to March 2011

is time-barred.

NFA's assertion that Troyer's *entire* CEA claim is time-barred, however, overreaches.

Following a two-year hiatus where he did not invest any money through Heneghan, Troyer

began to send money to Heneghan personally in April 2013, allegedly so that Troyer could

benefit from Heneghan's discounted fees as a trading firm employee.  Troyer's testimony

reflects that it was "towards the end of" the 2013 to 2015 time period when he became

---

[14] In his operative complaint, Heneghan based his CEA claim on NFA's alleged failure to enforce Bylaw 301(a)(ii)(D) when it did not terminate Heneghan's membership in connection with taking disciplinary action against Statewide in July 2011.  (*See* ECF 46).  But in his brief in support of his motion for summary judgment, Troyer seemingly attempts to expand the basis of his claim to include NFA's purported failure to enforce certain compliance rules against Heneghan from 1985 to 2012.  (*See* ECF 92 at 16-20).

suspicious of Heneghan, *after* Heneghan told Troyer that he had made a large amount of money

on one investment and such amount kept "climbing and climbing and climbing" every few days,

to the point that "it was pretty much an unbelievable number." (ECF 103-4 at 52-54). Troyer

then "called [Heneghan's] bluff" and told Heneghan to "cash out of that and send [him] the

money," stating "that's when all hell broke loose between he and I." (*Id.* at 53). Therefore, on

this record, a reasonable factfinder could only conclude that it was "towards the end of" the 2013

to 2015 time period when the statute of limitations began to run on the losses Troyer incurred

from 2013 to 2015, which makes Troyer's filing of this suit on May 8, 2016, timely.[15]

    In sum, by March 2011, Troyer had learned of his claim for the losses he incurred from

2008 to 2011, and thus, those losses are time-barred under the CEA's two-year statute of

limitations. Furthermore, Troyer's CEA claim is based on NFA's purported violation of Bylaw

301(a)(ii)(D), which occurred on or about July 28, 2011. Therefore, as a matter of law, Troyer's

losses preceding that date cannot serve as the basis for his claim, offering yet another basis to

enter summary judgment in NFA's favor on Troyer's claim for these losses. In contrast,

Troyer's claim for losses from April 2013 to April 2015 was timely filed under the two-year

statute of limitations, because Troyer discovered Heneghan's alleged misconduct toward the end

of that two-year period.

    However, despite Troyer's timely filing for his 2013 to 2015 losses, for the reasons

---

[15] NFA also argues that Troyer should have earlier discovered his claim against NFA by investigating NFA's website, because the Statewide complaint was posted there in July 2011. But by that time, Troyer was no longer investing funds through Statewide, Heneghan was no longer associated with Statewide, and the Statewide complaint did not name Heneghan. Therefore, this information might reasonably have led Troyer to discover a cause of action for his losses from 2008 to 2011 while Heneghan was associated with Statewide, but not for Troyer's losses from 2013 to 2015 when Troyer no longer had any connection to Statewide. Furthermore, as Troyer points out, NFA's online profile of Heneghan reflects only one regulatory action taken against Heneghan in March 2016, so researching Heneghan's disciplinary history through NFA's website would have been futile. (ECF 104-6; ECF 104-7).

already explained *supra*, no reasonable factfinder could find in Troyer's favor on his CEA claim for these losses. Even when viewing the facts in the light most favorable to Troyer, and affording him every reasonable inference, Troyer fails to establish any, much less all, of the three elements of his CEA claim. Consequently, Troyer's CEA claim fails as a matter of law, and summary judgment will be entered in favor of NFA and against Troyer.

### IV. CONCLUSION

For the foregoing reasons, NFA's motion for summary judgment (ECF 101) is GRANTED, and Troyer's motion for summary judgment (ECF 91) is DENIED. The Clerk is DIRECTED to enter a judgment in favor of NFA and against Troyer.

SO ORDERED.

Entered this 26th day of September 2019.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge